GARY M. RESTAINO
United States Attorney
District of Arizona
DENISE ANN FAULK
Assistant U.S. Attorney
State Bar No. 12700
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: (520) 620-7300
Email: denise.faulk@usdoj.gov
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Merrick Garland, et al.,<br><br>　　　　Defendants. | CV-22-00212-TUC-RM<br><br>**DEFENDANTS' RESPONSE TO MOTION FOR PRELIMARY INJUNCTION** |

Defendants Garland, Carvajal and Colbert,[1] acting in their official capacity by and through undersigned counsel, respond to Plaintiff's Motion for Preliminary Injunction (Doc. 7). For the reasons discussed below, Defendants request that the Court deny the Motion.

**I.　　Background**

　　**A.　　Plaintiff Keith Raniere**

A jury convicted Plaintiff Keith Raniere of Racketeering, Racketeering Conspiracy, Forced Labor Conspiracy, Wire Fraud Conspiracy, Sex Trafficking, Attempted Sex Trafficking and Sex Trafficking Conspiracy. (Ex. A, Flores Decl., ¶ 4, Att. 1, SENTRY Public Information, pp. 2-4; Att. 2, Judgment, pp. 1-4.) Plaintiff was sentenced to 120 years in prison. (*Id.*) Plaintiff's sentencing judge specifically ordered that Plaintiff "shall not associate in person, through mail, electronic mail or telephone with any individual *with an affiliation to* Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated

---

[1] Barbara von Blanckensee is no longer the warden at USP Tucson. The current acting warden, Danon Colbert, is substituted in her place pursuant to Rule 25, Fed. R. Civ. P.

organizations."  (Ex. A, ¶ 5, Att. 2, p. 9.)  (Emphasis added.)

### B. Suneel Chakravorty

#### 1. Sentencing Memorandum

Between the jury's verdict and the court's sentence, Plaintiff continued to regularly contact people affiliated with NXIVM, including Suneel Chakravorty, and the government informed the judge of that fact in its sentencing memorandum.  *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS, Dkt. 914 (E.D. N.Y. August 27, 2020).[2]  The government noted that "in a March 12, 2020 call with Suneel Chakravorty, one of Raniere's supporters, [Plaintiff] addressed his conduct with respect to [a victim], stating that she 'would have to go back to Mexico or she had to explain to people how she was going to stop from all the stealing and the other things that she was doing.  She also had to finish a book report.  She had a number of different book reports she was supposed to do and she was seen as being very prideful about it and no matter what, she would do anything, you know, say anything, but never just sit down and simply finish the book report.' [Dkt. 914-3 at 22.[3]] [Ex. C, p. 22.]  [Plaintiff] described [the victim] as engaging him a 'battle of wills' and who 'threw, like, uh, what would be a massive sort of tantrum.'  [Dkt. 914-3 at 23.] [Ex. C, p. 23.]"  Dkt. 914 at 52-53.  (Ex. B, pp. 52-53.)

The government also informed the court that "[i]n addition, [Plaintiff] has demonstrated a disregard for the law and for the system of justice.  In many phone calls with Mr. Chakravorty, [Plaintiff] expresses contempt for the prosecution and the Court.  For instance, during an April 8, 2020 phone call with Mr. Chakravorty, [Plaintiff] stated that 'the major witnesses all lied' and expressed his view that 'this judge' – referring to the Court – was corrupt.  [Dkt. 914-3 at 44.]  [Ex. C, p. 44.]  [Plaintiff] further stated that they had to 'get scrutiny on this judge, get some pundit who is willing to speak out about what this judge is saying, which is crazy, and the judge needs to know he's being watched . . . .'  [Dkt. 914-3 at 53.] [Ex. C, p. 53.]"  Dkt. 914 at 53-54.  (Ex. B, pp. 53-54.)

---

[2] A copy of the Sentencing Memorandum is attached hereto as Exhibit B.
[3] A copy of Exhibit D to the Sentencing Memorandum is attached hereto as Exhibit C.

The Bureau of Prisons (Bureau) suspended calls between Plaintiff and Mr. Chakravorty in July 2020, and, thereafter, Plaintiff "entered an individual [to his contact list] under the name 'Issac Edwards.' The address provided by [Plaintiff] for 'Issac Edwards' is fabricated and the phone number provided by [Plaintiff] for 'Issac Edwards' belongs to a burner phone. Subsequent calls between [Plaintiff] and 'Issac Edwards' reflect that 'Issac Edwards' is Mr. Chakravorty." Dkt. 914 at 56 n. 14. (Ex. B, p. 56.)

Plaintiff "also directed his supporters to develop a podcast and to set up a 'contest' in which members of the public would be invited to find purported errors in [his] prosecution and trial in exchange for a cash prize. In many phone calls, Mr. Chakravorty describes his efforts to find 'judges' – i.e., members of the public – to evaluate submissions for the contest and 'check[] the prosecutor's homework.'" [Dkt. 914-3 at 50.] [Ex. C, p. 50.]; see, e.g., [Dkt. 914-3 at 25, 43.] [Ex. C, p. 25, 43.]" Dkt. 914 at 54. (Ex. B, p. 54.) Also, "[i]n subsequent calls, [Plaintiff] offers lengthy diatribes on the criminal justice system for Mr. Chakravorty to record, similar to the 'verbal downloads' that were described at [his] trial." Dkt. 914 at 54. (Ex. B, p. 54.)

Plaintiff recognized that Mr. Chakravorty's communications with Plaintiff's attorney were not protected by the attorney client privilege. On April 24, 2020, Plaintiff stated to Mr. Chakravorty: "Right. We have 10 seconds. You may want to somehow become his client, so you'll have attorney client privilege. But I mentioned that in an email to him just a few minutes ago." Dkt. 914-3 at 64. (Ex. C, p. 64.)

**2. Bureau Records on Mr. Chakravorty from New York**

As early as July 16, 2020, the Bureau recognized that Plaintiff and Mr. Chakravorty were engaging in behavior that compromised the security of the facility in which Plaintiff was held. (Ex. D, Gallion Decl., ¶ 5, Att. 2, CTU Memo.) Specifically, Plaintiff and Mr. Chakravorty were recording prison-initiated telephone calls to use in podcasts and "interviews [Plaintiff] is pursuing to use in HBO, Netflix and Showtime." (*Id.*) Additionally, they were endangering the security of the facility and the public by organizing "a group of women to show up regularly and dance provocatively for inmates to view

through their cell windows." (*Id.*)  Plaintiff "directed Suneel [Chakravorty] to contact more women" to "danc[e] erotically" which led to a request for Plaintiff to be moved to another housing unit. (*Id.*)  Plaintiff also informed Mr. Chakravorty about "the staff work schedules and indicated his protesters should wait outside for the staff and offer donuts and coffee as they exit the facility." (*Id.*) (internal quotation marks omitted).

The Counter Terrorism Unit (CTU) concluded, "[Plaintiff's] manipulative behavior continues to manifest from behind the prison through the help of Suneel Chakravorty. [Plaintiff's] actions would place the safety and security of staff and the public at risk." (*Id.*)  The CTU recommended that Mr. Chakravorty be removed as one of Plaintiff's approved contacts. (*Id.*)  The Warden concurred, and Mr. Chakravoty was removed from Plaintiff's approved contact list. (Ex. D, ¶ 8, Att. 3, Warden Approval E-Mail, p. 1.)

### 3. Mr. Chakavorty's Representations to the New York District Court

On November 28, 2021, Mr. Chakravorty wrote to the district court judge presiding over *Edmonson v. Raniere*, Case 1:20-cv-00485-EK-CLP (E.D. N.Y.), a civil action brought by some of Plaintiff's victims.  Mr. Chakravorty clearly identified himself as holding Plaintiff's power of attorney, not as a paralegal *working for* Plaintiff's attorneys.  *Id.* at Dkt. 123.[4]  He indicated that he would "request a transcript of the hearing and have Mr. Raniere's criminal attorney send it to him." *Id.*  The letter is not on an attorney's letterhead. *Id.*

Similarly, on October 30, 2021, Mr. Chakravorty wrote to the court in the same case, identifying himself as "not a party to this case, nor am I an attorney.  I am defendant Keith Raniere's power of attorney." *Id.* at Dkt. 121.[5]  He further indicated that "as Mr. Raniere's power of attorney, [he had] referred cyber forensics experts to his criminal counsel." *Id.*  Again, the letter is not on an attorney's letterhead. *Id.*

### C. Restrictions on Mr. Chakravorty at USP Tucson
#### 1. Bureau Policies on Visitation and Telephone Privileges

As to inmate friends and associates, "[t]he visiting privilege ordinarily will be

---

[4] A copy of the letter is attached hereto as Exhibit E.
[5] A copy of the letter is attached hereto as Exhibit F.

extended to friends and associates having an established relationship with the inmate prior to confinement, *unless such visits could reasonably create a threat to the security and good order of the institution*.  Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, *when it is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution*."  28 C.F.R. § 540.44(c).  (Emphasis added.)  "Regardless of the institution's security level, the inmate must have known the proposed visitor(s) prior to incarceration.[6]  The Warden must approve any exception to this requirement."  P.S. 5267.09, *Visiting Regulations,* p. 6.[7]  (Ex. D, ¶ 9.)

      "Use of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate."  P.S. 4500.12, Trust Fund/Deposit Fund Manual*,* p. 126.[8]  (Ex. D, ¶ 12.)  "Inmates may be subject to telephone restrictions imposed by the Warden to protect the safety, security, and good order of the institution, as well as to protect the public."  P.S. 5264.08, Inmate Telephone Regulations*,* p. 14.[9]  (Ex. D, ¶ 13.)

      "The Bureau of Prisons recognizes the use of assistants by attorneys to perform legal tasks and, with proper controls and exceptions enumerated . . . accords such assistants the same status as attorneys with respect to visiting and correspondence."  28 C.F.R. § 543.16(a).  "The special visiting/correspondence status accorded to paralegals, clerks, and legal assistants depends on an ongoing, supervisory relationship with an attorney on an approved visiting/correspondence list.  Absent any current supervisory relationship, such persons may only receive social visiting or general correspondence privileges."  P.S. 1315.07, *Inmate*

---

[6] The Supreme Court approved a similar regulation in *Pell v. Procunier*, 417 U.S. 817, 827 (1974), because "[i]n the judgment of the state corrections officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compromise institutional security.  Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

[7] Available at https://www.bop.gov/policy/progstat/5267_09.pdf (last visited on May 27, 2022).

[8] Available at https://www.bop.gov/policy/progstat/4500.12.pdf (last visited on May 27, 2022).

[9] Available at https://www.bop.gov/policy/progstat/5264_008.pdf (last visited on May 27, 2022).

*Legal Activities*, p. 19.[10]  (Ex. A, ¶ 6.)

"The attorney who employs an assistant and who wishes the assistant to visit or correspond with an inmate on legal matters shall provide the Warden with a signed statement including: (1) Certification of the assistant's ability to perform in this role and awareness of the responsibility of this position; (2) A pledge to supervise the assistant's activities; and (3) Acceptance of personal and professional responsibility for all acts of the assistant which may affect the institution, its inmates, and staff.  The Warden may require each assistant to fill out and sign a personal history statement and a pledge to abide by Bureau regulations and institution guidelines.  If necessary to maintain security and good order in the institution, the Warden may prohibit a legal assistant from visiting or corresponding with an inmate."  28 C.F.R. § 543.16(b)(1)-(3).  "The Warden may require each paralegal, clerk, or legal assistant to complete a BP-S243.013" Application to Enter Institution as Representative form[11] as well as the BP-S242.013 Paralegal or Legal Assistant Agreement form.[12]  P.S.1315.07, *Inmate Legal Activities,* pp. 18-19.[13]  (Ex. A, ¶ 7.)

### 2.     Mr. Chakravorty at USP Tucson

On May 2, 2021, Mr. Chakravorty's visiting privileges were denied as the "prospective visitor/applicant did not have an established relationship with [Plaintiff] prior to [his] incarceration."  (Ex. D, ¶ 10, Att. 4, Visitor Denial Notice.)  In October 2020, Mr. Chakravorty had admitted to the New York District Court that his "first conversation with Keith Raniere was in prison, after his trial.  At this time, he and I were complete strangers."  (Ex. D, ¶ 11, Att. 5, Sentencing Court Documents Excerpt, p. 1.)  Mr. Chakravorty also detailed his involvement with NXIVM, as a coach for Executive Success Programs (ESP) and NXIVM, and his decision to "stay involved even during an international media storm.

---

[10] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on May 27, 2022).
[11] Available at https://www.bop.gov/policy/forms/BP_A0243.pdf (last visited on May 27, 2022)
[12] Available at https://www.bop.gov/policy/forms/BP_A0242.pdf (last visited on May 27, 2022).
[13] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on May 27, 2022).

To me, ESP did not seem like a sinister organization[,]" and "that is why I chose to continue as a coach up u[n]til the companies closed in May 2018." (*Id.* pp. 2-4.)

In early May 2022, the SIS Department at USP Tucson was monitoring telephone calls between Plaintiff and Mr. Chakravorty. (Ex. D, ¶ 14.) They spoke to each other about being "at war" with the federal government that would be "no holds barred." Even more concerning than this language of being "at war," Plaintiff asked about the quality of the recordings and stated that he has many recordings. As indicated above, Mr. Chakravorty previously recorded telephone conversations with Plaintiff while he was incarcerated in New York. (*Id.*) The CTU recommended that the USP Tucson SIS Department remove all of Plaintiff's current contacts and review all future contact requests. (*Id.*) The SIS Department may determine whether any requested individuals are affiliated with NXIVM, ESP, DOS or any other NXIVM-affiliated organizations, as prohibited by the special conditions of supervised release in the Judgment. (Ex. D, Att. 6, Judgment, p. 9.) If it is dangerous for Plaintiff to have access to particular individuals once released, it is also a security risk to allow Plaintiff to have access to these same individuals while incarcerated. (Ex. D, ¶ 16.)

On May 3, 2022, as a result of the findings of the SIS Department and in consultation with the CTU, the USP Tucson Warden imposed limitations on Plaintiff's contact list. (Ex. D, ¶ 15, Att. 7, Service Limitation Notice.) Plaintiff was limited to a maximum of ten active contacts, not including counsel. (*Id*). His then current contacts were removed, except Marianna Fernandez and nine verified attorneys. (*Id.*, Att. 8, TRULINCS Active Contact List (Redacted), pp. 1-3.) In the future, if Plaintiff wants to add more contacts to his approved TRULINCS list, the SIS Department will review the individuals as part of the approval process. (Ex. D, ¶ 18.) As of May 31, 2022, Plaintiff had not requested that additional individuals be added to his approved TRULINCS contact list. (*Id.*)

The limitations on Plaintiff's contact list do not impede Plaintiff's access to his attorneys via legal mail, legal calls and legal visits. (Ex. D, ¶ 17.) Plaintiff may still access his attorneys through these confidential lines of communication. (*Id.*) In addition to the numerous legal calls, Plaintiff has had "frequent legal visits." (Ex. A, ¶ 15.) His second this

week is scheduled for today.

When the restrictions were imposed, Acting SIA Gallion was not aware of Plaintiff's litigation regarding his New York conviction and sentence. All recommendations and determinations made, as reflected above, were made for the safety, security and good order of the institution and not in any way to hinder Plaintiff's legal efforts. (Ex. D, ¶ 19.)

### D.   First Amended Complaint

On May 6, 2022, Plaintiff filed the First Amended Complaint (FAC) alleging that the Bureau was interfering with his First and Sixth Amendment rights.[14] (Doc. 3.) Specifically, Plaintiff alleged that on that same day "Defendants interfered and frustrated that legal call by, among other things, causing the phone call to be cut off before Plaintiff and [attorney] Dougherty had concluded their conversation." (*Id.* at 6.) Plaintiff also alleged that "[o]n May 4, 2022, Plaintiff was on a privileged legal call with attorney Tully, when the call was apparently terminated prematurely, and without warning." (*Id.* at 5.) Plaintiff alleged that Mr. Tully anticipated that the judge in Plaintiff's New York criminal case would set a hearing on a Rule 33 motion he filed on May 3, 2022, and that Mr. Tully needed to consult with Plaintiff to prepare for the hearing. (*Id.*) Plaintiff also alleged that on April 28, 2022, Mr. Tully had requested the Second Circuit to stay Plaintiff's appeal from his criminal conviction pending a ruling on the Rule 33 motion. (*Id.* at 4.) The FAC did not include any allegations that Mr. Tully needed to confer with Plaintiff in order to file a different Rule 33 motion before a June 19, 2022, deadline. (Doc. 3, generally.)

### E.   Second Circuit and New York District Court Rulings

On April 29, 2022, the Second Circuit denied Plaintiff's April 28, 2022, motion to

---

[14] In his FAC, Plaintiff recognized that he failed to exhaust administrative remedies prior to filing suit. (Doc. 3 at 9.) The record is clear that administrative remedies are available at USP Tucson, that Plaintiff is aware of how to use the administrative remedy process, that administrative remedy forms were available to him and that he failed to file any administrative remedies relating to issues underlying the FAC or the Motion for Preliminary Injunction. (Ex. A, ¶¶ 18-32, Att. 5, USP Tucson Inmate A&O Handbook Excerpt (Jan. 2017); Att. 6, TCX 1330.18B, *Administrative Remedy Program;* Att. 7, SENTRY Administrative Remedy Index.) The FAC should be dismissed for Plaintiff's failure to exhaust administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001).

stay his criminal appeal pending a Rule 33 motion. *Raniere v. United States*, Case 20-3789, Dkt 193 (2nd Cir. April 29, 2022).[15] On May 9, 2022, the New York District Court deferred consideration of Plaintiff's Rule 33 motion due to the ongoing appeal, ordering:

> "ORDER: The Court is in receipt of Defendant Keith Raniere's 1168 motion for a new trial and 1170 motion for recusal. The judgment of conviction has been appealed to the United States Court of Appeals for the Second Circuit and is now *sub judice* after oral argument. Accordingly, pursuant to Federal Rules of Criminal Procedure 33(b)(1) and 37(a)(1), and in the interest of judicial economy, the court defers consideration of the motions until the Second Circuit resolves the pending appeal. The court will provide further instruction to the parties at that time. Ordered by Judge Nicholas G. Garaufis on 5/9/2022."

*Raniere*, Case No. 1:18-cr-00204-NGG-VMS (E.D. N.Y. May 9, 2022). Accordingly, there is no hearing imminent. Plaintiff neglected to mention the Order in his Motion for Preliminary Injunction, filed on May 26, 2022, seventeen days later. (Doc. 7.)

**F.   Plaintiff's Legal Calls**

One of a Correctional Counselor's regular duties is to set up legal calls. (Ex. A, ¶ 9.) When an attorney requests a legal call, the inmate's counselor ensures the attorney is licensed and in good standing. (*Id.*) Inmate legal calls are prioritized by institutional safety and security, staffing, facility availability, demand among the inmate population and current conditions within the institution (e.g., COVID-19 measures, security threats, lockdown, etc.). (*Id.*) When legal calls occur in the housing unit, the inmate reports to the counselor's office at the appointed time, and the counselor facilitates the call. (*Id.*) Inmate legal calls are not audio-recorded or monitored. (*Id.*) Instead, when a legal call takes place in a staff office, the staff member places the call and remains in the office until the connection is made with the inmate's attorney or appropriate staff. (*Id.*) Once the attorney or staff member is on the line, the counselor leaves the room and visually monitors the inmate from outside the room. (*Id.*) Once outside the room, the counselor cannot hear the content of the legal telephone call. (*Id.*) Plaintiff's legal calls have been and will continue to be coordinated within the institution's normal procedures. (*Id.* ¶ 10.) He has not been targeted for any restrictions on his ability to have legal telephone calls. (*Id.*)

---

[15] A copy of the Order denying stay is attached hereto as Exhibit G.

Additionally, Plaintiff's counselor keeps a log of his legal calls. (Ex. A, ¶ 11, Att. 3, Legal Call Log I.) As of May 31, 2022, the log shows 32 legal calls facilitated by Plaintiff's counselor since October 4, 2021, with an additional call scheduled for June 1, 2022. (*Id.*) Many others have occurred since. Most calls lasted one hour, with one call an hour and a half and another one thirty minutes. (*Id.*) The log includes a call on May 4, 2022, between Joseph Tully and Plaintiff, which lasted an hour. (*Id.*) The call was not disconnected. (*Id.* ¶ 12.) When a call is disconnected, Plaintiff's counselor attempts to reestablish the call. (*Id.*)

Others have facilitated legal calls for Plaintiff as well. Between January 5, 2022, and May 27, 2022, Counselor Ashworth placed sixteen legal calls to Plaintiff's attorneys. (*Id.* ¶ 13, Att. 4, Legal Call Log II.) Most lasted an hour, with one two hours and one thirty-five minutes. (*Id.*) On May 6, 2022, Case Manager Watson facilitated a call between Plaintiff and Mr. Daugherty. (Ex. H, Watson Decl., ¶ 5.) During the legal call, the connection was lost. (*Id.*) Case Manager Watson called Mr. Daugherty back, and the legal call resumed without further incident. (*Id.*) There is no evidence of anything nefarious.

## II. Legal Standards

### A. Rule 33(b)(1), Fed. R. Crim. P.

Rule 33(b)(1), Fed. R. Crim. P., provides:

> *Newly Discovered Evidence.* Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. *If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.*

(Emphasis added.) Rule 33 is not jurisdictional, as explained by the Second Circuit:

> Although Rule 33 is an 'inflexible claim-processing rule,' it is not 'jurisdictional' and is therefore subject to the time-modification provisions of Rule 45(b) of the Federal Rules of Criminal Procedure. *Eberhart v. United States,* 546 U.S. 12, 13, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005) (per curiam) (explaining that if Rule 33 were 'jurisdictional,' *i.e.,* created by statute, it would not be subject to waiver or forfeiture and could be raised for the first time on appeal).

*United States v. Owen*, 559 F.3d 82, 83-84 (2d Cir. 2009).

### B. Standards for a Preliminary Injunction

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'"

*Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam)) (emphasis added); *see also Winter v. NRDC, Inc.,* 555 U.S. 7, 24 (2008) (citation omitted) ("[A] preliminary injunction is an extraordinary remedy never awarded as of right."). Whether for a temporary restraining order or a preliminary injunction, the test is the same. *White v. Lindermen,* No. CV 11-8152-PCT-RCB (ECV), 2012 WL 5040850, at *1 (D. Ariz. Oct. 18, 2012) (citations omitted).

      A plaintiff seeking preliminary injunctive relief must show (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) the requested injunction is in the public interest. *Fuller v. Granville,* No. CV 14-0020-PHX-DGC, 2014WL4541122, at *6 (D. Ariz. Sept. 12, 2014) (citing *Winter,* 555 U.S. at 20). Alternatively, the plaintiff may establish "serious questions going to the merits" – something less than a likelihood of success on the merits – but only if the plaintiff also establishes that the "balance of hardships tips sharply in the plaintiff's favor" and the other two elements of the *Winter* test are met. *All. For The Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Under the "serious questions" test, the plaintiff must make a stronger showing of one element to offset a weaker showing of another. *Id.* Whichever formulation of the standard is applied, the movant has the burden of proof on each element of the test. *Env'l Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

      Further, a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). Thus, "there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction (one that would alter the status quo), which should not be granted 'unless the facts and law clearly favor the plaintiff.'" *White,* 2012 WL 5040850, at *1 (quoting *Comm. of Cent. Am. Refugees v. Immigration and Naturalization Serv.,* 795 F.2d 1434, 1441 (9th Cir. 1986)).

      The Prison Litigation Reform Act (PLRA) imposes further requirements on a prisoner who seeks injunctive relief. The PLRA requires that any injunctive relief be

*narrowly drawn* and the *least intrusive means* necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *Gilmore v. Cal.,* 220 F.3d 987, 999 (9th Cir. 2000). Under the PLRA, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(2). Courts recognize that, "because the problems of prisons in America are complex and intractable, and because courts are particularly ill equipped to deal with these problems, [courts] generally have deferred to the judgments of prison officials." *Shaw v. Murphy,* 532 U.S. 223, 229 (2001) (internal quote marks and citation omitted).

### C.   Standards Regarding Bureau Policies and Correctional Judgment

The Supreme Court has made it clear that "a prison regulation [that] impinges on inmates' constitutional rights … is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner v. Safley*, 482 U.S. 78, 89 (1987). First, the regulation cannot be "arbitrary or irrational," and the "governmental objective must be a legitimate and neutral one." *Id.* at 90. Second, if "there are alternative means of exercising the right that remain open to prison inmates," then "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Id.* (quoting *Procunier*, 417 U.S. at 827). Third, the court considers the impact accommodation would have on the allocation of prison resources, guards and other inmates. *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be *particularly deferential to the informed discretion of corrections officials*." *Id.* (Emphasis added.) Finally, the court considers whether there is a ready alternative or the regulation is an "'exaggerated response" to prison concerns." *Id.* Thus, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.*

As to the First Amendment, "a prison inmate retains those First Amendment rights

that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Procunier*, 417 U.S. at 822. Also, "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.*

In the Ninth Circuit, if the Sixth Amendment right to counsel is implicated, the courts also consider whether "the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel," and, if so, whether the interference "substantially prejudices the criminal defendant." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014). In an action seeking to enjoin "the continuation of an unconstitutional practice," substantial prejudice would be "that his right to privately confer with counsel has been chilled." *Id.* at 911.

**III.    Legal Discussion**

    **A.    Plaintiff Has Not Established the *Winter* Factors.**

Plaintiff seeks extraordinary affirmative injunctive relief. Far from the required "clear showing" and heightened standard for such affirmative relief altering the status quo, Plaintiff fails to establish the *Winter* factors.

        **1.    Plaintiff has not established a likelihood of success on the merits.**

Plaintiff has not established a likelihood of success or that serious questions go to the merits. The evidence contradicts Plaintiff's bald accusations. The great weight of the evidence shows that, contrary to Plaintiff's assertions, Mr. Chakavorty is Plaintiff's agent who was affiliated with ESP and NXIVM, not a "paralegal" *employed* by his attorney, has engaged in conduct that threatened the safety and security of the institutions and the public in both New York and Arizona, and is one of the people with whom Plaintiff was banned by his sentencing judge from associating. Plaintiff has not cited a single case that shows that a defendant has a Sixth Amendment right to meet with someone who has a "power of

attorney," rather than a paralegal employed by and supervised by an attorney.

      The Bureau has facilitated Plaintiff's meeting with his attorneys, both via numerous confidential legal calls and frequent legal visits. No evidence supports the bald assertions in the FAC that the Bureau has interfered with any legal calls. The one legal call that was dropped was promptly reconnected, which Plaintiff neglected to mention in the FAC. (Doc. 7.) Plaintiff produced no evidence that any Bureau employee hindered a single legal call or legal visit between Plaintiff and his attorneys. All evidence is to the contrary.

      Plaintiff has introduced no competent evidence that Mr. Chakravorty is a paralegal *retained* or *employed* by Mr. Tully. Mr. Tully has never requested that the Bureau accord him the standing of his paralegal. (Ex. A, ¶ 8.) Mr. Tully has not issued a pledge to supervise Mr. Chakravorty's activities, nor accepted personal and professional responsibility for all of his acts which may affect the institution, its inmates and staff. (*Id.* ¶¶ 7-8.) Instead, Mr. Chakravorty alone has indicated that he "act[s] as a paralegal to attorney Tully for the purposes of the Rule 33 petition."[16] (Doc. 7-1 at 4.) He avers that his "role evolved into paralegal and manager of the legal team." (Doc. 7-1 at 5.) He also asserts that he "will assist in preparing the attorneys and experts for a hearing on the Rule 33 petition." (*Id.*) He neglects to mention that no hearing is imminent, as the New York District Court stayed the Rule 33 motion pending Second Circuit decision on the direct appeal. More importantly, if Mr. Chakravorty were acting as the Mr. Tully's paralegal, Plaintiff's communications with him would void the attorney client privilege because they were knowingly made on a monitored line. *See Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007) (recognizing that the presence of third parties destroys the attorney client privilege.)

      Plaintiff's new claim that he needs to speak with Mr. Chakavorty as his attorney's "paralegal"[17] regarding a new Rule 33 motion that must be filed by June 19, 2022, is belied

---

[16] Based on this statement, the Motion baldly states: "Mr. Chakravorty's assistance proved so essential that the Law Office of Tully & Weiss considered him to be a member of the legal defense team and gave him the position of paralegal to the team. Exh. 1, ¶ 28." (Doc. 7 at 3.) The statement is not supported in any way by Mr. Chakravorty's conclusory statement that he "acts" as a paralegal. No evidence was provided as to how the "Law Office of Tully & Weiss considered him."

[17] California law defines a "Paralegal" as "a person who holds himself or herself out

- 14 -

by the dearth of evidence showing that Mr. Chakavorty is a paralegal, rather than an ardent former ESP and NXIVM coach with whom Plaintiff is banned from associating. Mr. Chakavorty is on record in federal court asserting his status as holding a "power of attorney." Not one of Plaintiff's cited cases involves a "power of attorney." Instead, they assert that the "attorney-client privilege" applies to communications with a paralegal *employed by* an attorney.[18] *See United States v. Sanmina Corp. & Subsidiaries,* 968 F.3d 1107, 1116 (9th Cir. 2020) ("The attorney-client privilege may extend to communications with third parties *who have been engaged* to assist the attorney in providing legal advice." (Emphasis added.)); *United States v. Mikhel*, 552 F.3d 961, 963-65 (9th Cir. 2009) (holding "[t]he inmate's attorney's *pre-cleared* paralegal(s) and *pre-cleared* investigators *in the regular full-time employment of the attorney* may meet with the inmate without the necessity of the inmate's attorney being present" and recognizing that the government's security interests were satisfied by a translator submitting to a background check and being "cleared by the FBI and USA/CDCA.")

      Nor is Plaintiff's belief that his Sixth Amendment rights trump all other considerations supported by his cited cases. In *Luis v. United States*,[19] 578 U.S. 5, 11-12

---

to be a paralegal, who is qualified by education, training, or work experience, who either contracts with or is employed by an attorney, law firm, corporation, governmental agency, or other entity, *and who performs substantial legal work under the direction and supervision of an active member of the State Bar of California*, as defined in Section 6060, or an attorney practicing law in the federal courts of this state, that has been specifically delegated by the attorney to him or her." Cal. Civ. Code § 6450(a). Assuming Mr. Chakravorty's statements are true, he employed Mr. Tully, who is working under his direction, not the converse.

[18] Plaintiff's reliance on *United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996), is problematic at best. While the Ninth Circuit did recognize that "fact-finding which pertains to legal advice counts as 'professional legal services,'" no paralegals were involved. *Id.* at 1297. Instead, the senior attorney "asked lawyers – not secretaries, paralegals, librarians or other of the firm's employees – to conduct the investigation. And, having chosen to hand the job over to lawyers, he is justified in expecting that communications with these lawyers will be privileged." *Id.* Similarly, in *Jenkins*, 487 F.3d at 491, the court does not indicate "outside experts engaged 'to assist the attorney in providing legal services to the client'" "often prove indispensable to the attorney because they 'transmit[] or interpret[] client communications to the attorney" as stated at Doc. 7 at 8. To the contrary, the court included in the list of people covered by the attorney client privilege "*members of the office staff responsible for transmitting messages between the attorney and client.*" (Emphasis added.) *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001), cited at Doc. 7 at 10, did not involve paralegals and does not include the purported quotation.

[19] Plaintiff erroneously states that *Luis* is about "the government's interest in 'freezing' potentially ill-gotten proceeds." (Doc 7 at 10.) The Supreme Court said the

(2016), the Supreme Court explained that "[a] defendant has no right, for example, *to an attorney who is not a member of the bar*." (Emphasis added.)  In *Geders v. United States*, 425 U.S. 80, 87 (1976), the court noted that "[t]o the extent that conflict remains between the defendant's right to consult with his attorney during a long overnight recess in the trial, and the prosecutor's desire to cross-examine the defendant without the intervention of counsel, with the risk of improper 'coaching,' the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel."  However, here, the conflict is not with a prosecutor's desire to avoid counsel's coaching the witness, it is with the Bureau's "legitimate penological interests" and "the institutional consideration of internal security within the corrections facilities themselves."  *See Turner*, 482 U.S. at 89, *Procunier*, 417 U.S. at 822.  Plaintiff has not shown that the Bureau has deliberately interfered with the confidential relationship between him and his counsel or chilled his right to privately confer with counsel.  *See Nordstrom*, 762 F.3d at 910.  He cannot do so because the evidence shows that the Bureau has facilitated his numerous confidential legal calls and frequent legal visits with his counsel, the latest of which is scheduled for today.

   Plaintiff has introduced no credible evidence that his ardent supporter, with whom he had been engaging in monitored social calls, is a "paralegal."  The evidence is clear that he is *Plaintiff's* agent.  Plaintiff has not established a likelihood of success on the merits.

       2**.**  **Plaintiff has not established irreparable harm.**

   Plaintiff has not shown irreparable harm.  A plaintiff "must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chron. Publ'g Co.,* 762 F.2d 1374, 1376 (9th Cir. 1985).  The irreparable injury must be both likely and immediate.  *Winter,* 555 U.S. at 24.  Mere "[s]peculative injury does not constitute irreparable injury to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988).  Again, the evidence shows that Plaintiff

---

opposite in holding "the pretrial restraint of *legitimate, untainted assets* needed to retain counsel of choice violates the Sixth Amendment.  The nature and importance of the constitutional right *taken together with the nature of the assets* lead us to this conclusion." *Luis,* 578 U.S. at 10.  (Emphasis added.)

has not suffered and will not suffer the harms he now alleges, which were not even mentioned in his FAC. The urgency claimed in the FAC – based on the upcoming hearing on the Rule 33 Motion on newly discovered evidence – was eviscerated when the New York District Court determined that it will not address the motion until the Second Circuit decides the appeal.[20] There is no upcoming hearing.

Plaintiff erroneously[21] stated that an Arizona District Court found that "a prisoner who suffered a First Amendment violation enjoys a presumption of irreparable harm." (Doc. 7 at 11.) Again, the case says the opposite: "Therefore, based on the filings, the oral argument, the evidence presented, and the case law, the Court finds that the Plaintiff has demonstrated the possibility of irreparable harm, if not the probability of harm." *Luckette v. Lewis*, 883 F. Supp. 471, 483 (D. Ariz. 1995). Here, Plaintiff has had and continues to have confidential communication with his counsel by frequent legal visits, legal mail and legal calls.

### 3. The equities and public policy favor upholding Bureau policies and correctional decisions.

The equities and public policy favor upholding BOP's correctional decisions. The evidence establishes no grounds for the extraordinary measure of overriding the professional judgment of the Bureau in preventing the security risk inherent in allowing contact between an inmate and a person the sentencing court banned, particularly when the person has already violated Bureau policies and put the safety and security of the institutions and the public at risk in two states. Plaintiff's effort to override those decisions should be rejected.

---

[20] Notably, the Second Circuit denied Plaintiff's motion for a stay of the appeal from the criminal conviction six days before Plaintiff filed the Complaint and seven days before Plaintiff filed the FAC. Nevertheless, Plaintiff included the allegation regarding the motion for stay in both complaints as though the Second Circuit had not already denied the motion.

[21] Many of Plaintiff's cited cases simply do not support his claims. In *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006), after the lower court refused to allow the defendant's chosen counsel to appear pro hac vice, the Supreme Court noted that "[t]he right to select counsel of one's choice, by contrast, has never been derived from the Sixth Amendment's purpose of ensuring a fair trial. It has been regarded as the root meaning of the constitutional guarantee," not as Plaintiff claims "Courts have held that access-to-counsel claims based on the government's wrongful interference strike at the 'root . . . of the constitutional guarantee.'" (*See* Doc. 7 at 11.)

### IV. Request for Hearing

It is Plaintiff's burden to establish entitlement to injunctive relief, which he has failed to do. However, in the event further evidence or information are needed for the denial of Plaintiff's motion, Defendants request an evidentiary hearing.

### V. Conclusion

For all of the foregoing reasons, Defendants Garland, Carvajal and Colbert request that the Court deny the Motion for Preliminary Injunction.

RESPECTFULLY SUBMITTED:  June 9, 2022.

> GARY M. RESTAINO
> United States Attorney
> District of Arizona
>
> *s/ Denise Ann Faulk*
> DENISE ANN FAULK
> Assistant U.S. Attorney

Copy of the foregoing served via EM/ECF to

Stacy Scheff
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611
Tucson, AZ 85717
*Pro Se*

s/ *Pamela. Vavra*
/ Response to MPI