Exhibit B

NS:TH
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -                    Docket No. 18-CR-204 (S-2) (NGG)

KEITH RANIERE,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S SENTENCING MEMORANDUM
AS TO DEFENDANT KEITH RANIERE

SETH D. DUCHARME
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Tanya Hajjar
Mark J. Lesko
Karin Orenstein
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

For fifteen years, the defendant Keith Raniere was the leader of a criminal enterprise based in New York. Raniere recruited individuals into organizations he founded, purportedly for their own benefit, and then exploited them—for power, for profit, or for sex. The sentence imposed on Raniere should reflect the immeasurable damage he has done to his victims. To protect the public from the defendant, and to justly punish his years of crime and exploitation, the Court should impose a Guidelines sentence of life imprisonment.

Raniere's post-conviction conduct reflects his total denial of culpability for the crimes of which he was convicted. While in prison, Raniere continues to regularly contact his supporters and has expressed contempt for his victims, the prosecution, and the Court. Raniere's complete lack of acceptance of responsibility also counsels in favor of a sentence of life imprisonment.

For the reasons set forth below, the defendant's challenges to the Presentence Investigation Report ("PSR") are meritless, and the Court should adopt the PSR's Guidelines calculation and recitation of the relevant facts. The government respectfully submits that the applicable Guidelines range and the relevant factors under 18 U.S.C. § 3553(a) warrant a sentence of life imprisonment. The Court should also order payment of restitution and a fine.

## BACKGROUND

The Court is familiar with the offense conduct in this case, having presided over the defendant's six-week jury trial in May and June 2019. The following factual summary is intended to provide an overview sufficient to situate the government's arguments with respect to sentencing in the relevant factual context, but not to provide a comprehensive recitation of all aspects of the offense conduct proven at trial.

In 2018 and 2019, Keith Raniere and five co-defendants were indicted for racketeering, racketeering conspiracy and related crimes, including sex trafficking, forced labor, alien smuggling, identity theft and extortion. On June 19, 2019, Raniere was convicted of all seven counts (and all eleven racketeering acts) submitted to the jury.[1] Raniere's convictions fall into the following categories of illegal conduct:

  i.  Sexual exploitation of Camila (Jane Doe 2);

  ii.  Alien smuggling and visa fraud;

  iii.  Trafficking of Daniela (Jane Doe 4) for labor and services;

  iv.  Unlawful surveillance of individuals believed to be enemies of Nxivm and of Raniere;

  v.  Obstruction of justice;

  vi.  Sex trafficking, wire fraud, and extortion related to DOS; and

  vii.  Identity theft related to tax evasion.

---

[1]  The other five defendants pleaded guilty.

I.    Offense Conduct

The evidence presented at trial demonstrated that for over a decade, Raniere led a criminal enterprise ("the Enterprise") and relied on an "inner circle" of individuals to carry out his orders. PSR ¶¶ 36-41. Raniere and his co-conspirators recruited individuals into various purported self-help organizations that Raniere founded, including Nxivm and affiliated programs, and DOS. Id.; see, e.g., Trial Transcript ("Tr.") at 619-24 (testimony of Mark Vicente regarding Nxivm recruitment strategies); id. at 1619-20 (testimony of Lauren Salzman that Raniere preferred DOS recruits to be individuals "in positions of power and influence").

Raniere demanded absolute commitment from those he recruited and those within his inner circle, including as to his teachings and ideology. PSR ¶ 38; see, e.g., Tr. at 308 (testimony of Sylvie that "a lot of the time it doesn't make any sense but we all just would agree . . . . it was so rare that someone would disagree with [the Nxivm curriculum], so rare"); id. at 502 (testimony of Vicente that "one couldn't question the higher ranks and questioning [Raniere] was seen as a very, very bad thing"); id. at 1875 (testimony of Lauren Salzman as to shunning). Raniere and his co-conspirators maintained control over the Enterprise by, among other means, obtaining sensitive information about members and associates of the Enterprise; inducing shame and guilt in order to influence and control members and associates of the Enterprise; isolating associates and others from friends and family and making them dependent on the Enterprise for their financial well-being and legal status within the United States; and encouraging associates and others to take expensive Nxivm courses, and incur debt to do so. PSR ¶ 38. Members of the Enterprise recruited and groomed sexual partners for Raniere, both within and outside of DOS, and many were

3

themselves in sexual relationships with Raniere that involved pledges of loyalty, penances for "ethical breaches," and collateral.  PSR ¶ 39.

i.    Sexual Exploitation of Camila

In September 2005, the defendant began a sexual relationship with Camila, then a fifteen-year-old child.  PSR ¶¶ 60-64; Tr. at 3457-65, 3524; Government Exhibit ("GX") 1400-44; see also GX 301-R (appended to this memorandum in Exhibit A).  Camila and her family had arrived in Clifton Park at the defendant's invitation, and he arranged for her to work as a maid in Nancy Salzman's house, which was a distance away from her siblings.  See Tr. at 2465-2473 (Daniela's testimony).  Camila lived in a house with other members of the Nxivm community, including Monica Duran, a woman who—like Camila— would later become a first-line master in DOS.  Id.

On November 2, 2005 and again on November 24, 2005, the defendant took photographs of Camila constituting child pornography.  Several of the photographs depict Camila lying on a bed fully nude.  At least five photographs depict close-ups of Camila's genitals.[2]  PSR ¶¶ 60-64.

ii.    Trafficking of Daniela

As proven at trial, between March 2010 and April 2012, Raniere, Lauren Salzman, and others trafficked Daniela for labor and services by confining her to a room for nearly two years on the threat of being sent to Mexico and withholding her birth certificate. PSR ¶¶ 65-69.

---

[2]    See GX503, 504, 528-534.  Pursuant to the Adam Walsh Act, these exhibits are available to the Court for review in advance of sentencing.

4

Raniere initiated a sexual relationship with Daniela, Camila's sister, when Daniela was eighteen. PSR ¶ 66. After Daniela re-entered the United States in 2004, she began to work for Raniere, including by cleaning, organizing his books, digitizing his music collection, and compiling reports summarizing lengthy textbooks on various topics. Id.; Tr. at 2511. As he did in his relationships with other women, Raniere controlled Daniela's diet and weight and insisted that Daniela keep the relationship secret. PSR ¶ 66. When she was 20, Daniela became pregnant by Raniere. Raniere's partner, Pamela Cafritz, paid for Daniela's abortion and instructed Daniela to lie about the identity of the father to medical staff. Id.

After Daniela developed romantic feelings for another man, Raniere told Daniela's parents that Daniela had committed an "ethical breach." PSR ¶ 67. Raniere ordered that Daniela be confined to a room in her parents' home without human contact. At Raniere's instruction, Lauren Salzman threatened Daniela if she left the room, she would be sent to Mexico without any identification documents. Id.; see GX 1578, 1535, 1534, 1563, 1603, 1934.

Daniela was confined to the room for nearly two years, during which she went months without human contact. PSR ¶ 68; Tr. at 1927. Family members left meals for Daniela outside her door. Daniela was denied prompt medical care and slept on a foam pad on the floor. During this time, Daniela wrote hundreds of letters to Raniere with various proposals to "heal" her purported "ethical breach." Daniela believed that if she stopped writing, she would be sent to Mexico without money or her identification documents. Id.

Lauren Salzman reported to Raniere regarding Daniela's "progress," but Raniere frequently told Salzman that Daniela was "game-playing" and manipulating Salzman

5

and needed to stay in the room longer. Tr. at 1930-34 (Salzman's testimony). Raniere

forbade Salzman from telling Daniela anything or giving her any information "about what

was going on, on the outside with anybody." Tr. at 1936-37. At one point, when Daniela cut

off her hair, Raniere instructed Lauren Salzman to tell Daniela that Daniela would have to

stay in the room until her hair grew back. Id.; Tr. at 2899. Over time, Daniela's

psychological health deteriorated:

> [S]ometimes I would beg: Please let me know. I don't know
> why, just—just let me out. Nobody cared. My family didn't.
> Nobody cared. So, it was also—it was also knowing that
> nobody wanted me. I'm in a world where nobody cares that I'm
> losing my life. . . . it was clearly never gonna end."

Tr. at 2905 (Daniela's testimony). In approximately February 2012, after considering

suicide, Daniela left the room. PSR ¶ 69. Daniela was then driven to Mexico at Raniere's

direction and was told that unless she completed book reports for Raniere, she would not

receive her birth certificate. Daniela ultimately obtained a copy of her birth certificate with

the assistance of an attorney working for a human rights commission. Id.

### iii. Alien Smuggling

Raniere and his co-conspirators participated in efforts to recruit and secure

immigration status for non-citizens so that they could work in one or more Nxivm-affiliated

organizations or as his sexual partners. PSR ¶ 42. Among the individuals that Raniere and

his co-conspirators assisted in entering or remaining in the United States unlawfully were

siblings Marianna, Daniela, Adrian and Camila. Id. By 2008, all four siblings were out of

status and unlawfully in the United States. See Tr. at 2491-2505 (testimony of Daniela); see

GX 1554.

a. <u>Daniela</u>

In 2004, Raniere arranged for Daniela to enter the United States unlawfully using a false identification document with the last name and date of birth of Ashana Chenoa, a deceased woman. PSR ¶ 44. Daniela's parents had paid for her to take a Nxivm course in Monterrey, Mexico, and encouraged Daniela to join the Nxivm community in Albany, New York. <u>Id.</u>; Tr. at 2301 (Daniela's testimony). On October 26, 2004, Daniela was denied entry into the United States and returned to her home town in Mexico. PSR ¶ 44; Tr. at 2408. Raniere instructed Daniela to fly to Toronto, Canada and enter the United States with a false sheriff's ID card containing the name and date of birth of a deceased woman who, according to Raniere, bore a resemblance to Daniela. PSR ¶ 44; Tr. at 2410. On December 24, 2004, Daniela met Kathy Russell at the border. <u>Id.</u> Russell handed Daniela the false sheriff's ID bearing the name "Lisa Chenoa," and drove Daniela across the border into the United States and back to the defendant's community in Clifton Park, New York. Tr. at 2411-2414.

b. <u>Camila</u>

Between approximately 2011 and September 2018, Raniere directed his co-defendant Kathy Russell to lease 120 Victory Way, a property in Clifton Park, New York. PSR ¶ 43. The residence was used to house Camila, who did not have legal status within the United States. <u>Id.</u> Russell leased the property for over seven years under an assumed name and, each year, paid the rent in cash and in full. <u>Id.</u>

c. <u>Marianna</u>

Raniere and his co-conspirators made significant efforts to assist Marianna in entering and remaining in the United States. PSR ¶¶ 49-53. Marianna arrived in the United

States in or about 2003, shortly after completing high school, in order to study the Nxivm curriculum with Raniere.  In 2004, Marianna began a sexual relationship with Raniere and Pamela Cafritz.  Some time thereafter, Marianna's status in the United States on a visitor's visa expired.  Tr. at 2491 (testimony of Daniela).  Notwithstanding that Marianna had been living with Raniere without legal status in the Nxivm community for nearly a decade, Clare Bronfman falsely claimed that Marianna had always been compliant with U.S. immigration laws and that Marianna had been employed by her father's rock-drilling company in Mexico. PSR ¶ 51.

    iv. <u>Identity Theft and Unlawful Surveillance (Keylogging)</u>

    Raniere and his co-conspirators engaged in unlawful surveillance and investigation of his perceived enemies.  PSR ¶¶ 70-75.  The targets of these efforts included federal judges overseeing litigation in which Nxivm was a party, high-ranking politicians, reporters who had published articles critical of Raniere or Nxivm, Nxivm's own lawyers, legal adversaries and their families, an accountant (James Loperfido) who worked for an attorney who had previously done work for Nxivm, and Edgar Bronfman Sr., the father of Clare Bronfman.  <u>Id.</u>; Tr. at 3357 (testimony of Loperfido).  On multiple occasions, Bronfman approached Stephen Herbits, a colleague of her father, whom she believed to have political influence, in an attempt to persuade him to help her intimidate individuals perceived to be hostile to Nxivm or Raniere.  PSR ¶¶ 70-75; Tr. at 1322-24 (testimony of Herbits), 1330-33.

    Between August 2005 and October 2008, Raniere directed Daniela to obtain the usernames and passwords for email accounts belonging to individuals they perceived to be Nxivm enemies, in order to gain access to those individual's email accounts and monitor

their communications.  PSR ¶¶ 70-75; see GX 1518; Tr. at 2535-40 (Daniela's testimony).

After the publication of a October 2003 Forbes article in which Edgar Bronfman was quoted

as calling Nxivm a "cult," Raniere considered Edgar Bronfman an enemy of his and of

Nxivm.  See GX 1456.  As a result, Raniere tasked Daniela with creating keylogging

software in order to access and monitor Edgar Bronfman's email account.  Tr. at 2552-54

(Daniela's testimony).  Bronfman installed the keylogging software on her father's computer,

and Daniela was thereafter able to access Edgar Bronfman's email account.  Tr. at 2554-55.

For years, Daniela reported the results to Raniere.  PSR ¶ 72; Tr. at 2556-57.  At Raniere's

direction, Daniela also created and installed keylogging software on the computer of James

Loperfido, an accountant who had worked for Joseph O'Hara, an attorney who had

previously done work for Nxivm.  Tr. at 2553 (Daniela's testimony), 3370 (Loperfido's

testimony).

Daniela thereafter regularly emailed the results of the keylogging software,

which reflected Loperfido's computer activity, to Raniere.  PSR ¶ 73; Tr. at 2560.  In

November 2008, Raniere also enlisted Daniela to install keylogging software on Daniela's

sister Marianna's computer after Raniere suspected Marianna of rekindling a relationship

with an ex-boyfriend.  PSR ¶ 74; Tr. at 2621-2622.  Through installation of the keylogging

software, Daniela provided Raniere with her sister's Facebook password.  Id.

On behalf of Nxivm, Bronfman hired several private firms, including

Canaprobe and Interfor, in order to investigate perceived enemies of Nxivm and Raniere.

PSR ¶ 75; Tr. at 5010. Between approximately 2007 and 2009, Canaprobe sent the results of

purported "bank sweeps" for bank account and balance information belonging to Nxivm's

adversaries.  Id.  On March 27, 2018, a search warrant was executed on the residence of

Nancy Salzman.  Among the items recovered was a large box containing what appears to be private banking information of many individuals perceived to be Nxivm enemies, including Edgar Bronfman, Joseph O'Hara, Rick Ross, and others.  Id.; Tr. at 4997-99 (describing purported banking information for, among other individuals, the author of the October 2003 Forbes article and prominent New York politicians and lobbyists).

        v.     Obstruction of Justice

Raniere obstructed justice by altering videotapes that were to be produced in discovery in a federal lawsuit in New Jersey.  PSR ¶¶ 80-83.  In 2003, Nxivm and affiliated entities filed suit against Stephanie Franco, a former Nxivm student, and Rick Ross.  Tr. at 4683-84 (Ross's testimony).  The lawsuit alleged copyright infringement and centered on a claim that Franco had violated a non-disclosure agreement by providing Nxivm course materials to Rick Ross, a cult deprogrammer, who published the course materials on his website.  Tr. at 910, 1299 (Vicente's testimony); Tr. at 1988-89 (Salzman's testimony); Tr. at 4700-4703 (Ross's testimony).  In around 2008, Franco's attorneys requested the production of certain videotapes in support of their claim that the Nxivm curriculum contained false statements and violated certain state consumer protection laws.  Id.  In June 2008, Raniere tasked Mark Vicente, among others, to alter videotapes and to remove certain segments from them without having the videotapes appear altered.  Tr. at 745 (Vicente's testimony).  Vicente was provided with videotapes to remove content, including segments in which Nancy Salzman made unsubstantiated health claims about Nxivm's curriculum.  Tr. at 1256.  These altered videotapes were then produced in discovery by Nxivm's attorneys with the false claim that they were provided in "unedited fashion."

vi. <u>DOS</u>

In late 2015, Raniere created DOS, a secret organization led by Raniere and comprised of "masters" who recruited and commanded groups of "slaves." PSR ¶¶ 84-96; Tr. at 1506 (testimony of Lauren Salzman). Aside from Raniere, all members of DOS were female. Raniere gave himself the title "Grandmaster." <u>Id.</u> Raniere's direct slaves (the "First Line") were Camila, Daniella Padilla, Nicki Clyne, Loreta Garza, Rosa Laura Junco, Monica Duran, Allison Mack, and Lauren Salzman. Tr. at 1509. Each of these "first-line slaves" recruited their own "slaves" by approaching young women and falsely describing DOS as a secret women's empowerment group or sorority. <u>Id.</u> Raniere instructed the First Line never to disclose his participation in and leadership of DOS. Prospective "slaves" were required to provide "collateral"—including damaging confessions about themselves and loved ones (truthful or not), rights to financial assets, and sexually explicit photographs and videos—to prevent them from leaving the group or disclosing its existence to others. Tr. at 1508-09, 1602-05.

Through DOS, Raniere used the First Line to recruit other women to make a "collateralized vow of obedience" to their masters (and, by extension, to Raniere) and then required these "slaves" to perform labor, take nude photographs, and, in some cases, to engage in sex acts with Raniere. Tr. at 1707, 1750, 2183. Raniere at one point told Camila that it would be "good" for her to "own a fuck toy slave" for him that she could "groom and use as a tool to pleasure" him. GX 1779-285; Tr. at 3569. Raniere also instructed Daniella Padilla, Loreta Garza, Rosa Laura Junco and Camila to find a young virgin "successor" for Raniere. Tr. at 3590, 3597.

11

The First Line of DOS met three times a week for about ten hours a week. PSR ¶¶ 84-96; Tr. at 1510-11 (Lauren Salzman's testimony). At the start of each meeting, the First Line took a fully nude photograph of themselves and sent it to Raniere. In the meetings that Raniere attended, Raniere sat on a chair, dressed, while the First Line sat on the floor beneath him naked. Id. Raniere engaged in sexual relationships with the First Line, occasionally at the same time, and directed them to purchase a "sorority house" which would contain BDSM equipment, including a human-sized cage. Tr. at 1510; 1538. These sexualized components of DOS, along with Raniere's leadership of DOS, were deliberately concealed from recruits. PSR ¶¶ 84-96; Tr. at 1509. In April 2017, the First Line of DOS purchased a "sorority house," located at 9 Milltowne Drive, Waterford, New York 12188. PSR ¶¶ 84-96; Tr. at 1623.

Raniere and other DOS "masters" recruited women as "slaves" into DOS by deliberately concealing Raniere's role in DOS. PSR ¶¶ 84-96; Tr. at 1509. Women were recruited into DOS from California, Mexico, Canada and elsewhere, and DOS "masters" used encrypted messaging applications located overseas, including Telegram and Signal, to communicate with their "slaves" and to collect collateral. Tr. at 1604-05. After women were recruited into DOS and their collateral was collected, the DOS "slaves" were told that they needed to provide additional collateral each month. DOS "slaves," including Sylvie, Nicole, and Jay, among others, believed that if they did not obey their "masters," their collateral would be released. PSR ¶¶ 84-96; see, e.g., Tr. at 213-14.

Raniere and DOS "masters" used a variety of means to coerce their "slaves" into submission. In accordance with Raniere's instructions, DOS "slaves" were required to be branded with a symbol that, unknown to the "slaves," represented Raniere's own initials.

12

Tr. at 1621. DOS "slaves" were also controlled in a number of other ways, including physical isolation (by being required to stay in Clifton Park); forced participation in "readiness" drills; requirements to seek permission from Raniere or their "master"; sleep-deprivation and extremely restrictive diets. PSR ¶¶ 84-96.

At Raniere's instruction, the DOS victim being branded was held down by other DOS "slaves" and was required to state, among other things, "Master, please brand me, it would be an honor." PSR ¶¶ 84-96. Raniere gave these directives to Allison Mack to implement:

| | |
|---|---|
| Raniere: | Do you think the person who's being branded should be completely nude and sort of held to the table like a, sort of almost like a sacrifice? I don't know if that, that's a feeling of submission, you know. So, [U/I] |
| Allison: | Yea |
| Raniere: | Ah, you could also of course videoing it, and videoing it ah from different angles or whatever gives collateral. |
| Allison: | Mmhm |
| Raniere: | So, it probably should be a more vulnerable position type of a thing. |
| Allison: | OK |
| Raniere: | Laying on the back, legs slightly, or legs spread straight like, like feet, feet being held to the side of the table, hands probably above the head being held, almost like being tied down, like sacrificial, whatever. |
| Allison: | OK |
| Raniere: | And the person should ask to be branded. |
| Allison: | OK |

13

| Raniere: | Should say, please brand me it would be an honor, or something like that. An honor I want to wear for the rest of my life, I don't know. |
| Alison: | OK |
| Raniere: | And they should probably say that before they're held down, so it doesn't seem like they are being coerced. |
| Allison: | OK |

GX 497-T.  The branding itself was performed without anesthesia and using a cauterizing pen, which burned the skin and left a permanent mark.  PSR ¶¶ 84-96.  Most of the brandings were performed by Danielle, a DOS "slave" who was also a licensed medical professional. PSR ¶¶ 84-96.

DOS "masters" also benefitted financially from recruiting and maintaining DOS "slaves."  DOS "slaves" were coerced into providing labor and services for their "masters" under the threat of the release of their collateral, including editing and transcription work, taking naked photographs, and other tasks.  DOS "masters" were expected to receive approximately 40 hours of labor each week from their "slaves."  PSR ¶¶ 84-96; Tr. at 1618-1619 (testimony of Lauren Salzman that Raniere decided that "if we each had six slaves who each had six slaves under them . . . you would have 40 hours, approximately 36, but approximately 40 hours of work per week for life from these individuals").

a.  Sylvie

Sylvie had worked for Clare Bronfman for nearly ten years when Monica Duran, a "first-line" master in DOS, approached Sylvie about joining DOS.  PSR ¶¶ 99-102; Tr. at 85 (Sylvie's testimony).  At that time, Sylvie had recently been married to another

14

member of the Nxivm community.  PSR ¶ 99; Tr. at 261.  Both Raniere and Bronfman, at various points, instructed Sylvie not to have sex with her husband for the first two years of their marriage.  Id.; Tr. at 447.

Duran approached Sylvie and invited Sylvie to a secret project that Duran said had nothing to do with Nxivm.  PSR ¶ 100; Tr. at 207.  Sylvie was told that, in order to learn more, she had to provide "collateral," which was something capable of destroying her relationships with her family. Tr. at 211, 264.  Sylvie provided a stamped letter addressed to her parents falsely confessing to being a prostitute.  Tr. at 277.  Sylvie also provided a naked photograph of herself as collateral.  Id.

Soon thereafter, Duran gave Sylvie an assignment to "seduce" Raniere.  PSR ¶ 101; Tr. at 219.  Sylvie was assigned to send Raniere naked photographs every day.  Sylvie was not attracted to Raniere and found him "creepy."  Tr. at 118.  Duran later arranged for Sylvie to meet Raniere at a house, where Raniere took Sylvie upstairs, instructed her to undress and lie down on the bed.  Tr. at 250-54.  Raniere then performed unwanted oral sex on Sylvie and took close-up photographs of Sylvie's vagina with Sylvie's phone.  Tr. at 257.  Sylvie felt disgusted by this encounter and acquiesced to it only because she believed her collateral would be released if she did not obey Raniere.  Tr. at 220.  The photographs were then sent to Duran using Telegram, an encrypted messaging service.  Tr. at 257-58.

After Sylvie completed the assignment she had been given, Sylvie deleted the photograph in disgust and shame.  Tr. at 257-58.  The next day, Duran called Sylvie, panicked, because the photographs had been deleted from Duran's phone.  Id.  Duran told Sylvie that she would have to go back to Raniere and have him take new photographs, which Sylvie did.  Id.

15

b. <u>Nicole</u>

Nicole, an actress in her early 30s, began taking Nxivm classes in 2015, including acting classes with Allison Mack.  In February 2016, Mack invited Nicole to join a "women's mentorship group," but asked that Nicole first provide collateral.  PSR ¶¶ 103-112; Tr. at 3845-47 (Nicole's testimony).  At the time, Nicole was living in Brooklyn, New York.  Nicole was told, and believed, that the organization was women-only and had no connection to Nxivm.  After Mack made some suggestions of sufficient collateral, Nicole wrote a series of letters falsely alleging sexual abuse by a family member and other damaging allegations.  Tr. at 3850.  After Mack assured Nicole that the letters would be "locked in a box" where nobody could see them, Nicole provided the letters and a sexually explicit video of herself to Mack.  Tr. at 3853.

Once Nicole had provided this collateral, Mack told Nicole about DOS, referring to it as "the Vow."  Tr. at 3854-55.  Nicole agreed to become Mack's DOS "slave."  Tr. at 3863-64.  When Nicole agreed to join DOS, she was not aware and was not told that she would later be required to provide additional collateral.  Tr. at 4017.  Nicole was later required to provide, and did provide, additional collateral on a monthly basis, including credit card authorizations and the right to her grandmother's wedding ring.  Tr. at 4021-22.

Mack directed Nicole to be celibate for six months and subsequently assigned Nicole to contact Raniere.  Tr. at 3868.  One night when Nicole was staying with Mack in Clifton Park, New York, Raniere called Mack.  Tr. at 3921-22.  Mack told Nicole to go outside and meet Raniere, which Nicole obeyed.  <u>Id.</u>  Raniere blindfolded Nicole, led her into a car and drove her to a house.  Tr. at 3925.  Raniere then led Nicole, still blindfolded, through some trees and inside a building, where he ordered her to undress and tied her to a

16

table.  Tr. at 3926-29.  Another person in the room, unknown to Nicole, began performing oral sex on Nicole.  Raniere asked if Nicole was ok and told Nicole that she was "very brave" and not to tell anyone what had happened.  Tr. at 3921.  Nicole believed that if she left DOS, her collateral would be released.  Id.

Unknown to Nicole, the individual who performed oral sex on Nicole was Camila, one of Raniere's First-Line "slaves," and the sexual abuse took place at 120 Victory Way.  Tr. at 1870.  A photograph recovered from Camila's Google account reflects a photograph of the table on which Nicole had been tied, along with a video camera that was pointed in the direction of the table.  GX 1190; Tr. at 3657.

Nicole met the other DOS "slaves" under Allison Mack, including India, Michelle, and Danielle.  Tr. at 4011-12.  Throughout Nicole's time in DOS, Mack regularly required her "slaves" to pose for nude photographs, including close-up photographs of their vaginas, either as assignments or collateral.  Tr. at 4016, 4024.  These photographs were sent to Raniere.

Mack also assigned her other slaves—India, Michelle and Danielle—with the task of "seducing" Raniere, all of whom had sexual interactions with Raniere or attempted to do so.  As a First Line master, Mack expected to receive and did receive financial opportunities and privileges as a result of her slaves' compliance with orders, including her orders to engage in sex acts with Raniere.  Id.

c.   Jay

Jay is an actress and model who began taking Nxivm classes in or about 2016, during which time she became friendly with India, one of Mack's slaves.  PSR ¶¶ 113-17; Tr.

at 4318 (Jay's testimony).  In approximately November 2016, India recruited Jay in DOS.
Tr. at 4324.  Jay was told that DOS was a women's-only organization.  Id.

After several months, Mack and India gave Jay a "special assignment" to
"seduce" Raniere and have Raniere take a photograph of Jay to prove that she had done it.
Tr. at 4416-17.  Mack told Jay, "I give you permission to enjoy it," and Jay understood the
assignment as a direction to have sex with Raniere.  Tr. at 4418-20.  Jay asked Mack directly
if Raniere was part of DOS, which Mack denied.  Id.  Jay refused to engage in a sex act with
Raniere.  Tr. at 4419.  Before leaving DOS in approximately May 2017, Jay captured images
of collateral belonging to other DOS "slaves," believing that she could protect the release of
her own collateral by having other DOS members' collateral as leverage.  Tr. at 4423-25.

    vii.   <u>DOS Aftermath</u>

The existence of DOS became known within the Nxivm community in early
June 2017, when the husband of Sarah Edmondson, a DOS "slave," publicly confronted
Nxivm members about DOS.  Tr. at 1796 (testimony of Lauren Salzman that she told
Raniere that Sarah's husband was "really upset").  Immediately after the existence of DOS
was publicly disclosed, Raniere directed the First Line of DOS to lie about his involvement
in DOS, as well as to compile materials related to DOS and secure them.  PSR ¶¶ 123-31; Tr.
at 1798-1800 (Salzman testimony).  Raniere also instructed the First Line to collect
"positive" testimonials about DOS and to create a DOS website.  Tr. at 1815.

In July and September 2017, Raniere and Bronfman received letters from
separate DOS victims requesting the return or destruction of their collateral, which included
descriptions of the collateral, including nude photographs and videos.  Id. ¶ 124; Tr. at 1805-
14.  Bronfman hired private investigators and public relations firms to rehabilitate DOS's

public image and to distance it from Nxivm.  Bronfman also made attempts to have criminal charges instituted against Sarah Edmondson.

In September 2017, Raniere and Bronfman were alerted to the fact that The New York Times would shortly be publishing an article about DOS.  Bronfman and Raniere drafted intimidating cease-and-desist letters to DOS victims that Bronfman and Raniere feared would publicly disclose the existence of DOS.  These letters were later sent to several DOS victims by attorneys in Mexico.  PSR ¶ 126; see Exhibit B.  For instance, on September 13, 2017, Raniere sent Bronfman the following email with the subject line, "What are your thoughts?":

Ms. [DOS victim],

I am the chief attorney of a criminal investigation in Mexico of more than 20 individuals tied together in a cooperative destructive network. These individuals, including yourself, have been acting against individuals who participate in the NXIVM corporation community.

You are currently connected to the criminal investigations involving fraud, coercion, extortion, harassment, stalking, theft of trade secrets (which includes use of trade secrets compromised of, amongst other things, client lists), criminal conspiracy, computer crimes and corporate espionage.

I strongly suggest that you cease and desist, undo, reverse, cancel, and retract, participation in all past, present, and future, conversations, conference calls, meetings, news media, social media, blogs, or websites, relating to this subject matter until the criminal matters are resolved. You should do everything in your power to affect this.

Your best course of action to minimize your exposure, in addition to the above, is to repair all damages to parties you have acted against, reconciling with them, and fully cooperating with the criminal investigations. In this regard, I can help you for I represent some of your victims and have access to others.

I know that people in the media (and also bloggers and the like) can be coercive, abusive in their power, and force unwitting, uninformed, participants to complicate situations and potentially even waive rights. You still have the ability to pull away from all participation with these people.

Please contact me as soon as possible,

Exhibit B-001. Less than thirty minutes later, Bronfman emailed the text of the email of the

email to Alejandro Betancourt, a co-conspirator based in Mexico.  The following day,

September 14, 2017, the referenced DOS victim received an email from a Mexican attorney,

Ricardo Olmedo of Olmedo Gaxiola & Abogados, with the subject line "CAUSA PENAL

EN MEXICO."  Attached to the email was a Microsoft Word document containing, word-

for-word, the text of the email sent by Raniere to Bronfman.  <u>See</u> Exhibit B-002.  The

metadata of the Word document received by the DOS victim reflects that the creator of the

document was Bronfman.

On September 18, 2017, Raniere sent Bronfman the following email with the

subject line "Draft":

Ms. [DOS victim],

You are the only person receiving this letter. This overture is against my better
judgement as I feel there is little probability of success yet more expense, but I am
writing you on my clients' behalf.  If you do not respond affirmatively to this letter by
1:00pm September 19th I will need to proceed as previously required.  I will then not
contact you informally again.

My clients want to give you this opportunity to cooperate and minimize the impact on
your life. The criminal investigations will increase in number, and thoroughness, and
will not stop until justice is served. This will not go away.

The group with which you are involved contains individuals who have already served
prison time, others who are currently indicted, and some that face extradition
proceedings.  The others are under investigation for quite serious crimes.  The form of
justice to which they subscribe is trial and conviction by media, personal opinion, and
abuse of power.  They appear to have no issue with committing a crime when it suites
[sic] them. They use the actions of others to justify this.  Whether the person they
target is right or wrong, this method of persecution is very wrongful.  You must
separate from them completely to mitigate the effects on yourself.

Please divest yourself from this wrongfulness and this group. Please write to me affirmatively by the above deadline indicating you will cooperate fully. I can also help you with any criminal investigations within the United States.

Sincerely,

Exhibit B-003.  That same day, the DOS victim received an email from Mr. Olmedo Gaxiola attaching a second letter as a document in Microsoft Word, which contained nearly exactly the same text as that sent to Bronfman by Raniere, and, the metadata of the Word document reflects that the creator of the document was Bronfman.  Exhibit B-004.

Other DOS victims, including Jay, received similar intimidating letters from another attorney, Diego Ruiz Durán of Bufete Ruiz Durán S.C.  On October 11, 2017—six days before The New York Times published its reporting on DOS[3]—Jay received an email from Mr. Durán.  In the email, Mr. Durán stated that he was taking "the liberty to writing to you to let you know that the State's Attorney's Office in Mexico, has issued some directives against you and other individuals."  Exhibit B-005.  Mr. Durán enclosed a letter in Spanish and a document containing an English translation directing Jay to "[s]top, abstain and refrain from incurring in any type of intimidation, acts of nuisance or disturbances[.]"  Id.

Months later, in December 2017, Bronfman released a public statement characterizing DOS as a "sorority," stating that it had "truly benefited the lives of its members, and does so freely.  I find no fault in a group of women (or men for that matter) freely taking a vow of loyalty and friendship with one another to feel safe while pushing back against the fears that have stifled their personal and professional growth."  GX 1393R.

---

[3]      See Barry Meier, Inside a Secretive Group Where Women Are Branded, N.Y. Times (Oct. 17, 2017).

Raniere also issued a public statement denying his association with DOS and claiming that "experts" had concluded that "members of the sorority . . . haven't been coerced."  GX 1009.

After multiple DOS victims spoke publicly about their experiences, Raniere and Nicki Clyne, a member of the First Line, considered releasing an edited video of Sarah's branding ceremony.  Tr. at 1836.  The branding video depicted Sarah naked and being branded and stating, as she had been instructed, "Master, please brand me, it would be an honor."  In May 2019, during the trial against Raniere, the video of Sarah's branding video was publicly disseminated and broadcast in Mexican media.  Tr. at 5149.

Shortly after the media reports were published regarding DOS, Raniere and Bronfman traveled to Mexico.  As media outlets began reporting that the United States Attorney's Office had launched a criminal investigation, Raniere stopped using the phone number he had previously used for over fifteen years and he and Bronfman began using encrypted email accounts.  Tr. at 1855-56.

viii.  <u>Financial Crimes</u>

Between approximately November 2016 and March 2018, Raniere and Bronfman conspired to commit identity theft in connection with Raniere's continued use of a credit card account number and bank account number belonging to Pamela Cafritz, knowing Cafritz was deceased.  PSR ¶ 78.  This scheme was part of a long-standing practice of deliberately keeping money and assets out of Raniere's name. <u>Id.</u>; <u>see e.g.</u>, Tr. at 607-08 (testimony of Mark Vicente that Raniere expressed desire to be "bankruptcy remote").

Bronfman facilitated the scheme by arranging for regular payment of Pamela Cafritz's credit card after she died on November 7, 2016.  <u>Id.</u>; Tr. at 4540 (testimony of Investigator Richard Guerci).  Among the charges on Pamela Cafritz's credit card were

charges to Prosvent LLC, Amazon Marketplace, Restoration Hardware, a pet shop, Domino's Pizza, a sock store in Brooklyn, Neiman Marcus, Bergdorf Goodman, Saks Direct, Netflix, and various baby companies. Tr. at 4556-4629. In total, approximately $135,000 was charged to Pamela Cafritz's credit card from November 7, 2016, the date of her death, to February 8, 2018. Tr. at 4620. In addition, disbursements were made from Pamela Cafritz's Key Bank account after she died. Tr. at 4556-64. Approximately $320,305 in checks and $736,856 total disbursements were drawn from Cafritz's account, which included payments to Russell. Tr. at 4582.

APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Gall, 552 U.S. at 50 (citation and footnote omitted). Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C. § 3553(a)(2)]." The factors courts shall consider in imposing sentence include "the nature and circumstances of the offense and the history and

23

characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In addition, 18 U.S.C. § 3661 provides that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

## THE GUIDELINES

The United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculation detailed in the PSR is accurate, and, based on a total offense level of 52 and a criminal history category of I, results in an advisory Guidelines range of life in prison.

| Group | Count | Adjusted Offense Level | Units |
|-------|-------|------------------------|-------|
| 1 | Counts 1(A) and 7: Visa Fraud and Wire Fraud | 23 | 0.0 |
| 2 | Counts 1, 2, RA1(a), RA1(b): Identity Theft | 23 | 0.0 |

| 3 | Counts 1, 2, RA2 and 4: Sexual Exploitation of Camila on November 2, 2005 | 42 | 1.0 |
| 4 | Counts 1, 2, RA3 and 4: Sexual Exploitation of Camila on November 24, 2005 | 42 | 1.0 |
| 5 | Counts 1, 2, RA5(a) and 5(b): Identity Theft of Loperfido | 23 | 0.0 |
| 6 | Counts 1, 2, RA5(a) and 5(b): Identity Theft of Edgar Bronfman | 23 | 0.0 |
| 7 | Counts 1, 2, RA6: Alter Records in an Official Proceeding | 23 | 0.0 |
| 8 | Counts 1, 2, RA7: Identity Theft of Marianna | 23 | 0.0 |
| 9 | Counts 1, 2, RA9(a) and 9(b): Trafficking and Document Servitude of Daniela | 31 | 0.0 |
| 10 | Counts 1, 2, RA10: Extortion | 23 | 0.0 |
| 11 | Counts 1, 2, RA12(a), 12(b), 8 and 9: Sex Trafficking and Forced Labor of Nicole | 36 | 0.5 |
| 12 | Counts 1, 2, RA14: Identity Theft of Pamela Cafritz | 23 | 0.0 |
| 13 | Counts 1 and 8(a): Sex Trafficking of Additional DOS Victim 1 | 38 | 1.0 |
| 14 | Counts 1 and 8(b): Sex Trafficking of Additional DOS Victim 2 | 38 | 1.0 |
| 16 | Counts 1, 8, 10: Attempted Sex Trafficking of Jay | 38 | 1.0 |

| | | | **5.5** |
|---|---|---|---|

The offense level applicable to the Group with the highest offense level is 42, which is the Group relating to the sexual exploitation of Camila. Because 5.5 units results in an increase of five levels pursuant to Guidelines Section 3D1.4, the combined adjusted offense level is 47. A five-level enhancement pursuant to Section 4B1.5(b)(1) for engaging in a "pattern of activity involving prohibited sexual conduct" is also applicable, which results in a total offense level of 52. PSR ¶ 292; Addendum to the PSR dated May 18, 2020.

In his objections to the PSR, Raniere raises seven challenges to the calculation of the Guidelines. Specifically, Raniere objects to (1) the application of the four-level leader or organizer role enhancement pursuant to Guidelines Section 3B1.1(a); (2) offense-level enhancements related to the sexual exploitation of Camila (Racketeering Acts Two, Three and Four); (3) an offense-level enhancement for "serious bodily injury" to Daniela as to Racketeering Act Nine; (4) the application of the cross-reference to the sex trafficking Guidelines as to the forced labor of Nicole (Racketeering Act 12(b) and 6); (5) the inclusion in the Guidelines of sex trafficking as to two additional DOS victims; (6) the calculation of the attempted sex trafficking of Jay (Counts 8 and 10); and (7) the five-level enhancement for engaging in a "pattern of activity involving prohibited sexual conduct" under Guidelines Section 4B1.5(b)(1). Def. Letter Dated March 11, 2020. As set forth below, these objections are meritless.

I.     A Leadership Role Enhancement is Warranted

Under section 3B1.1(a) of the United States Sentencing Guidelines, a defendant's base offense level should be increased by four levels "[i]f the defendant was an

26

organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." To qualify for the enhancement, the defendant must have been the organizer or leader "of one or more other participants" in the criminal activity. U.S.S.G. § 3B1.1, app. note 2. The court determines whether a role enhancement is applicable based on all relevant conduct as defined by Guidelines Section 1B1.3, see U.S.S.G. § 3B1.1, introductory commentary, and considers factors such as the defendant's "exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others," id., app. note 4; see also United States v. Katsman, 551 F. App'x 601, 603 (2d Cir. 2014) (summary order).

The applicability of the role enhancement is evaluated based on the defendant's role in the overall racketeering enterprise, not his role as to each underlying predicate act. See United States v. Ivezaj, 568 F.3d 88, 99 (2d Cir. 2009) ("[I]t makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted on the basis of his participation in discrete racketeering acts."); see also United States v. Damico, 99 F.3d 1431, 1438 (7th Cir. 1996). As proven at trial, the defendant was the leader of a criminal enterprise comprising over a dozen individuals over whom he exerted control and authority and who he trusted to carry out his criminal directives. See, e.g., Tr. at 1563-1580; GX 362. The four-level leadership role enhancement is warranted.

27

II.   Raniere Had Sexual Contact with Camila and She Was in His Custody, Care and Supervisory Control

   The trial record overwhelmingly established that in September 2005, the defendant began sexually abusing Camila, who was then a fifteen-year-old child, and that Camila was in the custody, care and supervisory control of the defendant during this time. Therefore, as to Racketeering Acts Two, Three and Four, a two-level enhancement pursuant to Guidelines Section 2G2.1(b)(2)(A) and a two-level enhancement pursuant to Section 2G2.1(b)(5) are warranted.

   Guidelines Section 2G2.1(b)(2)(A) provides for a two-level enhancement if the offense involved the commission "of a sexual act or sexual contact."  As detailed at trial, Raniere and Camila exchanged numerous sexually explicit emails referencing the beginning of their sexual relationship as September 2005 and their "anniversary"—that is, the first date they had sex—as September 18, 2005.  See, e.g., Exhibit A, GX 301-R-17; Tr. at 3462-65. As just one example, on March 18, 2009, Camila sent an email to Raniere expressing her concern that their relationship was "limited" to "sex" and that Raniere did not "want anything more."  In that email, Camila also stated the following:  "I just realized that it is the 18th of march today…. We've been together for 3 1/2 yrs. whoa that's a long time!"  See GX 1400-44.  The email is signed, "your vc," which is a reference to "virgin Camila," Raniere's nickname for Camila.  Additional communications make clear that Raniere first began having sex with Camila when she was 15 years old, when he took child pornography photographs of her.  See, e.g., Exhibit A, GX 301-R-679 (Camila referring to herself as an "inexperienced 15 year old"); GX 302-R-44 (Raniere: You know I guard the other pictures

28

right?  You know I have the others yes?  Camila: From way back when..? Raniere: I wanted the original forever. I thought it was truly mine.  Yes, from way back…").

The child pornography photographs that Raniere took of Camila in November 2005 themselves indicate a contemporaneous sexual relationship between Raniere and Camila.[4]  The photographs depict Camila lying on a bed fully nude, and several photographs depict close-ups of Camila's genitals.  Not only do the content of photographs themselves suggest that Camila was engaging in sexual activity with the taker of the photographs, Raniere, but the photographs were located in a folder containing nude photographs of eleven other women with whom Raniere had a sexual relationship at that time.  See also Tr. at 1535-36 (testimony of Lauren Salzman describing Raniere taking "up-close crotch shot" photographs of her in "around 2005"); Tr. at 2571-72 (testimony of Daniela having discovered photographs of "naked women" on Raniere's computer).  The collection of images are similar in content; each folder contains images of a nude woman on a bed and close-up photographs of the woman's pubic hair and vaginal area.

Daniela's testimony at trial confirmed the existence of a sexual relationship between Camila and Raniere before Camila turned 18.  Specifically, Daniela testified that she had a conversation with Raniere about his sexual relationship with her sister Camila and that the conversation took place at some point prior to fall 2006.  Tr. at 2472-74 ("I asked him if he was having sex with my sister [Camila].  He asked me if I minded.").

Further, Camila's gynecological records reflect that in 2011, Camila reported to medical professionals that she had been with the same sexual partner for "five years."  GX

---

[4]       See GX 503, 504, 528-534.

29

539-18; see Tr. at 3312-13.  In addition, a diary kept by Camila as a minor also reflects that

she was in a sexual relationship with Raniere.[5]  The diary, authored by Camila and dated July

2007 (when Camila was 17 years old), indicates that Camila was in a sexual relationship with

an individual who was also "with [her] sister in front of [her]" and who encouraged her to

lose weight.[6]  See Exhibit C at 2.  The diary also contains references to Nxivm members,

including her sister Marianna and brother Adrian; Camila's work as a caretaker of Raniere's

son; and grocery lists and weight loss.

The defendant's sexual abuse of Camila in the months prior to the commission

of the crimes of conviction clearly supports an enhancement pursuant to § 2G2.1(b)(2)(A).

See, e.g., United States v. Weisinger, 586 F. App'x 733, 739 (2d Cir. 2014) (summary order)

(affirming application of § 2G2.1(b)(2)(A) on the grounds that the defendant had sexual

contact with the victim in "grooming her for the crimes of conviction" even where the child

pornography at issue did not depict sexual contact with another person); United States v.

Holt, 408 F. App'x 229, 238 (11th Cir. 2010) (affirming application of enhancement where

---

[5]     Camila's diary, which was produced to the defendant prior to trial as VDM_NXIVM00028665-VMD_NXIVM00028761, will be provided to the Court under separate cover as Exhibit C.  Due to the sensitive nature of these materials, the government respectfully requests that they remain under seal.

[6]     The voluminous WhatsApp messages between Camila and Raniere admitted at trial reflect Camila's distress at Raniere's sexual relationship with her sister Marianna.  See, e.g.,  GX 301-R-265 ("Were you serious about having children with my sister or were you using that to scare me?"); id. ("You know how much we went through because of your relationship with her.  I always felt that you chose her over me."); GX 1779 ("Make sure your sister doesn't see you texting…"); GX 1779-419 ("I really thought I was not going to be part of your life [because] I was so afraid that it looked like you were going to choose my sister").

defendant's "inappropriate sexual relationship with [the victim] groomed her to participate in [his] production of pornographic images.").

 The evidence at trial also established that after Camila arrived in Clifton Park at the defendant's invitation, the defendant arranged for her to take Nxivm classes and to work as a maid in Nancy Salzman's house, which was a distance away from her siblings. See, e.g., Tr. at 2469 (Daniela's testimony that the "plan that Keith had for [Camila] was that she was going to be essentially Nancy's maid. She was going to be cleaning Nancy's house for money and attending Ethos classes and the house that they found for her was also far away from where I lived."). The defendant also arranged for Camila to live in Nxivm-affiliated housing with other women, including Monica Duran. See, e.g., Tr. at 2465-73. Camila was in the custody, care and supervisory control of the defendant during this time and a two-level enhancement pursuant to § 2G2.1(b)(5) is therefore applicable. See U.S.S.G § 2G2.1(b)(5) app. note 5 (noting that § 2G2.1(b)(5) "is intended to have broad application and includes offenses involving a minor entrusted to the defendant, whether temporarily or permanently").

 III. <u>An Enhancement for Daniela's Serious Bodily Injury is Warranted</u>

 The trial record amply demonstrated that Racketeering Act Nine involved serious bodily injury to Daniela and that a two-level enhancement pursuant to U.S.S.G. § 2H4.1(b)(1)(B) is applicable. "Serious bodily injury" is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, app. note 1. While she was confined to a room at the defendant's direction, Daniela repeatedly requested medical care for a toothache that

caused her constant pain.  Tr. at 1958-59; 2939-2942.  The defendant did not permit Daniela to visit a dentist for six weeks.  The defendant finally allowed Lauren Salzman to accompany Daniela to a dentist only after a part of Daniela's tooth broke off, leaving a hole.  Id.; Tr. at 2955.  Daniela also suffered extreme emotional and psychological pain as a result of her confinement, see, e.g., Tr. at 2891-901, and only escaped after she seriously contemplated suicide and started accumulating cleaning supplies in order to accomplish it, Tr. at 2905-06.  These events constitute serious bodily injury in connection with Daniela's condition of forced labor.  See, e.g., United States v. Callahan, 801 F.3d 606, 627 (6th Cir. 2015) (a victim sustained "serious bodily injury" in connection with her condition of forced labor when the defendant kicked her in the face, "knocking a tooth loose").

IV.    The Cross-Reference to Guideline Section 2H4.1(b)(4)(B) Is Accurate

The defendant's objection to the cross-reference, pursuant to U.S.S.G. § 2H4.1(b)(4)(B), to the guideline governing sex trafficking is meritless.  Section 2H4.1(b)(4) provides that if "any other felony offense was committed during the commission of, or in connection with, the [forced labor] offense, increase to . . . 2 plus the offense level from the offense guideline applicable to that other offense, but in no event greater than level 43."  "Any other felony offense is defined as "any conduct that constitutes a felony offense" under federal, state or local law.  Raniere argues that the cross-reference to the sex trafficking guideline results in double counting because he will be punished twice for the same conduct (sex trafficking of Jane Doe 5).  The Second Circuit has "repeatedly held, however, that a district court calculating a Guidelines sentence may apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by Congress and the Sentencing Commission [because while] such calculations

may involve 'double counting' in a literal sense, they do not involve <u>impermissible</u> double counting." <u>United States v. Maloney</u>, 406 F.3d 149, 152 (2d Cir. 2005) (emphasis in original). Because the sex trafficking guideline calculation results in a higher offense level than that of the forced labor guideline, pursuant to § 2H4.1(b)(4)(B), the sex trafficking guideline calculation "essentially replaced the forced labor calculation," which does not have the effect of impermissibly double counting the same underlying conduct. <u>United States v. Callahan</u>, 801 F.3d 606, 628-29 (6th Cir. 2015) (rejecting defendant's claim that the cross-reference, pursuant to § 2H4.1(b)(4)(B), to the guidelines governing a different offense constituted impermissible double counting).

V.     <u>The Trial Evidence Established that Raniere Participated in Sex Trafficking as to Other DOS Victims</u>

The trial record also established, either by evidence admitted at trial that proved such facts explicitly or from which the facts reasonably could be inferred, that Raniere participated in sex trafficking as to two additional DOS victims, or, at a minimum, attempted to do so. Specifically, Raniere and other DOS "masters" recruited women, including Sylvie and India, as "slaves" into DOS by deliberately concealing Raniere's role in DOS and the sexualized components of DOS. PSR ¶¶ 84-96; Tr. at 1509-11. Sylvie was recruited into DOS by Monica Duran, who gave Sylvie an assignment to "seduce Raniere." PSR ¶ 101; Tr. at 219. Sylvie testified that she was not attracted to Raniere and found him "creepy." Tr. at 118. Duran later arranged for Sylvie to meet Raniere at a house, where Raniere took Sylvie upstairs, instructed her to undress and lie down on the bed. Tr. at 250-54. Raniere then performed unwanted oral sex on Sylvie and took close-up photographs of Sylvie's vagina with Sylvie's phone. Tr. at 257. Sylvie felt disgusted by this encounter and

33

acquiesced to it only because she believed her collateral would be released if she did not

obey Raniere.  Tr. at 220.  After Sylvie completed the assignment she had been given, Sylvie

deleted the photograph in disgust and shame.  Tr. at 257-58.  The next day, Duran called

Sylvie, panicked, because the photographs had been deleted from Duran's phone.  Id.  Duran

told Sylvie that she would have to go back to Raniere and have him take new photographs,

which Sylvie did.  Id.

        The evidence at trial also established that the First Line received benefits,

financial and otherwise, by facilitating Raniere's access to their slaves.  For example, on

March 3, 2016, Raniere sent an email to Allison Mack asking if India knew that "to complete

her [assignment] she needs to take all her clothes off" so that Raniere could take a

photograph of her.  GX 1805.  The following day, Mack sent an email to Raniere apologizing

for "bug[ging] him" but explaining that she "had not been paid as head trainer for the source"

and that she was "struggling a little with income."  GX 1803.  Mack wrote that Bronfman

could not approve the payments until Raniere reviewed them.  Raniere responded the same

day with the following email:  "Yes.  Any news on India?"  Lauren Salzman testified at trial

that when she asked Mack whether Raniere was "fucking her slaves," Mack responded that

she and Raniere were going to "start working with India and Jay" and clarified to Salzman

that "working" meant sex.  Tr. at 1794.  Taken as a whole, this evidence establishes that

Raniere participated in sex trafficking as to Sylvie and as to India.

## VI.    Raniere is Not Entitled to a Three-Point Reduction Under Section 2X1.1(b)(1)

        The defendant is not entitled to a three-point reduction under U.S.S.G.

§ 2X1.1(b)(1) because the evidence at trial established that the defendant "completed all of

the acts [he] believed necessary for successful completion of the substantive offense[,]" that

is, the sex trafficking of Jay (Jane Doe 8).  See Tr. at 4416-26, 4433.  Under 18 U.S.C.

§ 1591, it is not required that the victim actually perform a commercial sex act as long as the

defendant recruited, enticed, harbored, transported, provided, obtained, maintained,

patronized or solicited Jay for purposes of engaging in commercial sex acts.  See Jury

Charge, ECF Docket Entry No. 728, at 100.  The defendant completed all the acts he

believed necessary for successful completion of the substantive offense, and is not entitled to

the three-point reduction.  See United States v. Medina, 74 F.3d 413, 418 (2d Cir. 1996)

(explaining that § 2X1.1(b)(2) "determines punishment based on the conduct of the

defendant, not on the probability that a conspiracy would have achieved success"); United

States v. Deas, 768 F. App'x 81, 82 (2d Cir. 2019) (summary order) (same as to attempt);

United States v. Jenkins, 69 F. App'x 499, 501 (2d Cir. 2003) (summary order) (same).

VII.    Raniere Engaged in a Pattern of Activity Involving Prohibited Sexual Conduct

The government submits that the five-level enhancement under § 4B1.5(b)(1)

for engaging in a "pattern of activity involving prohibited sexual conduct" is warranted.  As

set forth above, Raniere began a sexual relationship with Camila in or about September 2005,

and thereafter, on two occasions in November 2005, produced child pornography depicting

Camila.  The Second Circuit has held that "[p]roof of any two separate occasions of

prohibited sexual conduct" is sufficient to find "that a defendant poses the sort of continuing

danger supporting a § 4B1.5(b) enhancement."  See United States v. Broxmeyer, 699 F.3d

265, 284-86 (2d Cir. 2012) (finding that the defendant's conviction of attempted production

of child pornography, coupled with a single other occasion of prohibited sexual conduct, was

indicative of a pattern of prohibited sexual conduct); see also United States v. Batson, 749 F.

App'x 804, 807 (11th Cir. 2018) (multiple sexual offenses involving the same minor victim qualified as a pattern of sexual activity under § 4B1.5(b)(1)).

FINANCIAL PENALTIES AND RESTITUTION

## I.    Assessments and Fines

In addition to assessments imposed by 18 U.S.C. § 3013, the Court should impose a payment of a $5,000 special assessment pursuant to the Justice for Victims of Trafficking Act of 2015, as well as a fine within the Guidelines range of $50,000 to $250,000.[7]  PSR ¶¶ 356-60.

The Guidelines provide that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," and employs an eight-factor test to determine the amount of any such fine.  U.S.S.G. §§ 5E1.2(a), 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  Id.  The defendant bears the burden of demonstrating an inability to pay a fine.  See United States v. Camargo, 393 F. App'x 796, 798 (2d Cir. 2010) (summary order); United States v. Salameh, 261 F.3d 271, 276 (2d Cir. 2001).

The Guidelines fine range for the offenses of conviction is $50,000 to $250,000.  PSR ¶ 359 (citing U.S.S.G. § 5E1.2(c)(3)).  It appears that Raniere has the ability to pay a fine; Raniere reported an interest in the $8 million estate of his deceased former

---

[7]    Although the PSR states that the $5,000 special assessment is to be imposed "per count," the government notes that the Second Circuit has recently "conclude[d] that the text of § 3014, taken as a whole and in its context, is . . . meant to be applied on a per-offender, not a per-count, basis."  United States v. Haverkamp, 958 F.3d 145, 149 (2d Cir. 2020).

36

partner, Pamela Cafritz, and also reported to the Probation Officer that he also had earnings from Executive Success Programs ("ESP") and Nxivm. PSR ¶¶ 343, 347. Although the defendant's true financial situation is opaque, see PSR ¶ 347, the defendant has not met his burden of establishing his inability to pay a fine. For the reasons set forth herein, there is a need for a financial penalty in light of the seriousness of Raniere's crimes, his disregard for the law, and the need for deterrence.

## II.     Restitution

In Title 18, United States Code, Section 1593, Congress provided for mandatory restitution for victims of sex trafficking, forced labor, and document servitude, among other crimes. 18 U.S.C. § 1593(a); see United States v. Sabhnani, 599 F.3d 215, 254 (2d Cir. 2010). Defendants convicted under Section 1593 are required to pay the "full amount of the victim's losses," as defined in 18 U.S.C. § 2259(b)(3). Section 1593 defines the term "victim" as an "individual harmed as a result of a crime under this chapter[.]"

Unless otherwise provided by statute (e.g., 18 U.S.C. § 2259, providing mandatory restitution for Chapter 110 offenses, including the production of child pornography), restitution for all other Title 18 offenses are calculated under 18 U.S.C. § 3663A (mandatory restitution for certain offenses) or § 3663 (discretionary restitution). Under Section 3663A, a victim is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

Under either statute, a defendant's "economic circumstances should have no bearing on a court's decision to enter such an order. 18 U.S.C. § 3664(f)(1)(A); In re Morning Star Packing Co., 711 F.3d 1142, 1144 (9th Cir. 2013) (holding district court committed legal error in denying restitution because of defendant's claimed financial status and potential availability of civil remedies).

At present, the government has received over 25 declarations of loss from individuals who identify themselves as victims of the defendant's criminal conduct and expects it may receive more. In light of the number of victims and the scope, complexity and duration of the defendant's criminal activity, the government respectfully requests that the Court set a date no later than 90 days after sentencing for a final determination of victim losses for purposes of restitution. See 18 U.S.C. § 3664(d)(5).

In addition, the government anticipates that it will make a request that Raniere's restitution order identify victims of sex trafficking, forced labor and document servitude (the "1593 Victims") and prioritize restitution to such victims. The government recognizes that the restitution order entered by the Court may exceed Raniere's ability to pay such order and the total value of assets to be criminally forfeited. Therefore, the government intends to request that, pursuant to 18 U.S.C. § 3664(i), the Court prioritize restitution to the 1593 Victims in Raniere's restitution order. 18 U.S.C. § 3664(i) ("If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim."); see, e.g., United States v. Newcomb, No. 6:14-CR-00001-1, 2015 WL 4878940, at *3 (W.D. Va. Aug. 14, 2015) (relying on § 3664(i) in prioritizing one corporate victim over another).

38

The Attorney General, acting through the Department of Justice's Money Laundering and Asset Recovery Section ("MLARS"), may exercise discretion to remit forfeited funds to persons who have incurred a pecuniary loss directly caused by the offense underlying the forfeiture, or a related offense. 28 C.F.R. §§ 9.2, 9.8(b)(1). A "related offense" includes an offense committed "as part of the same scheme or design, or pursuant to the same conspiracy, as was involved in the offense for which forfeiture was ordered." 28 C.F.R. § 9.2. Upon the final forfeiture of the assets subject to preliminary forfeiture orders in this case, the United States Office for the Eastern District of New York presently intends to request that the Department of Justice approve the restoration of the forfeited funds to the Clerk of Court to distribute pursuant to any restitution order entered by the Court as to Raniere.[8] However, pursuant to 28 C.F.R. § 9.1(b)(2), the sole discretion to approve the Office's request lies with the chief of the Department's Money Laundering and Asset Recovery Section ("MLARS"), and the losses in the restitution order must otherwise comport with 28 C.F.R. Part 9.

Offenses involving human trafficking have special provisions concerning dispositions of forfeited funds. Congress has directed that all property forfeited under Section 1594 "shall" be used to pay any restitution ordered in the criminal case. See 18 U.S.C. § 1594(f)(1); see also 18 U.S.C. § 1594(f)(2) (providing that such transfers of

---

[8]      When MLARS approves restoration of forfeited funds, MLARS typically directs the funds to the most comprehensive restitution order issued in the case. This ensures that no victims will be omitted from compensation and that all are treated fairly, and also ensures that restoration accomplishes the same objectives as 28 C.F.R. § 9.8. The government anticipates that any restitution ordered entered against Keith Raniere will be the most comprehensive of those entered in this Court, in light of Raniere's leadership role and his conviction on all charges in the indictment.

forfeited funds shall have priority over any other claims to the assets or their proceeds). Because, however, at least some of the assets to be forfeited in this case were not forfeited pursuant to an offense covered by Section 1594, should MLARS approve restoration of any judicially-forfeited funds to the Clerk of Court, the Clerk would distribute such funds to victims on a pro rata basis absent an order from the Court that specifically prioritizes the 1593 Victims.[9]

Given the primary of the sex trafficking and forced labor offenses in this case, the degree of harm caused by these violations, and Congress's interest in prioritizing forfeited funds for remission to victims of these crimes, the government respectfully submits that any restitution order entered by the Court should specifically identify the 1593 Victims and prioritize restitution to them, to ensure that they receive the funds they need to fully recover and rebuild their lives.

---

[9] In addition to judicial forfeiture proceedings, the government has commenced administrative forfeiture proceedings against approximately $330,847.86 turned over to the government by counsel for Nicki Clyne (the "Clyne Funds"). The Clyne Funds represent the proceeds of the sale of the DOS "sorority house." See Tr. at 1510; 1538. Under 18 U.S.C. § 1594, the forfeiture statute applicable to the Clyne Funds, the Department of Justice is required to remit such funds for payment of restitution to the 1593 Victims. For such a transfer to comply with Section 1594, Raniere's restitution order must identify such victims and their losses.

## ARGUMENT

It is difficult to overstate the seriousness of the defendant's crimes. As reflected in the impact statements submitted by the victims in this case, Raniere wreaked a path of destruction through his victims' lives.[10] The defendant was able to engage in criminal activity for so long because he successfully cultivated followers loyal to him who carried out his orders and shielded him from scrutiny. Raniere sought out those who could provide financial support or the connections to enhance his reputation and increase his power to intimidate critics and detractors. Raniere concealed his abuse behind the smokescreen of his supposed "personal growth" programs—a charade he continues to this day. Since his conviction, Raniere has continued to demonstrate a complete lack of remorse for his crimes.

The government respectfully submits that a Guidelines sentence of life imprisonment is necessary to provide appropriate punishment, to protect the public from further crimes by Raniere, to promote respect for the law, and to discourage others from committing similar crimes.

I.   The Nature and Circumstances of the Offenses and the Need to Provide Just Punishment Warrant a Sentence of Life Imprisonment

There is no question about the seriousness of the offenses for which Raniere was convicted. As demonstrated at trial, among the many acts of manipulation, coercion, and exploitation that Raniere committed were the following:

- Raniere ordered the confinement of Daniela to a room, without human contact, for nearly two years;

---

[10]   The government is currently in receipt of a significant number of victim impact statements, which have been provided to counsel for the defendant. These statements, along with any others the government receives, will be provided to the Court as directed in advance of the October sentencing.

- Raniere sexually exploited Camila, a 15-year-old child, and took photographs of his abuse;

- Raniere created and led DOS, in which women were recruited under the false pretense of joining a women-only mentorship group, later discovering that they had taken collateralized "vows of obedience" to women who were "slaves" to Raniere;

- Raniere directed that several DOS "slaves" be assigned to have sex with him;

- Raniere directed the unlawful surveillance of individuals perceived to be enemies or critics of Nxivm;

- Raniere obstructed justice by ordering the tampering of evidence to be used in a civil lawsuit; and

- After some DOS victims began to share their experiences of abuse publicly, Raniere and Clare Bronfman drafted threatening cease-and-desist letters, which were then sent to several DOS "slaves" by attorneys in Mexico retained by Bronfman.

The defendant's crimes are among the most serious under the law, both in their character and in the amount of time and manipulation dedicated to their commission. The government will not here belabor the fact that the criminal conduct proved at trial shocks the conscience. The brother of Camila and Daniela, Adrian, has described the devastating impact of Raniere's actions on his family:

> The emotional and physical torture that my sisters had to endure should never be allowed to happen to anybody. My whole family is still suffering because of him. . . . Keith made my whole family think Dani was a dangerous psychopath, and to this day my father will not speak to her, or me, or our mother, because we are somehow going against Keith. He still has that kind of hold over half of my family. Keith Raniere is a menace to society; he cares about nobody and nobody can ever be safe with him around.

Their mother also submitted an impact statement describing the effect of Raniere's criminal conduct on her children: "Keith played with each of us at will. He set us as enemies,

separated us.  He did inhuman things to my daughters behind my back. . . . Keith took away

the freshness of my children, their spontaneity, their curiosity, their love for themselves."

Raniere began preying on Camila, whom he called "virgin Camila," in 2005.

The power imbalance between them could not have been more stark: Camila was fifteen

years old, with no legal status in the United States, and Raniere was forty-five and the leader

of the community to which Camila's parents belonged.  Raniere did not just abuse Camila

sexually.  For over a decade, he psychologically tortured a young woman, withdrawing

affection or approval if she did not accede to his demands.  As demonstrated in the thousands

of messages exchanged between Raniere and Camila, a small subset of which are appended

to this memorandum as Exhibit A, Raniere's conduct towards Camila was controlling and

emotionally abusive.  See, e.g., Exhibit A, GX 301-R-96 ("If you want me to come tonight, I

will under these conditions: there will be no talking.  You will meet me at the door in the

outfit you think I would find sexiest.  You will arouse me, we will make love for my

satisfaction and pleasure.  You will do everything you can to provide that.  I will finish and

leave.  Do you agree yes or no?"); 301-R-239 ("I expect you to text me this vow [of

obedience] now.  I will text you later.  I expect you to answer this right away.  Otherwise no

go.  You need to be happy wherever you are with me because my time means that much.").

Raniere required Camila to ask permission of him for everything she did, even

in order to contact her own family and to cut her hair.  See, e.g., GX 301-128 ("I really hate

that I feel like I have to ask you for permission to do anything outside of my schedule");

GX 1779-25 ("Can I text my family?"), GX1779-87 (Camila's request for Raniere's

permission to remove pubic hair), GX 1779-166 (Camila's request for Raniere's permission

to take "4 days away for a flamenco workshop," to which Raniere responded, "Give me a

day...likely a yes").  When Camila resisted him, Raniere threatened to evict her from the

residence she was living in and, because she had no legal status, deport her to Mexico.  See,

e.g., GX 301-R-222 (Raniere: "That's the last chance move your stuff out tonight.");

GX 1779-2 (Camila: "Can you please not send me back to mx?"); GX301-R-280 (Raniere:

"The apartment will need to be done first thing tomorrow 8am.  Put all my things, money,

etc… together").

   Raniere's messages to Camila reflect Raniere's preoccupation with Camila's

weight and her sexual submission to him.  See, e.g., GX 301-R-249 (demanding that Camila

"eat less"), see also GX 302-R ("You need to not be prideful and lovingly satisfy me.  Let's

see if you can."); GX 308-R ("You need to make me far superior to everyone ([Robbie

Chiappone] and Jim [Del Negro]) in every way conceivable no question.").  Raniere was

obsessed with Camila's previous romantic interest in Chiappone.  Tr. at 3466-69; GX301-R-

20; GX1779.  Raniere required Camila to provide him with details of her interactions with

Chiappone, including what clothes Camila wore and Chiappone's sexual performance.  Id.;

Tr. at 3557.  Raniere told Camila that her relationship with Chiappone affected her "purity"

and her suitability as his "successor" and that Camila would have to "fix" it, by, among other

things, finding him a "virgin" to be his "successor" and "pure vessel."  See, e.g., Tr. at 3469,

3588-89 ("There are potential successors but they are so young.  This creates several

problems.  Will I live long enough? Will they stay pure?  Will they connect so deeply with

me being so much older?").

   During the course of the "relationship" between the defendant and Camila,

Camila slowly became withdrawn.  She no longer socialized with family and friends.  She

lost weight at Raniere's insistence.  As recounted in her brother's impact statement, Camila

"became extremely private. She wouldn't tell anyone where she lived.  She struggled losing

weight and was malnourished.  She always appeared to be busy, but I never knew with what,

and she never had any money.  I had [no] idea how much Keith was manipulating her.  He

was very good at keeping his actions hidden from me and from other people."  <u>See also</u> Tr. at

1597 (Lauren Salzman's testimony that there was "a lot of curiosity and speculation about

what was going on with Camila.  How come nobody could go to the house? . . . And

eventually Lucy told me that she figured out where Cami lived because she saw Keith

coming and going from Cami's house.  And I wasn't permitted to know or nobody told me.")

Camila's own messages to the defendant reflect her despair and distress at this time:

| | |
|---|---|
| October 10, 2014: | I feel like I have a gun pointed at me and I'm and I'm just trying to say what you want to hear so you won't shoot but I don't know what it is you want to hear. |
| November 24, 2014: | I feel like your puppet. |
| December 8, 2014: | You have taken everything that is important and meaningful to me.  But it is more than that.  You have branded me for life.  Your words have destroyed me.  I feel helpless and worthless.  I feel dead inside. |
| February 8, 2015: | I'm angry at you because you couldn't see how being with me at such a young age was probably taking away from my life and opportunities. |

Exhibit A, GX 301-R-89, 233, 284; GX 302-R-77.

For decades, Camila told no one about her sexual relationship with Raniere,

the man who was without question the most powerful person in her family and community.

Camila had suicidal thoughts.  She harmed herself—a common response to sexual abuse and

a coping mechanism to feel in control.[11]  See, e.g., Tr. at 2474 (testimony of Daniela describing Camila's cutting).  These effects are not uncommon in similarly-victimized individuals, and for this reason, Raniere's post hoc justification for DOS as having been created "as part of ensuring that [Camila] would never" again attempt suicide, see Tr. at 1895 (Lauren Salzman's testimony), is perverse.

Raniere's treatment of Daniela, Camila's sister, was also shocking.  As he did with Camila, the defendant instructed Daniela to keep their coercive sexual relationship a secret and pressured her to lose weight.  Tr. at 2379 (testimony of Daniela); id. at 2633 (Pamela Cafritz instructed Daniela to conceal that Raniere was the father of her child to medical professionals); id. at 2636 (after her abortion, Raniere told Daniela that it was a "great opportunity" for her to lose weight, a conversation that left Daniela "in shock").  After Daniela told Raniere about her relationship with another man, Daniela's "life changed overnight."  Tr. at 2675 ("I was highly dependent on him and his community which he controlled and he was also my only friend.  Like, there was nobody else for me to talk to at that point.  I had a coach.  I didn't talk to my mother anymore.  My relationships [were] secret and, therefore, a large part of my life was.").

---

[11]     See Judith L. Herman, Trauma and Recovery: The Aftermath of Violence--From Domestic Abuse to Political Terror 109 (2015) ("The connection between childhood abuse and self-mutilating behavior is by now well documented.  Repetitive self-injury and other paroxysmal forms of attack on the body seem to develop most commonly in those victims whose abuse began early in childhood. . . . Self-injury is intended not to kill but rather to relieve unbearable emotional pain, and many survivors regard it, paradoxically, as a form of self-preservation."); Lori G. Plante, Bleeding to Ease the Pain: Cutting, Self-Injury and the Adolescent Search for Self 17-18 (2007) ("Many experts have concluded that the most common causal factor related to cutting and other forms of self-injury is a history of sexual abuse and trauma."); Self-Harm, Rape, Abuse & Incest National Network (RAINN), https://rainn.org/articles/self-harm ("Some survivors of sexual assault may use self-harm to cope with difficult or painful feelings.").

46

Raniere enlisted the assistance of Daniela's family members and Lauren Salzman in confining Daniela to a room in her parents' home without human contact for nearly two years.  Tr. at 2686-87 (testimony of Daniela); <u>see also</u> Tr. at 1926 (testimony of Lauren Salzman that Daniela's family members "seemed sad and ashamed about their participation").  Raniere ensured that Daniela's confinement was kept secret and told Lauren Salzman not to speak to him over the phone about it.  Tr. at 1927.  Daniela was miserable and wrote letters to Raniere every day, often multiple times a day, letters which went unopened.  Tr. at 1934.  At trial, Lauren Salzman testified:

> I think it's horrendous.  I—of all the things that I did in this case
> and the crimes that I committed, too, I think that this is the worst
> thing that I did.  I—I don't know what to say.  I kept her in her
> room for two years . . . . And the family, they were close as a
> family when they came to us.  And those relationships were
> incredibly severed through this and other things that happened.
> And I don't know how you can ever recover from that.

Tr. at 1936.  As was made clear by Daniela's testimony at trial, Raniere's actions had a lasting effect on her psychological health.  Daniela testified, "I broke pretty quickly . . . I think I went crazy . . . I would be completely numb for days."  Tr. at 2891; <u>see</u> Tr. 2892 ("I had no books.  I had nothing to read.  Nothing to listen to or nothing to grab onto or somebody else's words to grab on to."); <u>id.</u> at 2904 ("[i]t was harder and harder to keep the darkness at bay.").

Through DOS, Raniere escalated the scope of his abuse and exploitation of women.  Raniere urged his First Line DOS "slaves" to recruit hundreds of women into DOS.  Tr. at 1619-20 (testimony of Lauren Salzman that Raniere expressed a preference for DOS "slaves" in "positions of power and influence").  After these women provided "collateral," such as sexually explicit photographs and videos and damaging confessions, they were

coerced into submitting to providing additional collateral, doing tasks for their "masters," and, in some instances, engaging in sexual activity with Raniere.  Raniere's role as "Grandmaster" and the sexual nature of DOS was deliberately concealed from recruits, including paddling, sexual activity with "slaves," and "up-close vagina pictures."  Tr. at 1790-94 (testimony of Lauren Salzman).  These sexually explicit photographs, which were required of nearly every woman recruited into DOS, were of the same type that Raniere took and kept of his own sexual partners.  See, e.g., Tr. at 1537 (testimony of Lauren Salzman describing Raniere's preference with respect to pubic hair); id. at 1626 (testimony of Lauren Salzman that Raniere preferred DOS pictures "with our legs spread or up close vaginal pictures"); id. at 2378 (testimony of Daniela that, as to pubic hair, "one did not touch it").

Raniere expressed callous disregard for the women recruited to be DOS "slaves."  When, for example, the First Line expressed concerns about branding their recruits with Raniere's initials without their knowledge or consent, Raniere responded that "it shouldn't matter" and "insisted" that it "would not be a problem."  Tr. at 1621-22 (testimony of Lauren Salzman).  But for the bravery in the DOS victims speaking about their abuse, there is little doubt that Raniere would have continued to commit crimes.  Raniere even attempted to use the First Line of DOS to locate a virgin "successor," who, as Lauren Salzman testified, would serve as a "replacement" for Camila.  Tr. at 1899-1901.  Lauren Salzman testified that the first-line DOS masters, including Rosa Laura Junco, made attempts to recruit virgins for this role for the defendant's benefit.  Id.  Raniere's communications with Camila also refer frequently to finding a young "successor candidate."  See Exhibit A, GX 301-R-29; see GX 301-R-332 ("Does Ana know suitable virgins?"); GX 1779-485 ("[I]f my lineage does not withstand competition, my unique genetic combo will not be able to

48

either.  It will not be a basis of other generations, it will be absorbed and combined with others until a superior combination comes about."); GX 1779-485 (Raniere telling Camila that "Rosa Laura" could assist her in becoming "friends with young future candidates" and "shepherding them over time").  These efforts were confirmed in a October 4, 2015 email from Rosa Laura Junco to Raniere, in which Rosa Laura Junco apologized for her "shortcomings" in keeping her teenage daughter, Lauris, away from the defendant and the effect on the defendant's "possibility for succession."  GX 1325.  In the email, Rosa Laura Junco states that she is "100 clear that you are what I want for my daughter (and obviously for myself)."

Sex trafficking is a crime that strips victims of their dignity and self-worth, causing them unimaginable damage.  For many of his victims, Raniere's actions had a destructive impact on their psychological health, emotional stability, and understandings of relationships and trust.  At trial, Sylvie testified about her disgust and shame after Raniere performed unwanted oral sex on her and took photographs of her vagina:

> I felt so disgusting and ashamed, so I just thought—I felt like it was all lies.
>
> I felt—I think I just felt shame, all around that time I felt so much shame and still do honestly about this whole thing . . . I just felt like everything was just lies and secrets and darkness. Like I say, it was such a horrible time.

Tr. at 255-259.  As Nicole explains in her victim impact statement, "[t]he massive effect this had on my psychological state is hard to fully explain. On one hand, the fear I felt in being both blackmailed and bullied, of slowly realizing I no longer had control of my own life. And on the other hand, the deep confusion and struggle to believe Allison when she told me how much she cared for me and reminded me that what I was being put through was for my own

good. The cruelty of that abuse of power and trust will be with me forever." Nicole states

that she "regularly felt like [she] was losing her mind." Similarly, Jay states that her

"confidence in [her]self, [her] talents, and who [she] is has been completely shattered" by her

experience in DOS. She explains, "My sunny disposition has been shifted. I find myself

darker, more negative on my outlook of humanity. . . . Not wanting to make new friends or

connect with others. Feeling constantly alienated."

        Other victim impact statements from DOS victims, which will be provided in

full to the Court, reflect that the defendant is responsible for causing profound levels of stress

and emotional injury:

> "I NEVER would have joined if I had known that Keith was the
> top master. . . . I have no words to explain how this affected me.
> I have never felt so vulnerable and exposed."

> "Just thinking about the possibility of Keith being set free gives
> me tremendous anxiety and stress. He hurt me and some of my
> friends in ways that can never be undone."

> "With the branding, I was physically injured and it's a scar that
> is very difficult to erase. There was a lot of physical pain
> also. . . . But the most harm that I experience was emotional. To
> be deceived by people that I really trusted. They knew
> everything about me, they knew I wanted to help others and like
> me, a lot of people were in the same situation. And that's the
> worst part, to take advantage of people who wanted to build
> better people, better communities, better families, and be better
> human being. And everything was a lie."

The unprecedented magnitude, duration and scope of Raniere's crimes demand the most

serious penalty available.

II.    <u>Raniere's Denial of Responsibility, the Need to Protect the Public and Specific Deterrence</u>

Raniere has demonstrated a complete lack of acceptance of responsibility for his crimes of conviction.  Raniere's post-conviction prison calls and emails reflect that he is unrepentant, has no empathy for his victims, and would continue to commit crimes if released.  <u>See</u> Exhibit D.  Raniere still communicates with Nicki Clyne, a member of the First Line, and even though DOS caused incalculable harm to the women who were recruited into it, on November 7, 2019, Raniere wrote an email to Nicki Clyne stating:

> I believe the sorority is good—not just good and even noble, but great—and vitally important for women and humanity.  It is tragic the current organization has been stymied by a few envious men abusing position of power in government, media, and film; some women who didn't live up to their sacred honor and vows; and people in general who just feel threatened by this idea.  The missing part of our society, found in a secret group of women like this, aches to be embraced; we should deeply mourn it[s] possible loss.  It is a living thing, a precious thing, and an essential thing to complete the human story: groups that are different are not necessarily bad, and ways of journeying through our lives, only for the few, and too intense for the many, are foundationally important for all of us.  This sorority is such a thing: living, precious, intense, and some would say even sacred.  If the current group of committed women, for whatever reason, do not carry [t]his considerable body of knowledge, practices, and skills forward, some other group of brave courageous, women should—even must—somehow, somewhere.  It's here, waiting for the right women, right now.  Who will carry forth this burning torch of light?

Exhibit D-004.  Similarly, in a March 12, 2020 call with Suneel Chakravorty, one of Raniere's supporters, Raniere addressed his conduct with respect to Daniela, stating that she "would have to go back to Mexico or she had to explain to people how she was going to stop from all the stealing and the other things that she was doing.  She also had to finish a book report.  She had a number of different book reports she was supposed to do and she was seen

as being very prideful about it and no matter what, she would do anything, you know, say anything, but never just sit down and simply finish the book report."  Exhibit D-021. Raniere described Daniela as engaging him a "battle of wills" and who "threw, like, uh, what would be a massive sort of tantrum."  Exhibit D-022.

The defendant's unwillingness or inability to express understanding of, and remorse for, his actions is deeply troubling.  It suggests that a Guidelines sentence is particularly important for specific deterrence and protection of the public.  See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order); accord United States v. Martinucci, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)).  A sentence of life imprisonment is particularly warranted where, as here, the defendant has committed offenses for which Congress has made specific findings about the likelihood of recidivism.  See H.R. Rep. No. 107-527, at 2 (2002) (noting that "studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes" and that "recidivism rates do not appreciably decline as offenders age").

In addition, Raniere has demonstrated a disregard for the law and for the system of justice.  In many phone calls with Mr. Chakravorty, Raniere expresses contempt for the prosecution and the Court.  For instance, during an April 8, 2020 phone call with Mr. Chakravorty, Raniere stated that "the major witnesses all lied" and expressed his view that "this judge"—referring to the Court—was corrupt.  Exhibit D-043.  Raniere further stated

that they had to "get scrutiny on this judge, get some pundit who is willing to speak out about what this judge is saying, which is crazy, and the judge needs to know he's being watched . . . ." Exhibit D-052.

Raniere also directed his supporters to develop a podcast and to set up a "contest" in which members of the public would be invited to find purported errors in Raniere's prosecution and trial in exchange for a cash prize. In many phone calls, Mr. Chakravorty describes his efforts to find "judges"—i.e., members of the public—to evaluate submissions for the contest and "check[] the prosecutor's homework." Exhibit D-049; see, e.g., Exhibit D-024; D-042. In an email on January 8, 2020 to Eduardo Asunsolo, Raniere explains that prizes should be in the amount of $25,000.[12] Exhibit D-009; see also id. (Asunsolo: "Some people have feedback that it might be good to have a PR firm linked to the contest. It can filter people who'd just want attention and not to seriously analyze the case. And help in general with the contest.") In subsequent calls, Raniere offers lengthy diatribes on the criminal justice system for Mr. Chakravorty to record, similar to the "verbal downloads" that were described at Raniere's trial, see, e.g., Tr. at 339 (Sylvie's testimony); Tr. at 524 (Vicente's testimony), presumably for publication on a podcast. In these calls, Raniere claims that his conviction resulted from corruption. Exhibit D-061 ("There's a person, Preet Bharara, who was head of the Southern District at one point. He even said that there are corrupt judges. Some judges are corrupt.").

Further, even though counsel for Raniere stated, at trial, that he did not have access to Raniere's phone, Raniere has given his supporters "permission" to "get to [his]

---

[12]     The source of funds for these cash prizes is not apparent.

phone." [13]  In an April 6, 2020 call with Mr. Chakravorty, Raniere told Mr. Chakravorty that "they have a mirror of the phone, I believe, from, uh, you know, a security agency that did the custody, so, you should be able to go on the phone and take off my WhatsApp chats, my Telegram chats, things like that . . . so, I, I give you guys, you, you know, Nicki [Clyne], permission to do that."  Exhibit D-027.  In a call on April 8, 2020, Raniere and Mr. Chakravorty had the following exchange:

> CHAKRAVORTY:  Oh, okay, uh, as far as getting your cell phone, uh, apparently that's, that's considered contraband, um . . .
>
> RANIERE:  Yeah, I just read an email from Marc. I wasn't able to respond to any of them because since I have to do this so quickly…
>
> CHAKRAVORTY:  Okay.
>
> RANIERE:  . . . Um, I think the phone is still my property. That was… I don't think it was ever even subpoenaed.

---

[13]    At trial, Mr. Agnifilo stated that he did not have access to Raniere's phone:

> THE COURT:  Yes, where is the phone anyway?
>
> Mr. Agnifilo:  I don't have the phone.
>
> THE COURT:  Surprising.
>
> Mr. Agnifilo:  It's surprising or not.
>
> THE COURT:  You have no idea where it is?
>
> Mr. Agnifilo:  I don't know where the phone is.

Tr. at 4225-26.

CHAKRAVORTY:    Oh, okay.

RANIERE:    Um, so, you know and I . . . as, as far as pictures. . . there is nothing there, I believe is considered. . . I don't know, I mean, I guess they can try to say certain pictures were considered illegal or something like that, but, um, you know, uh, uh, see what, see what he can do because that phone has not been subpoenaed.

Exhibit D-040.

In his communications with his supporters, Raniere repeatedly attempts to cast himself as a victim of persecution and harassment from the government and from unknown enemies.[14] See, e.g., Exhibit D-002 ("[T]his situation has been a purely political, envy-driven, money-powered lie to destroy a community, and keep me either incarcerated for life or otherwise "disposed of."  This lie is perpetrated by certain politicians, prosecutors, lobbyist [sic], agents, judges, and people of influence, who likely received great benefits of recognition, social capital, favors, and maybe even money: it should all be closely examined."); Exhibit D-072 ("[T]hese people who are the political pushers of judges and media, they don't need to be able to influence a particular judge. . . . So if they have a certain number of judges that are under their control in the Second Circuit, all they have to do is make sure that your case gets in front of one of those judges.")

---

[14]    Raniere has continued to regularly contact his supporters, even entering aliases for them in the Bureau of Prisons contact list in order to prevent detection.  For instance, it appears that in July 2020, the Bureau of Prisons suspended calls between Raniere and Mr. Chakravorty for a period of time.  On August 11, 2020, Raniere entered an individual under the name "Issac Edwards."  The address provided by Raniere for "Issac Edwards" is fabricated and the phone number provided by Raniere for "Issac Edwards" belongs to a burner phone.  Subsequent calls between Raniere and "Issac Edwards" reflect that "Issac Edwards" is Mr. Chakravorty.

Raniere's post-conviction conduct reflects his total lack of empathy for his victims. The government submits that his continued lack of acceptance of responsibility is a factor the Court should consider seriously and that only a sentence of life imprisonment is significant enough to prevent and deter future wrongdoing.

III.   <u>The Need to Promote Respect for the Law and General Deterrence</u>

The need to promote respect for the law and to deter others also warrants a significant sentence. Raniere was able to commit these crimes because, for years, he and his co-conspirators retained scores of attorneys, public relations firms, and consultants to shield his activities and to pursue individuals he perceived to be detractors or critics. The targets of these efforts included reporters; vocal critics of Nxivm or Raniere, including Rick Ross and Raniere's ex-girlfriends; former Nxivm members; former Nxivm attorneys; and even federal judges overseeing litigation involving Raniere and Nxivm. <u>See, e.g.</u>, Tr. at 4728-29 (testimony of Rick Ross); <u>id.</u> at 4999 (testimony of Special Agent Weniger);

General deterrence is particularly significant in sex trafficking cases, where victims are often reluctant to speak to law enforcement and where, as Congress has recognized in enacting the sex trafficking statute, "traffickers often escape deserved punishment." <u>United States v. Estrada-Tepal</u>, 57 F. Supp. 3d 164, 169 (E.D.N.Y. 2014) (quoting legislative history and discussing legislative goals in enactment of 18 U.S.C. § 1591). In addition, Raniere's crimes were difficult to investigate and were uncovered as a result of more than a year-long investigation requiring significant government resources, including interviews of more than a hundred individuals. A sentence that serves as general deterrence of crimes that are complex and difficult to investigate is also warranted here. <u>See, e.g.</u>, <u>United States v. Heffernan</u>, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of

(general) deterrence argue for punishing more heavily those offenses that either are lucrative

or are difficult to detect and punish, since both attributes go to increase the expected benefits

of a crime and hence the punishment required to deter it.").

IV.    The Need to Avoid Unwarranted Sentencing Disparities

        Under 18 U.S.C. § 3553(a)(7), the Court must also consider "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This factor is difficult to apply in

this case as Raniere is not similarly situated to other defendants, but even so, the government

submits that it also weighs in favor of a sentence of life imprisonment.  See, e.g., United

States v. Brown, 12-CR-145 (N.D.N.Y.) (GLS) (sentence of 60 years for production and

possession of child pornography); United States v. Rivera, 09-CR-619 (SJF) (E.D.N.Y.)

(sentence of 40 years for sex trafficking, forced labor, and alien harboring counts); United

States v. McGowan, 09-CR-653 (SJF) (E.D.N.Y.) (sentence of 90 years for three counts of

production of child pornography); United States v. Brockett, 08-CR-289 (E.D.N.Y.) (SJ)

(sentence of 23 years for sex trafficking); United States v. Broxmeyer, 08-CR-21 (TJM)

(N.D.N.Y.) (sentence of 30 years for attempted production and possession of child

pornography in connection with 17-year-old girl).  Notably, Raniere did not just commit one

or two of the crimes.  He led members of a racketeering enterprise in the commission of all

of them, and over an extended period of time.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that the

Court should impose a Guidelines sentence of life imprisonment on the defendant.


Dated:     Brooklyn, New York
              August 27, 2020

                                Respectfully submitted,

                                SETH D. DUCHARME
                                ACTING UNITED STATES ATTORNEY
                                Eastern District of New York
                                271 Cadman Plaza East
                                Brooklyn, New York 11201


By:    /s/ Tanya Hajjar
         Tanya Hajjar
         Mark J. Lesko
         Karin Orenstein
         Assistant United States Attorneys
         (718) 254-7000