Stacy Scheff
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611, Tucson, AZ 85717-0611
(520) 471-8333 • FAX (520) 300-8033
stacy.scheff@gmail.com
State Bar No. 028364
*Counsel for Plaintiff*

**DISTRICT COURT FOR THE UNITED STATES**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Keith Raniere,<br><br>    Plaintiff,<br><br>v.<br><br>Merrick Garland, US Attorney General; Michael Carvajal, Director Federal Bureau of Prisons; Danon Colbert, Warden USP Tucson, Anthony Gallion (all in their official capacities),<br><br>    Defendants | Case No.: 4:22-cv-00212-RCC-PSOT<br><br>**PLAINTIFF'S REPLY TO RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**<br>(***Expedited Consideration Requested***)<br>(***Hearing Requested***) |

     Plaintiff, via counsel, replies to Defendants' Opposition[1] to Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order at Doc. 14.

     The Defendants complain about many things, but none of them are justification for preventing Plaintiff from speaking to his Power-of-Attorney and the manager of his legal team, Suneel Chakravorty. Plaintiff summarizes the Defendants' arguments here without conceding them:[2]

    1. **"Disparagement":** First, the Defendants complain that Plaintiff and Mr.

---

[1] No appearance has been entered.

[2] Mr. Chakravorty has full transcripts of the phone calls that Defendants complain of, and take out of context. Additionally, those calls were made in the larger context of the post-conviction relief efforts. These transcripts and other evidence that provides full context will be filed as soon as possible as an exhibit to this motion.

1

    Chakravorty disparaged the judge and the criminal prosecution in his criminal case.  Doc. 14, p.2.

2. **"Publicity":** Second, that the non-privileged and monitored phone calls were used in podcasts and other publicity.  Doc. 14, p.3.

3. **"Dancing women and Donuts":** Third, that Plaintiff is charged with posing a security risk to the prison by causing women to dance outside the prison and offer prison employees donuts and coffee. Doc. 14, p.3.

4. **"Established relationship":** Fifth, that Mr. Chakravorty did not have an established relationship with Plaintiff prior to his incarceration.  Doc. 14, pp.5-6.

5. **"NXIVM affiliation":** And finally, that Mr. Chakravorty is "affiliated" with NXIVM. Doc. 14, pp. 6-7.

    The Defendants appear to admit that their justification for banning Mr. Chakravorty consists mainly of their dislike for his effectiveness in assisting Plaintiff: the **disparagement** of the government; the **established relationship** standard (which conveniently contains exceptions to *either having or not having* an established relationship based on vague references to "the security… of the institution"); and the **NXIVM affiliation** arguments are all factors that can also be viewed as perfectly innocuous and legal activities that are reasonable for the Power-of-Attorney and paralegal/manager of the legal team.

    The Defendants argue that Plaintiff still has access to his attorneys, and that Mr. Tully has never issued a pledge to supervise Mr. Chakravorty's activities.  However, Mr. Chakravorty had been communicating with Mr. Raniere - without incident - up until May

2, 2021, when Defendants suddenly decided that, in their opinion, Mr. Chakravorty "did not have an **established relationship** with Plaintiff prior to his incarceration." Doc. 14, p.6.

Defendants also argue that Mr. Chakravorty is suspect because of his **NXIVM affiliation**. However, both cannot be simultaneously true: either Mr. Chakravorty *had* an **established relationship** with Plaintiff via his alleged **NXIVM affiliation**, which would weigh in favor of allowing communications, OR he *did not* have an **established relationship** with Plaintiff and therefore no **NXIVM affiliation**, which would also weigh in favor of allowing communications, according to Defendants' logic. Defendants here are using misdirection to show the Court the picture that they want it to see: i.e. 'heads I win, tails you lose'.

Additionally, NXIVM was never adjudged a criminal organization, only Plaintiff's "inner circle", which *does not* include Mr. Chakravorty. Therefore any **NXIVM affiliation** is entirely innocuous and insufficient to justify any legitimate penological goal.

Defendants also argue that, because Mr. Chakravorty spoke to Plaintiff on a monitored line, that he voided the attorney/client privilege. This is also a logical inconsistency: Defendants admit that they do not recognize Mr. Chakravorty as a legal professional, despite his position as paralegal and manager of the legal team, therefore he was forced to communicate on a monitored line. This allowed Defendants to listen to the conversations and determine whether the communications posed any threat to the prison, and if so, to take steps to mitigate the harms. Despite all of this monitoring, Mr.

Chakravorty was allowed to visit with Plaintiff until May 2, 2021.  Now, Defendants seek to use these *monitored* communications against Plaintiff's claims, including the **Disparagement** and **Publicity** arguments.

However, the fact that Mr. Chakravorty has been the moving force behind Plaintiff's post-conviction relief efforts does not detract from his central role in managing the legal team. Defendants fail to draw a significant distinction between being an "ardent" supporter, and being a trusted power-of-attorney and paralegal and legal manager.  There is no reason why he cannot be both.  Indeed, Mr. Chakravorty is more than just a paralegal, he is the lynchpin of the legal team, having hired and fired attorneys for Plaintiff.  Therefore being able to speak with his attorneys does Plaintiff no good without the technical interpreter and supporter who has been the driving force behind Plaintiff's post-conviction relief efforts for nearly three years.

**II. Law & Argument**

Defendants use the *Turner* standard to argue against Plaintiff's right to Free Speech.  However, the *Turner* standard does not apply when attorney/client communications, and access to the courts are implicated.

> Following *Wolff,* courts have analyzed claims regarding the confidentiality of attorney-inmate communications under various constitutional principles, including the First Amendment right to freedom of speech and the Fourteenth Amendment rights to due process and access to the courts, or some combination of these rights. Courts also have recognized that "while most cases brought by prisoners are civil... [a] practice of prison officials reading mail between a prisoner and his lawyer in a criminal case would raise serious issues under the Sixth Amendment ... which guarantees a right to counsel in criminal cases." *Guajardo–Palma v.*

4

> *Martinson,* 622 F.3d 801, 803 (7th Cir.2010); see also *Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir.2009) ("[O]pening properly marked legal mail alone ... implicates both the First and Sixth Amendments because of the potential for a 'chilling effect.'"); *Altizer v. Deeds*, 191 F.3d 540, 549 n. 14 (4th Cir.1999) ("Inspecting an inmate's legal mail may implicate the inmate's Sixth Amendment right to communicate freely with his attorney in a criminal case.").

*Nordstrom v. Ryan*, 762 F.3d 903, 909 (9th Cir. 2014).

It is not surprising that the Defendants focus on the deferential *Turner* standard instead of the stricter First and Sixth Amendment standards. In *Nordstrom,* the plaintiff there was in the same legal posture as Mr. Raniere is here: his appeals are done, and he is pursuing post-conviction relief, with an upcoming deadline. Another similarity between *Nordstrom* and Plaintiff here is the creativity of the prison administrators in imagining things that ***might be*** a threat to prison security, but probably are not:

> The district court is correct that outgoing legal mail *could* be used to facilitate criminal activity, but ADC did not present any evidence that this has ever happened, or that it is likely to happen.

*Nordstrom v. Ryan*, 856 F.3d 1265, 1273 (9th Cir. 2017) (emphasis in original).

Similarly here, things such as **<u>Dancing women and Donuts</u>** outside the prison fences pose no obvious threat to prison security. Indeed, Defendants admit that the problem was easily solved by moving Plaintiff to a different side of the prison. Nor does **<u>Publicity</u>** pose any threat to prison security, but rather is a crucial right:

> When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions; his yearning for self-respect does not end; nor is his quest for self-realization concluded.

5

*Procunier v. Martinez,* 416 U.S. 396 (1974) overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989)).

Finally, regarding the Defendants' request that Mr. Chakravorty be supervised by an attorney, he is willing comply.

### III. Conclusion.

Plaintiff has an ***extremely narrow*** window in which to finalize his post-conviction relief petitions based on newly discovered evidence. Defendants are actively thwarting those efforts by imagining threats to institutional security that have no basis in reality. Plaintiff will be irreparably harmed if he is forced to miss this window of opportunity. On the other hand, Defendants will suffer no harm or burden at all – only the burden of enforcing the constitutional rights of those they claim to be "correcting". For the United States of America, the Constitution can never be a burden.

Therefore Plaintiff has met all of the factors necessary to obtain an emergency Order that Plaintiff be allowed to communicate with Mr. Chakravorty

DATED this 10th day of June, 2022 by

/s/Stacy Scheff
STACY SCHEFF
Attorney for Plaintiff

Delivered via ECF
to all registered parties