GARY M. RESTAINO
United States Attorney
District of Arizona
DENISE ANN FAULK
Assistant U.S. Attorney
State Bar No. 12700
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: (520) 620-7300
Email: denise.faulk@usdoj.gov
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere,<br><br>          Plaintiff,<br><br>vs.<br><br>Merrick Garland, et al.,<br><br>          Defendants. | CV-22-00212-TUC-RCC<br><br>**RESPONSE TO MOTION FOR LEAVE TO AMEND COMPLAINT** |

Defendants Garland, Carvajal, Ulrich[1] and Gutierrez,[2] acting in their official capacities by and through undersigned counsel, hereby respond to Plaintiff's Motion for Leave to Amend Complaint (Doc. 28). This Court should deny the motion as the amendment is futile. This response is supported by all matters of record and the following:

**I.     Background**

    **A.     Relevant Parties**

Plaintiff Keith Raniere is a federal inmate at the United States Penitentiary (USP Tucson) in Tucson, Arizona. (Doc. 22 at 1.) Plaintiff is serving an aggregate sentence of 120-years for racketeering conspiracy, racketeering, forced labor conspiracy, wire fraud

---

[1] J. Ulrich is the Acting SIA and replaces former Acting SIA Gallion pursuant to Rule 25(d), Fed.R.Civ.P.

[2] Warden Guttierez is the current warden at USP Tucson, having replaced Warden Colbert, who was acting warden at the time Plaintiff filed the Complaint. Plaintiff attempts to name "USP Tucson Warden" in his SAC, without any legal justification for suing an unnamed official when his name is known. (Doc. 28 at 2.) Rule 25(d), Fed.R.Civ.P. provides for substitution when an official capacity party leaves office.

conspiracy, sex trafficking conspiracy, sex trafficking of Jane Doe 5 and attempted sex trafficking of Jane Doe 8 in violation of multiple federal statutes. (*Id.*) He is projected to be released from custody on June 27, 2120. (*Id.*)

Suneel Chakravorty is a former associate of NXIVM who has been banned from communicating with Plaintiff at two institutions for misconduct during Plaintiff's incarceration. Mr. Chakravorty's misdeeds were detailed in Defendants' Response to Plaintiff's Motion for Preliminary Injunction (Doc. 14 at 2-7) and are incorporated herein.

Nicki Clyne is a former associate of NXIVM who has been banned from communicating with Plaintiff. (Ex. A, Mitchell Decl., ¶ 6, Att. 1, Visitor Denial Memos, p. 2.) Ms. Clyne is an unindicted co-conspirator. (*Id.*, Att. 2, Special Investigative Services Investigation, p. 5.) Plaintiff circumvented mail monitoring by communicating with Ms. Clyne through another inmate and by using her to communicate with Clare Bronfam, another associate of NXIVM and co-defendant of Plaintiff who is currently serving time in federal prison. (*Id.*, pp. 1-6.)

Danielle Roberts is a former associate of NXIVM who has been removed from Plaintiff's visiting list due to her extensive involvement with NXIVM. (*Id.*, ¶ 7, Att. 1, p. 1.) She was removed "for safety and security of institution." (*Id.*) In January 2022, Ms. Robert's attorney contacted the Bureau and was informed that Plaintiff could file a request through the Administrative Remedy Program regarding her removal. (*Id.*, Att. 3, Email correspondence.)

**B.    Complaint**

On May 5, 2022, Plaintiff filed the Complaint alleging that the Bureau was interfering with his First and Sixth Amendment rights. (Doc. 1.) Plaintiff alleged that in May 2021, Mr. Chakravorty's visitation privileges were revoked, and "[o]n May 4, 2022, Plaintiff was on a privileged legal call with attorney Tully, when the call was apparently terminated prematurely, and without warning." (*Id.* at 4.) Plaintiff claimed the dropped phone call constituted unlawful frustration and interference with First Amendment access to Courts and retaliation based on rights protected under the First Amendment. (*Id.* at 6-7.)

### C. First Amended Complaint (FAC)

The next day, Plaintiff filed the FAC, again alleging that the Bureau was interfering with his First and Sixth Amendment rights. (Doc. 3.) Specifically, Plaintiff alleged that on that same day "Defendants interfered and frustrated that legal call by, among other things, causing the phone call to be cut off before Plaintiff and [attorney] Dougherty had concluded their conversation." (*Id.* at 6.)

As to the May 4, 2022, phone call, Plaintiff alleged that Mr. Tully anticipated that the judge in Plaintiff's New York criminal case would set a hearing on a Rule 33 motion he filed on May 3, 2022, and that Mr. Tully needed to consult with Plaintiff to prepare for the hearing. (*Id.*) Plaintiff also alleged that on April 28, 2022, Mr. Tully had requested the Second Circuit to stay Plaintiff's appeal from his criminal conviction pending a ruling on the Rule 33 motion. (*Id.* at 4.)

Plaintiff sought "merely to maintain the status quo ante, pending administrative exhaustion." (*Id.* at 9.) More specifically, Plaintiff sought a "preliminary injunction to preserve the status quo *pending administrative exhaustion*, to include restraining Defendants [and] their employees" from interfering with Plaintiff's communication with his attorneys via telephone, visiting with his attorneys in person and interfering with Plaintiff's communication by telephone with his attorneys' employees and agents. (*Id.* at 9-10.) (Emphasis added.)

### D. Status of Criminal Proceedings

On April 29, 2022, well before Plaintiff filed the Complaint and FAC, the Second Circuit denied Plaintiff's April 28, 2022, motion to stay his criminal appeal pending a Rule 33 motion. *Raniere v. United States*, Case 20-3789, Dkt 193 (2nd Cir. April 29, 2022). (Doc. 14-8 at 2.) On May 9, 2022, the New York District Court deferred consideration of Plaintiff's Rule 33 motion due to the ongoing appeal. *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS (E.D. N.Y. May 9, 2022). Accordingly, the deadline to file Rule 33 motions has passed, and there is no hearing imminent.

### E. Plaintiff's Motions for Preliminary Injunction and Temporary Restraining Order

On May 26, 2022, Plaintiff filed a Motion for Preliminary Injunction (Doc. 7), asserting that Defendants were "unlawfully hindering and obstructing Plaintiff's First and Sixth Amendment rights to communicate via telephone with his criminal defense attorneys and his attorneys' agents in the lead-up to the 3-year deadline for post-conviction relief petitions." (*Id.* at 1.) Plaintiff specifically complained about his ability to speak with Mr. Chakravorty, a non-lawyer. (*Id.* at 2.) Plaintiff made no further claims that any phone calls with his lawyers were "obstructed." (*Id.*)

On June 6, 2022, Plaintiff filed a Motion for Temporary Restraining Order, asserting that Defendants were "unlawfully hindering and obstructing Plaintiff's First and Sixth Amendment rights to communicate via telephone with his power-of-attorney and paralegal Suneel Chakravorty." (Doc. 13 at 1.)

In response, Defendants provided evidence that Mr. Chakravorty had been banned from communicating with Plaintiff because of his past disruptive behavior during Plaintiff's incarceration, his lack of a relationship with Plaintiff prior to incarceration and his use of a false name to obtain access to Plaintiff during Plaintiff's incarceration. (Doc. 14 at 2-7.) Defendants also provided evidence of Plaintiff's many communications with his counsel, including evidence refuting that the May 4, 2022, call was terminated prematurely and explaining how the May 6, 2022, call was reconnected promptly after having been disconnected. (*Id.* at 7-10.) Defendants provided evidence as to Plaintiff's robust access to counsel. (*Id.;* Doc. 17 at 1-2.)

In reply, Plaintiff abandoned any claim that any calls with attorneys were dropped for any nefarious purpose and argued instead that Plaintiff should be allowed to speak with Mr. Chakravorty. (Doc. 15.) Plaintiff produced no evidence to refute the evidence the Defendants submitted. Instead, Plaintiff asserted that "transcripts and other evidence that provides full context will be filed as soon as possible as an exhibit to this motion." (*Id.* at 1.) Over three months later, the purported evidence has yet to be filed. (Docket, generally.)

The Court denied the motion for preliminary injunction and temporary restraining order, specifically finding "[n]or is there evidence before the Court that Plaintiff has been

unable to communicate with his attorneys or their agents who have been cleared by the institution to have confidential communications with Plaintiff." (Doc. 18 at 15.)

### F. Motion for Summary Judgment on Exhaustion

On August 1, 2022, Defendants filed their Motion for Summary Judgment on Exhaustion based on Plaintiff's admitted failure to exhaust administrative remedies. (Doc. 21.) Plaintiff had requested relief in both the Complaint and the FAC pending exhaustion of administrative remedies. (Doc. 1 at 8, 3 at 9.) That motion is pending, and briefing is not yet complete. (Docket, generally.)

### G. Second Amended Complaint (SAC)

In an admitted attempt to avoid his failure to exhaust administrative remedies, Plaintiff instead filed the instant motion, seeking leave to file the SAC. (Doc. 28 at 4.) Plaintiff admits that the proposed SAC seeks to cure his failure to exhaust administrative remedies "in part by expanding the temporal scope of the complaint to include instances of retaliation for which Plaintiff has exhausted administrative remedies." (*Id.*)

The SAC includes detailed information about Mr. Chakravorty's involvement with Plaintiff, including that he "communicates with the mother of Mr. Raniere's son in matters regarding their son." (Doc. 28-1 at 8.) The SAC neglects to note that the mother of Mr. Raniere's son is on Plaintiff's approved contact list, so he speaks with her directly. (Doc. 14 at 7.) The SAC also includes detailed allegations regarding Plaintiff's contacts with Ms. Clyne, the NXIVM associate with whom Plaintiff was disciplined for contacting through another inmate in July 2021.[3] (Doc. 28-1 at 13-14.) The SAC also includes allegations regarding Plaintiff's contacts with Ms. Roberts, who he alleges lost her medical license for "supervis[ing] the ceremony for women in DOS where they had their skin cauterized or

---

[3] Plaintiff's assertion that he is attempting to amend the FAC "to include instances of retaliation for which Plaintiff has exhausted administrative remedies (Doc. 28 at 4) appears to be based on the administrative remedies he submitted challenging the sanctions imposed by the disciplinary hearing officer for the Incident Report involving Ms. Clyne. The administrative remedies do not seek reinstatement of Ms. Clyne's visiting privileges and, thus, would not even exhaust administrative remedies as to Plaintiff's claim that the Bureau is interfering with his First Amendment rights to freedom of association with her. (Doc. 22-2 at 12, 20.)

branded with a symbol [of Plaintiff's initials] indicating their membership." (Doc. 28-1 at 14.)

The SAC includes the new allegation that "Mr. Chakravorty is vital for that preparation" for a hearing on the Rule 33 petition. (Doc. 28 at 17.) The SAC fails to mention that the court stayed that motion pending the appeal in that case over four months ago. *Raniere*, Case No. 1:18-cr-00204-NGG-VMS (E.D. N.Y. May 9, 2022).

The SAC includes allegations that Plaintiff was assaulted, was written an Incident Report for Fighting and was placed in the Special Housing Unit (SHU), where he remains. (Doc. 28-1 at 16-17.) The SAC neglects to acknowledge that Plaintiff attended a disciplinary hearing at which the Incident Report was expunged, and he remains in the SHU in administrative detention status, while the Special Investigative Services (SIS) Department conducts an investigation into whether it is safe for him to return to general population. (Ex. A, ¶ 16.)

From these myriad allegations, Plaintiff alleges, in a conclusory fashion, "On information and belief, the USP Tucson Warden is following a pattern of retaliation for Plaintiff exercising his *constitutional rights* to challenge his criminal conviction and *to speak to, and visit with, anyone not excluded by law or valid penological purpose*." (Doc. 28-1 at 22.) (Emphasis added.)

Plaintiff asserts a cause of action for unlawful frustration and interference with First Amendment access to the courts based on the alleged May 4, 2022, dropped call. (Doc. 28-1 at 22-23.) He alleges "on information and belief," that his "right to communicate" with Mr. Chakravorty and Ms. Clyne "was denied as retaliation for exercising his First Amendment rights." (*Id.* at 24.) Finally, he asserts a cause of action under the Sixth Amendment asserting that Defendants "have deliberately interfered with the confidential relationship between Plaintiff and his criminal defense counsel," and "[t]he interference substantially prejudices the Plaintiff by denying Plaintiff the ability to timely communicate with his counsel during the time that his Rule 33 motion is pending." (*Id.* at 25-26.) As with the Complaint and the FAC, Plaintiff seeks "a preliminary injunction to preserve the

status quo *pending administrative exhaustion.*" (*Id*. at 26.)

### H. Relevant Administrative Remedies

The detailed discussion regarding the Bureau's Administrative Remedy Program in the Motion for Summary Judgment (Doc. 21 at 5-6) is hereby incorporated.

During Plaintiff's incarceration with the Bureau, he has filed five administrative remedy appeals. (Ex. A, ¶ 9, Att. 5, SENTRY Administrative Remedy Index, pp. 1-4.) The first two pertained to disciplinary sanctions imposed against him following an October 26, 2021, disciplinary hearing regarding Plaintiff circumventing mail monitoring by having another inmate contact Ms. Clyne, a former NXIVM member who had been removed from Plaintiff's contact list for prior misconduct. (Doc. 22 at 4.) Plaintiff filed a BP-10 with the Western Region, which was received on February 25, 2022. (*Id*.) On June 30, 2022, he filed a BP-11 with the Office of General Counsel. (*Id*.)

In March 2022, Plaintiff's counsel wrote to the Bureau asserting that the denial of social visitation privileges for Mr. Chakravorty, Ms. Clyne and Ms. Roberts was improper. (Ex. A, ¶ 8, Att. 4, March 28, 2022, Letter from C. Cook to J. Tully.) In response, Bureau counsel informed Plaintiff's counsel that only the Warden can reinstate a suspended individual to an inmate's visiting list and that Plaintiff had not challenged the denial of his social visitors through the Administrative Remedy Program. (*Id.* pp. 1-2.) To date, Plaintiff has not submitted any administrative remedies or appeals challenging the denial of social visits for Mr. Chakravorty, Ms. Clyne or Ms. Roberts. (Ex. A, ¶ 10, Att. 5, pp. 1-4.)

On September 8, 2022, Plaintiff filed a Request for Administrative Remedy questioning why a different NXIVM associate was denied visitation. (*Id.*, ¶ 11, Att. 6, Remedy No. 1133790-F1, p. 3.) The same date, Plaintiff filed a Request for Administrative Remedy erroneously stating that Mr. Chakravorty had been banned a second time from communicating with him at USP Tucson after having been reinstated. (*Id.,* Att. 7, Remedy No. 1133798-F1.) The Warden, in his discretion, had allowed Plaintiff a single legal phone call, but not a legal visit, with Mr. Chakravorty, due to the then-imminent Rule 33 deadline. (*Id.,* ¶ 12.) Mr. Chakravorty remains banned due to his conduct at two institutions and

because he represents a threat to the security and good order of the institution. (Doc. 14-5 at 3-6.) If it is dangerous for Plaintiff to have access to particular individuals once released, it is also a security risk to allow Plaintiff to have access to these same individuals while incarcerated. (*Id*. at 6.)

Finally, also on September 8, 2022, Plaintiff filed an administrative remedy that appears to be an attempt to begin the process to exhaust administrative remedies as to the allegations in the FAC regarding his contact list having been scrubbed. (Ex. A, ¶ 11, Att. 1133808-F1.) The Request for Administrative Remedy does not reference access to counsel or access to courts, just the scrubbing of his contact list, which left in place all counsel. (*Id.*)

### I.  Bureau Policies on Visitation and Telephone Privileges

As to inmate friends and associates, "[t]he visiting privilege ordinarily will be extended to friends and associates having an established relationship with the inmate prior to confinement, *unless such visits could reasonably create a threat to the security and good order of the institution*. Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, *when it is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution*." 28 C.F.R. § 540.44(c). (Emphasis added.) "Regardless of the institution's security level, the inmate must have known the proposed visitor(s) prior to incarceration.[4] The Warden must approve any exception to this requirement." P.S. 5267.09, *Visiting Regulations,* p. 6.[5] (Ex. A, ¶ 3.)

"Use of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate." P.S. 4500.12, Trust Fund/Deposit Fund Manual*,* p. 126.[6]

---

[4] The Supreme Court approved a similar regulation in *Pell v. Procunier*, 417 U.S. 817, 827 (1974), because "[i]n the judgment of the state corrections officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compromise institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

[5] Available at https://www.bop.gov/policy/progstat/5267_09.pdf (last visited on Sept. 23, 2022).

[6] Available at https://www.bop.gov/policy/progstat/4500.12.pdf (last visited on Sept. 23, 2022).

(*Id.*, ¶ 4.)  "Inmates may be subject to telephone restrictions imposed by the Warden to protect the safety, security, and good order of the institution, as well as to protect the public." P.S. 5264.08, Inmate Telephone Regulations, p. 14.[7] (*Id.*)

"The Bureau of Prisons recognizes the use of assistants by attorneys to perform legal tasks and, with proper controls and exceptions enumerated . . . accords such assistants the same status as attorneys with respect to visiting and correspondence."  28 C.F.R. § 543.16(a). "The special visiting/correspondence status accorded to paralegals, clerks, and legal assistants depends on an ongoing, supervisory relationship with an attorney on an approved visiting/correspondence list.  Absent any current supervisory relationship, such persons may only receive social visiting or general correspondence privileges." P.S. 1315.07, *Inmate Legal Activities*, p. 19.[8]  (*Id.*, ¶ 5.)

If necessary to maintain security and good order in the institution, the Warden may prohibit a legal assistant from visiting or corresponding with an inmate." 28 C.F.R. § 543.16(b)(1)-(3).

**II.      Legal Discussion**

Rule 15(a), Fed. R. Civ. P., governs amending pleadings.  It provides in part

> (2)      In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave *when justice so requires*.

(Emphasis added.)  "[T]he grant or denial of an opportunity to amend is within the discretion of the District Court." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  It can be denied for many reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.*

---

[7] Available at https://www.bop.gov/policy/progstat/5264_008.pdf (last visited on Sept. 23, 2022).

[8] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on Sept. 23, 2022).

After the defendant files a responsive pleading, courts do not grant leave to amend when "amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay." *Madeja v. Olympic Packers, LLC,* 310 F.3d 628, 636 (9th Cir. 2002); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (same); *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003) ("Futility alone can justify the denial of a motion for leave to amend."). Denying leave to amend is appropriate when "the amended complaint would be subject to dismissal." *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991). Here, the Court should exercise its discretion to disallow the amendment.

**A.  Plaintiff's new allegations are insufficient to exhaust administrative remedies for his FAC or SAC.**

Plaintiff admits he filed the SAC to try to avoid his admitted failure to exhaust administrative remedies, which is the basis for a motion for summary judgment on exhaustion pending before this Court. (Doc. 28 at 4.) Plaintiff's attempt is futile. Plaintiff filed administrative remedies opposing the sanctions imposed when he and Ms. Clyne communicated through another inmate, thereby circumventing mail monitoring. (Doc. 22 at 4; Doc. 22-2 at 12, 20.) There is no mention in the remedies of an impending deadline for a Rule 33 motion. (*Id.*) There is no mention in the remedies of interference with Sixth Amendment rights to counsel. (*Id.*) There is no mention of "retaliation," even though the most recent remedy was filed June 9, 2022, well after Plaintiff filed the Complaint and FAC in this case. (*Id.*) There is no mention of Plaintiff's rights of association with his former NXIVM associate and no request to have her reinstated as a visitor. (*Id.*) The only remedy requested was to have the disciplinary finding expunged. (*Id.*) Plaintiff's attempt to amend the FAC to use the administrative remedy regarding sanctions for communicating with Ms. Clyne to bypass the administrative remedy requirement regarding his claims for First Amendment access to courts and Sixth Amendment interference with counsel is futile. This Court should deny the motion.

**B.  Prisoners have limited freedom of association First Amendment rights.**

The gravamen of the proposed amendments to Plaintiff's FAC is not aimed at his

communication with his attorneys. Plaintiff has not included any new allegations of interference with counsel since Defendants introduced evidence in response to the Motion for Preliminary Injunction and Motion for Temporary Restraining Order that demonstrated Plaintiff's robust and continuing access to counsel.[9] Instead, Plaintiff complains that Defendants are interfering with his First Amendment rights of association as to former NXIVM associates, Mr. Chakravorty, Ms. Clyne and Ms. Roberts.[10] (Doc. 28-1.)

The Supreme Court has recognized that "[m]any of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). In fact, because "[t]he very object of imprisonment is confinement," the Court concluded that "freedom of association is among the rights least compatible with incarceration." *Id.* Indeed, "[s]ome curtailment of that freedom must be expected in the prison context." *Id.* "An inmate does not retain rights inconsistent with proper incarceration." *Id.*

Accordingly, the Supreme Court has upheld prison regulations that, among other things, limited the circumstances under which minor children could visit their incarcerated parents and completely suspended the privilege for two years when a prisoner commits two substance-abuse violations. *Id.* at 130, 133-34. The Ninth Circuit also has recognized limitations on a prisoner's association rights. *See Dunn v. Castro*, 621 F.3d 1196, 1201, 1205 (9th Cir. 2010) (prisoner did not have a clearly established right to be free from an 18-month restriction on visitation with his children because "*Dunn* is no ordinary parent. He is a parent who is incarcerated."); *Gerber v. Hickman*, 291 F.3d 617, 619 (9th Cir. 2002) (affirming denial of inmate's request to provide semen sample to his wife for artificial insemination, because "the right to procreate is fundamentally inconsistent with incarceration."); *Valdez v. Rosenbaum*, 302 F.3d 1039, 1042-43, 1047 (9th Cir. 2002)

---

[9] Notably, since being placed in SHU in late July 2022, Plaintiff has had at least four legal calls, each lasting between one and two hours and at least nine legal visits. (Ex. A, ¶¶ 12, 14, Att. 9, Legal Call Log; Att. 10, Legal Visit Entrance Memos.) His access to counsel remains robust.

[10] Plaintiff has not asserted that Ms. Clyne or Ms. Roberts is an attorney. (Doc. 28-1.) Instead, they are high level former associates in NXIVM who have been banned from visiting Plaintiff for the security and good order of the institution. (Ex. A, ¶¶ 6-7, Att. 1.)

1  (restricting telephone access of a detainee in administrative segregation to one legal call per
2  day did not violate his substantive due process rights).

### C. Prison regulations provide reasonable restrictions on visitation to preserve safety and good order.

The Supreme Court has made it clear that "a prison regulation [that] impinges on inmates' constitutional rights … is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner v. Safley*, 482 U.S. 78, 89 (1987). First, the regulation cannot be "arbitrary or irrational," and the "governmental objective must be a legitimate and neutral one." *Id.* at 90. Second, if "there are alternative means of exercising the right that remain open to prison inmates," then "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Id.* (quoting *Procunier*, 417 U.S. at 827). Third, the court considers the impact accommodation would have on the allocation of prison resources, guards and other inmates. *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be *particularly deferential to the informed discretion of corrections officials*." *Id.* (Emphasis added.) Finally, the court considers whether there is a ready alternative or the regulation is an "'exaggerated response" to prison concerns." *Id.* Thus, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.*

As to the First Amendment, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Procunier*, 417 U.S. at 822. Also, "central to all other corrections goals is the institutional consideration of internal security within the

corrections facilities themselves." *Id.*

In the Ninth Circuit, if the Sixth Amendment right to counsel is implicated, the courts also consider whether "the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel," and, if so, whether the interference "substantially prejudices the criminal defendant." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014).  In an action seeking to enjoin "the continuation of an unconstitutional practice," substantial prejudice would be "that his right to privately confer with counsel has been chilled." *Id.* at 911.

### 1. Mr. Chakravorty, Ms. Clyne and Ms. Roberts pose a threat to the security and good order of the institution.

Here, Mr. Chakravorty, Ms. Clyne and Ms. Roberts were all involved with NXIVM, which the Bureau has determined poses a threat to the security and good order of the institution.  Additionally, both Mr. Chakravorty and Ms. Clyne violated Bureau rules for and with Plaintiff. (Ex. A, ¶ 6, Att. 2; Doc. 14 at 2-7.)

The SAC does not include any new allegations of interference with counsel, instead relying on the two purportedly dropped calls that were debunked in the Defendants' Response to Motion for Preliminary Injunction. (Docs. 14, 28-1.)  Plaintiff's right to counsel is not implicated by the requested amendment.

### D. The SAC does not allege an infringement on Plaintiff's rights to association beyond the curtailment that occurs from incarceration and his and his associates' failure to follow Bureau policies.

When viewed through the lens of the limitations imposed by Plaintiff's incarceration, the SAC fails to state a claim upon which relief can be granted.  Plaintiff's right to associate with former NXIVM associates while in prison is necessarily limited by the reality of his incarceration. *Overton*, 539 U.S. at 131.  His sentencing court determined his continued association with them posed a risk. (Doc. 14-5 at 34.)  Such restrictions have been held valid. *See United States v. Burgert*, 116 F. App'x 124, 126 (9th Cir. 2004) (upholding restriction on defendant's association with persons actively involved with militia while on supervised release).

Additionally, while the sentencing court has jurisdiction over the Plaintiff during

the trial and supervised release, the Attorney General and the Bureau have jurisdiction over him during his imprisonment. 18 U.S.C. § 3621(b). The Bureau's decision to make the same judgment as the sentencing court as to the dangers inherent in Plaintiff's continued association with those involved in NXIVM is well within its discretion. As the Supreme Court has explained

> First Amendment associational rights . . must give way to the reasonable considerations of penal management. As already noted, numerous associational rights are necessarily curtailed by the realities of confinement. They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations . . . possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment. As we noted in *Pell v. Procunier*, supra, at 823, 94 S.Ct., at 2804, "central to all other corrections goals is the institutional consideration of internal security within the correctional facilities themselves."

*Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 132 (1977). *See also, Evans v. Cnty. of Sacramento*, 165 F.3d 915 (9th Cir. 1998) (rejecting plaintiff's claim that her rights were violated when her requests for visitation with her husband were denied without a hearing because "[t]he denial of visitation rights based upon legitimate penological objectives, however, do not implicate the First Amendment's right to freedom of association.").

Notably, the Bureau need not show that Plaintiff's association with his banned NXIVM associates would be "detrimental to proper penological objectives" or would constitute a "present danger to security and order." *Jones*, 433 U.S. at 127. Instead, those

> considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. at 827. The necessary and correct result of our deference to the informed discretion of prison administrators permits them, and not the courts, to make the difficult judgments concerning institutional operations in situations such as this.

*Id.* Plaintiff has failed to meet his burden, and for this reason alone, Plaintiff's SAC fails to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

E. **The policies at issue cannot form the basis for a constitutional violation because they bear a rational relationship to legitimate penological interests.**

Finally, a court need not delve into an examination of the contours of a constitutional right when it can determine that prison regulations which allegedly infringe on a constitutional right bear a "rational relation to legitimate penological interests." *Overton*, 539 U.S. at 132 (*citing Turner v. Safley*, 482 U.S. 78, 89 (1987)).  In doing so, a court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.*

In *Turner*, the Supreme Court articulated four factors that are relevant in determining whether a prison regulation that impacts a prisoner's constitutional right is rationally related to legitimate penological interests:  1) whether there is a valid, rational connection to a legitimate governmental interest; 2) whether alternative means are open to inmates to exercise the asserted right; 3) what impact accommodation of the right would have on officers, other inmates and prison resources; and 4) whether there are ready alternatives to the regulation.  *Id.,* 482 U.S. at 89-91.

Prison order and security and inmate rehabilitation are preeminent penological interests, each of which is served by the regulation at issue.  *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (identifying "preservation of internal order and discipline, maintenance of institutional security, and rehabilitation of prisoners" as legitimate correctional interests).

### III.   Conclusion

In summary, despite Plaintiff's reference to his First Amendment rights to association, when considered in conjunction with the limitations imposed by his incarceration, the facts he alleges in the SAC simply fail to support a plausible constitutional violation.  The Bureau regulations and policies at issue accommodate and facilitate Plaintiff's association with people who do not pose a risk to the security and good order of the institution, and any restriction on the extent and nature of their communication are

rationally related to legitimate penological interests. Accordingly, the Court should deny Plaintiff leave to file the SAC as futile.

RESPECTFULLY SUBMITTED: September 23, 2022.

>GARY M. RESTAINO
>United States Attorney
>District of Arizona
>
>*s/ Denise Ann Faulk*
>DENISE ANN FAULK
>Assistant U.S. Attorney

Copy of the foregoing served via EM/ECF to

Stacy Scheff
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611
Tucson, AZ 85717
*Pro Se*

s/ *Pamela. Vavra*
/ Response to MT Amend