GARY M. RESTAINO
United States Attorney
District of Arizona
DENISE ANN FAULK
Assistant U.S. Attorney
State Bar No. 12700
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: (520) 620-7300
Email: denise.faulk@usdoj.gov
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>Merrick Garland, et al.,<br><br>　　　　　Defendants. | CV-22-00212-TUC-RCC<br><br>**DEFENDANTS' RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER OR FOR PRELIMINARY INJUNCTIVE RELIEF** |

　　　　Defendants Garland, Peters, Gutierrez and Ulrich, acting in their official capacities by and through undersigned counsel, respond to Plaintiff's Motion for Temporary Restraining Order or, alternatively, for Preliminary Injunctive Relief (Doc. 34).  Defendants hereby incorporate Defendants' Response to Motion for Preliminary Injunction (Doc. 14) and Defendants' Response to Motion for Temporary Restraining Order (Doc. 17) in their entireties.  For the reasons set forth in those responses and the additional reasons discussed below, Defendants request that the Court deny the motion.

**I.　　Background**

　　　　**A.　　Relevant Parties**

　　　　Plaintiff Keith Raniere is a federal inmate at the United States Penitentiary (USP Tucson) in Tucson, Arizona.  (Doc. 22 at 1.)  Plaintiff is serving an aggregate sentence of 120-years for racketeering conspiracy, racketeering, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking of Jane Doe 5 and attempted sex

trafficking of Jane Doe 8. (*Id.*) He is projected to be released from custody on June 27, 2120. (*Id.*)

Suneel Chakravorty is a former associate of NXIVM who has been banned from communicating with Plaintiff at two institutions for misconduct during Plaintiff's incarceration. Mr. Chakravorty's misdeeds were detailed in Defendants' Response to Plaintiff's Motion for Preliminary Injunction (Doc. 14 at 2-7) and are incorporated herein.

Nicki Clyne is a former associate of NXIVM who has been banned from communicating with Plaintiff. (Doc. 31-2 at 4, 11.) Ms. Clyne is an unindicted co-conspirator. (*Id.* at 4, 17.) Plaintiff circumvented mail monitoring by communicating with Ms. Clyne through another inmate and by using her to communicate with Clare Bronfman, another associate of NXIVM and co-defendant of Plaintiff who currently is serving time in federal prison. (*Id.* at 13-18.)

Danielle Roberts is a former associate of NXIVM who has been removed from Plaintiff's visiting list due to her extensive involvement with NXIVM. (*Id.* at 4, 10.) She was removed "for safety and security of institution." (*Id.*) In January 2022, Ms. Robert's attorney contacted the Bureau of Prisons (Bureau) and was informed that Plaintiff could file a request through the Administrative Remedy Program regarding her removal. (*Id.* at 4, 20.) Plaintiff has provided no evidence that he has done so. (Doc. 34.)

**B.     First Amended Complaint (FAC)**

On May 6, 2022, Plaintiff filed the FAC alleging that the Bureau was interfering with his First and Sixth Amendment rights. (Doc. 3.) Specifically, Plaintiff alleged that on that same day "Defendants interfered and frustrated that legal call by, among other things, causing the phone call to be cut off before Plaintiff and [attorney] Dougherty had concluded their conversation." (*Id.* at 6.) Plaintiff also alleged that "[o]n May 4, 2022, Plaintiff was on a privileged legal call with attorney Tully, when the call was apparently terminated prematurely, and without warning." (*Id.* at 5.) Plaintiff alleged that Mr. Tully anticipated that the judge in Plaintiff's New York criminal case would set a hearing on a Rule 33 motion he filed on May 3, 2022, and that Mr. Tully needed to consult with Plaintiff to

prepare for the hearing. (*Id.*) Plaintiff also alleged that on April 28, 2022, Mr. Tully had requested the Second Circuit to stay Plaintiff's appeal from his criminal conviction pending a ruling on the Rule 33 motion. (*Id.* at 4.)

Plaintiff asserted claims for unlawful frustration and interference with First Amendment access to the courts (Count One), retaliation based on rights protected under the First Amendment as to his access to the courts "by imminently threatening to cut off all telephonic and in-person communication with his attorneys" (Count Two) and "Sixth Amendment" by interfering "with the confidential relationship between Plaintiff and his criminal defense counsel" (Count Three). (Doc. 3 at 7-9.)

Plaintiff sought "merely to maintain the status quo ante, pending administrative exhaustion." (*Id.* at 9.) More specifically, Plaintiff sought a "preliminary injunction to preserve the status quo pending administrative exhaustion, to include restraining Defendants [and] their employees" from interfering with Plaintiff's communication with his attorneys via telephone, visiting with his attorneys in person and interfering with Plaintiff's communication by telephone with his attorneys' employees and agents. (*Id.* at 9-10.)

### C. Second Circuit and New York District Court Decisions

On April 29, 2022, the Second Circuit denied Plaintiff's April 28, 2022, motion to stay his criminal appeal pending a Rule 33 motion. *Raniere v. United States*, Case 20-3789, Dkt. 193 (2nd Cir. April 29, 2022).[1] (Doc. 14-8 at 2.) On May 9, 2022, the New York District Court deferred consideration of Plaintiff's Rule 33 motion due to the ongoing appeal. *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS (E.D. N.Y. May 9, 2022). On August 31, 2022, the Court ordered that it would "continue to defer consideration of any and all motions for new trials grounded on newly discovered evidence, until the Second Circuit resolves the pending appeal." *Id.* (E.D. N.Y. Aug. 31, 2022). The deadline to file Rule 33 motions has passed, and there is no hearing imminent.

---

[1] Just last week, the Second Circuit denied Plaintiff's second motion to stay his criminal appeal pending a Rule 33 motion. *Id.* Dkt. 211 (2nd Cir. Oct. 7, 2022).

### D. Plaintiff's Access to Counsel at USP Tucson

Defendants provided evidence that the Bureau has facilitated dozens of legal calls and frequent legal visits between Plaintiff and his attorneys. (Doc. 14-2 at 5-8, 37-38, 40-41; Doc. 17-1 at 2-4, 7-8, 12-13; Doc. 31-2 at 5-7.) The legal calls and legal visits have continued while Plaintiff is housed in the Special Housing Unit (SHU). (Doc. 31-2 at 5-7.)

### E. Plaintiff's Placement in the SHU

On July 26, 2022, Plaintiff was involved in a physical altercation in Food Service. (Ex. A, Ulrich Decl., ¶ 16, Att. 2, Incident Report No. 3655238, p. 1.) When two inmates are involved in a physical altercation, each inmate is written an incident report that will be investigated and is subject to a final decision by a disciplinary hearing officer. (*Id.*) As a result of receiving the incident report, Plaintiff was placed in administrative detention in the SHU pending an investigation. (*Id.* ¶ 18, Att. 4, Administrative Detention Order.) The incident report was expunged following the investigation and disciplinary hearing. (*Id.* ¶ 17, Att. 3, Expunged Incident Report No. 3655238.)

Currently, Plaintiff remains in the SHU while the Special Investigative Services (SIS) Department is investigating safety and security issues pertaining to Plaintiff at USP Tucson.[2] (*Id.* ¶ 20.) While Plaintiff has been housed in the SHU, he has been reviewed periodically by the Segregation Review Official (SRO) as required by policy. (*Id.* ¶¶ 10, 19, Att. 5, SRO Reviews.) Plaintiff may express concerns about cell assignments, cellmates and other issues during those periodic reviews. (*Id.* ¶ 19.) Plaintiff has introduced no evidence that he expressed concerns about his current housing status or cellmate during any of the SRO reviews or through the Administrative Remedy Program. (Doc. 34.) There are no safety or security concerns with Plaintiff's current housing assignment, including his current cellmate.[3] (Ex. A, ¶ 19.)

---

[2] If the Court requires more detailed information regarding the investigation and the safety and security issues pertaining to Plaintiff at USP Tucson, Defendants can provide it in camera to the Court.

[3] Plaintiff has made allegations regarding his cellmate and speculations regarding allegations he might assert against him in the future. (Doc. 34 at 5-6.) Due to Plaintiff's cellmate's privacy rights, Defendants will not discuss the allegations except to note that there are no safety or security concerns regarding housing Plaintiff with his cellmate. (Ex. A, ¶ 19.)

### F. SHU Policies and Procedures

There are two types of status in the SHU: (1) administrative detention status and (2) disciplinary segregation. (Ex. A, ¶ 5.)   Administrative detention is a non-punitive status which removes the inmate from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities, or to protect the public.  *See* 28 C.F.R. § 541.22(a).  An inmate may be placed in administrative detention status for investigation into or while awaiting a hearing "for possibly violating a Bureau regulation or criminal law."  *See* 28 C.F.R. § 541.23(c)(1).  Bureau officials, not the inmate, determine whether an inmate is placed in the SHU on administrative detention status.  (Ex. A, ¶¶ 6-7.)

Conversely, an inmate is placed on disciplinary segregation status "as a disciplinary sanction."  *See* 28 C.F.R. § 541.24.  In disciplinary segregation status, an inmate's "personal property will be impounded, with the exception of limited reading/writing materials, and religious articles.  Also, [an inmate's] commissary privileges may be limited."  *See* 28 C.F.R. § 541.31(h)(1).  An inmate may be released from disciplinary segregation status "after satisfying the sanction imposed by the DHO.  The SRO may release [the inmate] earlier if it is determined [that he] no longer require[s] disciplinary segregation status."  *See* 28 C.F.R. 541.33(b).  (Ex. A, ¶ 8.)

Regardless of the status of the inmate in the SHU, standardized conditions of confinement are afforded each inmate in the SHU.  *See* 28 C.F.R. § 541.31(a)-(o) ("Your living conditions in the SHU will meet or exceed standards for healthy and humane treatment.").  Likewise, "You will receive personal items necessary to maintain an acceptable level of personal hygiene, for example, toilet tissue, soap, toothbrush and cleanser, shaving utensils, etc.  You will ordinarily have an opportunity to shower and shave at least three times per week." 28 C.F.R. § 541.31(f).  Federal regulations outline the specific conditions of confinement in the following categories: (a) Environment; (b) Cell Occupancy; (c) Clothing; (d) Bedding; (e) Food; (f) Personal Hygiene; (g) Exercise; (h) Personal Property; (i) Correspondence; (j) Telephone; (k) Visiting; (l) Legal Activities; (m) Staff Monitoring; (n) Programming Activities; and (o) Administrative Remedy Program.  *Id*.

Medical and mental health care are mandated as well.  *See* 28 C.F.R. § 541.32(a)-(b) ("After every 30 calendar days of continuous placement in . . . administrative detention . . . status, mental health staff will examine you, including a personal interview.  Emergency mental health care is always available.").  (Ex. A, ¶ 9.)

The SRO reviews an inmate's placement in the SHU periodically.  *See* 28 C.F.R. § 541.26.  "Within three work days of your placement in administrative detention status, not counting the day you were admitted, weekends, and holidays, the SRO will review the supporting records."  28 C.F.R. § 541.26(a).  There is also a formal review within "seven continuous calendar days of your placement in . . . administrative detention . . . status . . . at a hearing you can attend."  28 C.F.R. § 541.26(b).  "After every 30 calendar days of continuous placement in . . . administrative detention . . . status, the SRO will formally review your status at a hearing you can attend."  28 C.F.R. § 541.26(c).  "You can submit a formal grievance challenging your placement in the SHU through the Administrative Remedy Program[.]"  28 C.F.R. § 541.26(d).  (Ex. A, ¶ 10.)

While in the SHU, inmates have access to informal grievance forms (BP-8) and formal grievance forms (BP-9, BP-10, BP-11), as well as Cop-Outs, to make requests to staff.  Cop-Outs can include any type of request, including if an inmate believes his Unit Team is not providing him with forms, and may be made to any staff member, including Associate Wardens and the Warden.  (Ex. A, ¶ 11.)  SHU inmates are monitored by program and unit team staff.  Qualified health personnel and one or more responsible officers the Warden designates visit each inmate daily, and a Lieutenant visits the SHU during each shift.  (*Id.* ¶ 12.)  Either the Unit Manager or a Case Manager/Correctional Counselor makes daily visits to inmates housed in the SHU.  The Unit Manager visits at least weekly.  (*Id.* ¶ 13.)  If an inmate has an issue he wants to bring to the attention of staff, he can do so via a Cop-Out at any time or during the in person rounds with multiple Unit Team and other staff.  (*Id.* ¶ 14.)

### G.   Constitutionality of SHU Placement

The Fifth Amendment prohibits deprivation of a protected life, liberty or property

interest without due process. U.S. Const. amend. V. However, inmates who have been convicted of crimes do not have a liberty interest in being housed in the general population because placement in segregated housing for nonpunitive reasons is "within the terms of confinement ordinarily contemplated by a prison sentence." *Toussaint v. McCarthy*, 801 F.2d 1080, 1091 (9th Cir. 1986) (citing *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). While a State may create liberty interests protected by the Due Process Clause, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). The *Sandin* Court recognized that placement in segregated housing does not "present the type of atypical, significant deprivation" in which a liberty interest might exist within the prison context. *Id*. at 486; *see also Hewitt*, 459 U.S. at 468 ("It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence... [A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.") Further,

> Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel…[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (internal citations omitted).

### H. Plaintiff's Motion

Plaintiff filed the instant motion seeking to have this Court interfere with the

Bureau's housing decisions[4] and order Plaintiff's immediate removal from the SHU and return to general population. (Doc. 34.) Plaintiff repeatedly states without support that he is being held in the SHU without penological justification. (*Id.* at 1, 8, 9.) Having unilaterally decided that neither punishment nor protection[5] is the basis for Plaintiff's current housing in the SHU, he asserts his "firm belief that Defendants desire to keep him quiet." (*Id.* at 4.) He asserts that recently several news outlets reported on his "underlying allegations" and that "there is a close link in time" between the news reports, which Plaintiff claims as his First Amendment activity, and the purported "adverse" action by Defendants. (*Id.* at 4-5.) Plaintiff does not explain how a news report from September 22, 2022, could cause the Defendants to retaliate in August 2022 by keeping him in the SHU after clearing him from the incident report for fighting, even if they had seen the news reports, which Plaintiff does not allege occurred. (*Id.*) Most importantly, Plaintiff fails to link the alleged retaliation of housing him in the SHU with the FAC, in which he claims First and Sixth Amendment claims regarding access to courts and counsel.

**II.     Legal Standards**

   **A.     Standards for a Temporary Restraining Order (TRO) without Notice**

Rule 65(b)(1), Fed.R.Civ.P., provides

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A) *specific facts in an affidavit or a verified complaint* clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) *the movant's attorney certifies in writing any efforts made to give notice* and the reasons why it should not be required.

(Emphasis added.) Additionally, Rule 65(b)(2), Fed.R.Civ.P., provides

---

[4] Title 18 U.S.C. § 3621(b) precludes judicial review of the Bureau's "designation of a place of imprisonment."
[5] Plaintiff asserts that he "has never asked to be protected from other prisoners who might intend him harm." (Doc. 34 at 4.) However, Bureau officials, not the inmate, determine whether an inmate will be placed in administrative segregation in the SHU. (Ex. A, ¶ 6.)

> Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

**B.     Standards for a Preliminary Injunction**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam)) (emphasis added); *see also Winter v. NRDC, Inc.,* 555 U.S. 7, 24 (2008) (citation omitted) ("[A] preliminary injunction is an extraordinary remedy never awarded as of right."). The test is the same for a TRO or a preliminary injunction. *White v. Lindermen,* No. CV 11-8152-PCT-RCB (ECV), 2012 WL 5040850, at *1 (D. Ariz. Oct. 18, 2012) (citations omitted).

A plaintiff seeking preliminary injunctive relief must show (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) the requested injunction is in the public interest. *Fuller v. Granville,* No. CV 14-0020-PHX-DGC, 2014WL4541122, at *6 (D. Ariz. Sept. 12, 2014) (citing *Winter,* 555 U.S. at 20). Alternatively, the plaintiff may establish "serious questions going to the merits" – something less than a likelihood of success on the merits – but only if the plaintiff also establishes that the "balance of hardships tips sharply in the plaintiff's favor" and the other two elements of the *Winter* test are met. *All. For The Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Under the "serious questions" test, the plaintiff must make a stronger showing of one element to offset a weaker showing of another. *Id.* Whichever formulation of the standard is applied, the movant has the burden of proof on each element of the test. *Env'l Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

Further, a preliminary injunction is "merely to preserve the relative positions of the

parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). "When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quotation omitted).

The Prison Litigation Reform Act (PLRA) imposes further requirements on a prisoner who seeks injunctive relief. The PLRA requires that any injunctive relief be *narrowly drawn* and the *least intrusive means* necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *Gilmore v. Cal.,* 220 F.3d 987, 999 (9th Cir. 2000). Under the PLRA, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." 18 U.S.C. § 3626(a)(2). The Supreme Court recognizes that, "because the problems of prisons in America are complex and intractable, and because courts are particularly ill equipped to deal with these problems, [the Supreme Court] generally ha[s] deferred to the judgments of prison officials." *Shaw v. Murphy,* 532 U.S. 223, 229 (2001) (internal quote marks and citation omitted).

### C. Standards Regarding Bureau Policies and Correctional Judgment

The Supreme Court has made it clear that "a prison regulation [that] impinges on inmates' constitutional rights … is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner v. Safley*, 482 U.S. 78, 89 (1987). First, the regulation cannot be "arbitrary or irrational," and the "governmental objective must be a legitimate and neutral one." *Id.* at 90. Second, if "there are alternative means of exercising the right that remain open to prison inmates," then "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974). Third, the court considers the impact accommodation would have on the allocation of prison resources, guards and other inmates. *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be *particularly deferential to the informed discretion of*

*corrections officials.*" *Id.* at 90. (Emphasis added.)  Finally, the court considers whether there is a ready alternative or the regulation is an "'exaggerated response' to prison concerns." *Id.*  Thus, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

As to the First Amendment, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.  Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Procunier*, 417 U.S. at 822.  Also, "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.*

In the Ninth Circuit, if the Sixth Amendment right to counsel is implicated, the courts also consider whether "the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel," and, if so, whether the interference "substantially prejudices the criminal defendant." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014).  In an action seeking to enjoin "the continuation of an unconstitutional practice," substantial prejudice would be "that his right to privately confer with counsel has been chilled." *Id.* at 911.

**III.   Plaintiff has not met the Standards for a TRO without Notice or a Preliminary Injunction**
   **A.   The motion is outside the scope of the instant proceeding.**

"A court's equitable power lies only over the merits of the case or controversy before it." *Pac. Radiation Oncology, L.L.C. v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015).  If, instead, "a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Id.*  "[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the

conduct asserted in the underlying complaint." *Id.* at 636. A "sufficiently strong" nexus between the injunction and the complaint can be found "where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)); *see also Saddiq v. Ryan*, 703 F. App'x 570, 572 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1335 (2018) (denying request for preliminary injunctive relief regarding alleged retaliation because Saddiq failed to establish nexus between the retaliation claim and the claims in the complaint); *Pearson v. GEO Grp. Inc.,* No. CV-16-03094-PHX-DGC (BSB), 2018 WL 1382526, at *2 (D. Ariz. Mar. 19, 2018) (denying motion for injunctive relief regarding nipple rings in proceeding involving mail); *Brisken v.* Griego, No. CV 16-02434-PHX-JJT (ESW), 2017 WL 8792538, at *4 (D. Ariz. Dec. 8, 2017) (denying injunction to be taken to eye doctor when only medical allegations in complaint related to broken hand); *Valenzuela v. Ryan,* No. CV-15-00158-PHX-NVW (MHB), 2016 WL 8193623, at *1 (D. Ariz. Nov. 14, 2016) (denying request for preliminary injunction regarding rapes alleged to be retaliation for current lawsuit because plaintiff was required to file new lawsuit to allege new claims).

Here, Plaintiff seeks a TRO or injunction requiring Defendants to release him from the SHU and return him to general population. (Doc. 34.) The requested injunction is not related in any way to the underlying claims in the suit, which involve claims regarding access to the courts and counsel.[6] (Compare Doc. 34 with Doc. 3.) If Plaintiff were to succeed in his lawsuit, he would receive an injunction requiring Defendants to stop interfering with his access to courts and counsel. If he prevailed as to the motion, he would be released from the SHU to the general population. No nexus exists between the motion and the lawsuit.

Plaintiff's motion for a TRO or preliminary injunction must be denied because it is outside the scope of the instant proceeding.

---

[6] Having failed to plead allegations related to his instant request for preliminary injunction in his FAC, Plaintiff also improperly bypassed the requirements of the PLRA, which requires the court to screen all prisoner complaints to determine whether they have stated a claim upon which relief can be granted. Here, the court had no opportunity to screen Plaintiff's allegations because they were raised for the first time in his motion.

**B. Plaintiff has not met the standards for a TRO without Notice.**

Plaintiff asserts that he has met the required standards for a TRO without notice because two of his counsel have written to the Warden about his continued placement in the SHU after his exoneration from the incident report. (Doc. 34 at 8.) First, counsel was required to certify in writing any efforts made to give notice of the motion for a TRO. *See* Rule 65(b)(1)(b), Fed.R.Civ.P. Second, Plaintiff did not include any "*specific facts in an affidavit or a verified complaint* [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." *See* Rule 65(b)(1)(b), Fed.R.Civ.P.

Instead, Plaintiff makes the unsupported statement that "[c]onfinement inside a cell for 23-hours-per-day, even for a matter of days, can have irreparable effects on a detainee's[7] physical and emotional health." (Doc. 34 at 8.) While recognizing that "[t]he purpose of a temporary restraining order is to maintain the *status quo* until such time that opposition briefing and a hearing can take place," Plaintiff instead requests that he be "released to the general population within the Tucson facility until such time that responsive briefing and a hearing can take place to determine whether SHU confinement is appropriate for a longer period of time." (*Id.*)

In other words, rather than requesting a prohibitory injunction seeking to maintain the status quo, Plaintiff is requesting a mandatory injunction, which "goes well beyond simply maintaining the status quo *Pendente lite* [and] is particularly disfavored." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) (quotation omitted). "When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Stanley*, 13 F.3d at 1320 (quotation omitted).

Plaintiff has not met the standards for a TRO without notice and, in fact, seeks a highly disfavored mandatory injunction.

---

[7] Plaintiff is not a "detainee." He is a federal inmate convicted by a jury of his peers and sentenced to 120 years in Bureau custody. (Doc. 22 at 1.)

### C. Plaintiff Has Not Established the *Winter* Factors.

Far from the required "clear showing" and heightened standard for the extraordinary affirmative injunctive relief Plaintiff seeks, Plaintiff fails to establish the *Winter* factors.

#### 1. Plaintiff has not established a likelihood of success on the merits.

Plaintiff has not established a likelihood of success or that serious questions go to the merits. The evidence contradicts Plaintiff's bald assumptions. The entire motion rests on Plaintiff's "belief" that he is being retaliated against for exercising First Amendment rights, which he asserts is shown by suspicious timing. The suspicious timing includes Acting SIA Gallion "scrubbing" his contact list[8] (of non-attorneys) shortly after his counsel filed the Rule 33 motion. (Doc. 34 at 2.) However, the only *evidence* on the issue is Lt. Gallion's declaration that he was not aware of Plaintiff's litigation regarding his New York conviction and sentence when the restrictions on Plaintiff's contacts were imposed. (Doc. 14-5 at 6.) Instead, all recommendations and determinations were made for the safety, security and good order of the institution and not in any way to hinder Plaintiff's legal efforts. (*Id.*)

Now, Plaintiff speculates that the Bureau decided to hold him in the SHU after clearing him of fighting in August 2022 because of news reports that were written in September 2022. (Doc. 34 at 4-5.) Plaintiff does not allege that Defendants or their employees were even aware of the news reports. (*Id.*) Again, the only *evidence* in the record is that Plaintiff is being held in the SHU while the SIS Department is investigating safety and security issues pertaining to Plaintiff at USP Tucson. (Ex. A, ¶ 20.)

The Bureau has "legitimate penological interests" and a central correctional goal "of internal security within the corrections facilities themselves." *See Turner*, 482 U.S. at 89; *Procunier*, 417 U.S. at 823. Plaintiff has not provided any evidence that the Bureau deliberately interfered with the confidential relationship between him and his counsel or

---

[8] Notably, if Plaintiff wishes to add any contacts, he may request approval of the contacts, and the SIS Department will review them as part of the approval process. (Doc. 14-5 at 6.) As of May 31, 2022, Plaintiff had not done so. (*Id.*) Plaintiff provides no evidence that he has requested any contacts be added in the months since then. (Doc. 34.)

chilled his right to confer privately with counsel. *See Nordstrom*, 762 F.3d at 910. He cannot do so because the evidence shows that the Bureau has facilitated his numerous confidential legal calls and frequent legal visits with his multiple counsel – which legal calls and legal visits continue even while he currently is housed in the SHU. (Doc. 14-2 at 5-8, 37-38, 40-41; Doc. 17-1 at 2-4, 7-8, 12-13; Doc. 31-2 at 5-7.) Similarly, Plaintiff has not shown that his SHU placement interferes with his access to courts. Access to courts and counsel form the basis of the FAC. (Doc. 3.)

Plaintiff has not established a likelihood of success on the merits.

### 2. Plaintiff has not established irreparable harm.

Plaintiff has not shown irreparable harm. A plaintiff "must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chron. Publ'g Co.,* 762 F.2d 1374, 1376 (9th Cir. 1985). The irreparable injury must be both likely and immediate. *Winter,* 555 U.S. at 24. Mere "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988). Again, the evidence shows that Plaintiff has not suffered and will not suffer the harms he now alleges, which were not even mentioned in his FAC. The urgency claimed in the FAC – based on the upcoming hearing on the Rule 33 Motion on newly discovered evidence – was eviscerated when the New York District Court determined that it will not address the motion until the Second Circuit decides the appeal. There is no upcoming hearing. Plaintiff has provided no evidence that he lacks access to courts or counsel while housed in the SHU. (Doc. 34.) To the contrary, the Bureau has facilitated access to counsel throughout Plaintiff's time at USP Tucson, including during his current placement in the SHU. (Doc. 14-2 at 5-8, 37-38, 40-41; Doc. 17-1 at 2-4, 7-8, 12-13; Doc. 31-2 at 5-7.)

At best, Plaintiff's risk of injury is speculative, and speculative injury is not irreparable injury sufficient for a preliminary injunction. *Caribbean Marine*, 844 F.2d at 674.

### 3. The equities and public policy favor upholding Bureau policies and correctional decisions.

The equities and public policy favor upholding the Bureau's correctional decisions.

The evidence establishes no grounds for the extraordinary measure of overriding the professional judgment of the Bureau in holding an inmate in non-punitive administrative detention status while the SIS Department is investigating safety and security issues pertaining to him at his current institution. Plaintiff's effort to override those decisions should be rejected.

**IV.     Request for Hearing**

It is Plaintiff's burden to establish entitlement to a TRO or preliminary injunction, which he has failed to do. However, in the event further evidence or information are needed for the denial of Plaintiff's motion, Defendants request an evidentiary hearing.

**V.     Conclusion**

For all of the foregoing reasons, Defendants Garland, Peters, Gutierrez and Ulrich request that the Court deny the Motion for Temporary Restraining Order or, alternatively, for Preliminary Injunctive Relief (Doc. 34).

RESPECTFULLY SUBMITTED:  October 13, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Denise Ann Faulk*
DENISE ANN FAULK
Assistant U.S. Attorney

Copy of the foregoing
served via EM/ECF to

Stacy Scheff
LAW OFFICE OF
STACY SCHEFF
P.O. Box 40611
Tucson, AZ 85717
*Pro Se*

s/ *Pamela. Vavra*
*/ Response to MTRO – 2nd*