Stacy Scheff
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611, Tucson, AZ 85717-0611
(520) 471-8333 • FAX (520) 300-8033
stacy.scheff@gmail.com; Stacy@ScheffLaw.com
State Bar No. 028364
*Counsel for Plaintiff*

**DISTRICT COURT FOR THE UNITED STATES**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Keith Raniere,<br><br>Plaintiff,<br><br>v.<br><br>Merrick Garland, US Attorney General; Michael Carvajal, Director Federal Bureau of Prisons; Barbara VonBlankensee, Warden USP Tucson, Anthony Gallion (all in their official capacities),<br><br>Defendants | Case No.: 4:22-cv-00212-RCC-PSOT<br><br>**REPLY TO RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**<br>(*Expedited Consideration Requested*)<br>(*Hearing Requested*) |

Plaintiff Keith Raniere, via counsel, Replies to Defendant's Response in Opposition to his Motion Temporary Restraining Order.

**I. INTRODUCTION**

The parties agree that Plaintiff Keith Raniere is currently incarcerated at the United States Penitentiary in Tucson, and being held in the Special Housing Unit ("SHU"). Plaintiff claims that the Bureau of Prisons is retaliating against him for presenting a credible challenge to his conviction for child pornography. The Defendants claim that their actions are justified by the need for the "safety, and security of the institution". Mr. Raniere is petitioning this court for a preliminary injunction and a

1

temporary restraining order to enjoin Defendant's from interfering with his access-to-counsel and the courts via this latest act of retaliation. Mr. Raniere seeks to return to the *status quo ante* where his attorneys, power-of-attorney, family, and friends were allowed to contact him, and where he lived in the prison's general population.

Defendants' evidence is contradictory or non-existent. Defendants claim that Plaintiff has not presented any evidence that he expressed concerns about his current housing, (Doc. 39, p.4), <u>and</u> that only they can determine whether and where Plaintiff is safe in their custody (Doc. 39, p.5).  However, Plaintiff has filed grievances as well as this Motion.  Attached as Exhibit 1 is Plaintiff's declaration regarding his current placement and treatment.  Plaintiff did ***not*** express fear of returning to general population. Exh. 1, ¶11.  Plaintiff ***has***, however, expressed fear of his current placement in the SHU with his current cellmate.  Exh. 1, ¶¶ 26-30.  Plaintiff has not received the hearings that policy requires.  Exh. 1, ¶¶ 22-33.

For this reason, Plaintiff requests a hearing so that this Court can hear testimony from the parties regarding whether the acts of the Defendants are justified as they claim, or if they are thinly-veiled retaliation for trying to prove Plaintiff's innocence.

## II. DENYING CONTACT BETWEEN MR. RANIERE AND THE LISTED PEOPLE IS UNLAWFUL.

Defendants seek to cast their retaliation in a penologically justifiable light, while painting Mr. Raniere's loved ones and associates as suspicious characters in order to justify their continued policy violations and abuses. There is no valid penological reason to deny Mr. Raniere contact with Mr. Chakravorty, Ms. Clyne and Dr. Roberts, nor is

there a legal basis on which to do so. Defendant's claim that NXIVM, Chakravorty, Clyne and Roberts are all "threats to the security and good order of the institution" and alternatively claim they can deny Mr. Raniere contact with them based on his conditions of supervised release. Neither are true.

> The first sentence of § 3624(e) supports our construction. A term of supervised release comes "after imprisonment," once the prisoner is "released by the Bureau of Prisons to the supervision of a probation officer." Supervised release does not run while an individual remains in the custody of the Bureau of Prisons. The phrase "on the day the person is released," in the second sentence of § 3624(e), suggests a strict temporal interpretation, **not some fictitious or constructive earlier time**.

*United States v. Johnson*, 529 U.S. 53, 57, 146 L. Ed. 2D 39 (2000) (Emphasis added).

Here, the sentencing judge had an opportunity to limit Mr. Raniere's contact with certain individuals <u>while he is in prison</u>, pursuant to 18 U.S.C. § 3582(e), but opted to impose such restrictions on the ***supervised release*** portion of his sentence, ***not*** during the term of imprisonment. (*see* Doc. 31-2- Ex. A, Att. 2, pp. 1-9). It is unclear why the BOP via Defendant's would put forth an argument that, if successful, would require the Judicial Branch to enforce the conditions they impose on defendants while they are still in the custody of the Executive Branch, or alternatively require prison officials to relinquish control of their institutions and allow judges to enforce conditions of release before release.

Moreover, the individuals that Defendants now say are a danger to the safety, security, and good order of the institution, were all allowed to visit with Plaintiff *in person,* at USP Tucson previously. It was only when Mr. Raniere was preparing his Rule

33 challenge to his conviction, that Chakravorty, Clyne, and Roberts became "dangerous", and suddenly the conditions of supervised release were applied. Not before. The Defendants have failed to explain what happened to create an institutional threat when none existed previously. The far more plausible explanation is that Defendants are retaliating because they do not want Plaintiff to succeed in challenging his conviction.

### A. Mr. Chakravorty

Defendants begin their catalog of Mr. Chakravorty's "misdeeds" (Doc. 39, p.2, referring to Doc. 14 pp. 2-7) by relaying words spoken to him by Mr. Raniere, casting Mr. Raniere's displeasure with the government as somehow being Mr. Chakravorty's fault. If the Bureau were to block all contact between inmates and the outside because the prisoners were not happy with some aspect of the government or justice system, there would be no communication at all. More importantly, Mr. Raniere has a protected Constitutional right to speak his mind, even if he is in prison, especially in the context of challenging his conviction. Defendants assert that Mr. Chakravorty is "guilty" of recording calls between himself and Mr. Raniere. (*Id.*) This act is not prohibited by BOP policy at all.

Next Defendants point out Mr. Chakravorty's sin of representing himself truthfully and accurately to the court as Mr. Raniere's power-of-attorney. "Mr. Chakravorty clearly identified himself as holding Plaintiff's power of attorney." (Doc. 14, p. 4). Mr. Chakravorty is Mr. Raniere's POA *and* works as a paralegal for Mr. Tully. As such, he must have contact with Mr. Raniere. Mr. Raniere has litigation pending in multiple

jurisdictions, with multiple legal teams handling different aspects of each, each with with its own set of deadlines.  Mr. Chakravorty is the liaison between each legal team and Mr. Raniere.  Therefore, the ability to communicate with Mr. Raniere is crucial to coordinating Mr. Raniere's legal efforts, as well as managing Mr. Raniere's personal affairs.

Furthermore, Mr. Chakravorty *was* permitted *two* legal calls with Plaintiff on June 17, 2022, and June 19, 2022 - and then no more - without any explanation for the change.

Finally, Defendant's seek to legislate the behavior of the general public on public streets.  Mr Chakravorty helped to organize a group of people to dance on the street, outside the Metropolitan Detention Center in the middle of Manhattan. The dancers were allegedly visible to prisoners held in the MDC.  Defendant's claim - without citing a policy or law - that this is a threat to the safety and security of the institution.  In fact Defendant's offer no real evidence that Mr. Chakravorty (or indeed any of the three people prevented from seeing Mr. Raniere) broke any policy at all.

> *...Namely, Suneel Chakravorty. During this review of phone and emails, CTU Staff found numerous occasions where this individual, under the direction of inmate Raniere, has violated BOP policies and procedures.*

(Doc 14-5 Ex. D, Att. 2, p. 1) Yet the report does not name or list a single policy or procedure that was broken. Defendants categorization of Mr. Chakravorty's work with, and on behalf of, Mr. Raniere as "misdeeds" is utterly unsupported.

### B. Ms. Clyne

Defendant's refer to Ms. Clyne as "an unindicted co-conspirator". Another term for

that is "an innocent person". Ms. Clyne has never been charged with a crime, let alone convicted. The reason Defendants disallowed her visits is that she is associated with Mr. Raniere via NXIVM. This is not a crime, and therefore also not a legitimate penological reason to hold Mr. Raniere to his conditions of release until the time when they were ordered by the court to apply.

Ms. Clyne has initiated an outreach program where she assists prisoners with family research projects, and she gives people her contact information for that purpose. This is not a crime of any kind, but rather a touching humanitarian gesture that should be rewarded. Ms. Clyne is still in touch today with many, if not all of the prisoners she has been helping except for Mr. Raniere, her partner.

### C. Dr. Roberts

As with Mr. Chakravorty and Ms. Clyne, Dr. Roberts has had her visits with Mr. Raniere discontinued because she was affiliated with NXIVM, which violates a condition of Mr. Raniere's supervised release. Like the others, Defendants make no attempt to justify rescinding contact with Mr. Raniere when contact was permitted previously.

### D. "The Safety and Security of the Institution"

Defendants use this quote from *Turner v. Safley,* 482 U.S. 78 (1987) and *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) like a magic invocation that protects them from liability. However,

> *Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective. A prisoner may be able to marshal substantial evidence that, given the importance of the interest, the Policy is not a reasonable one.

6

*Beard v. Banks*, 548 U.S. 521, 535 (2006).

Defendants are relying on the Court not to look behind the curtain.[1] The claim that these three individuals, who were previously allowed access to Plaintiff, suddenly became a threat to the security of a federal penitentiary when nothing else of substance changed, is absurd. Merely saying a thing does not make it so.

Each of the three has in the past visited and called Mr. Raniere without incident, and undoubtedly each would continue to abide by Bureau policies if they are allowed back in contact with him. Defendants have offered no evidence of any past misdeeds which actually endangered any BOP institution. Surely "the safety and security of the institution" are not magic words which allow prison officials to do whatever they want by their mere invocation. There must be a valid penological reason or actual threat that justifies such drastic action, and none exists here.

**E. THERE IS NO VALID PENOLOGICAL INTEREST IN RETALIATION.**

Of fundamental import to prisoners are their First Amendment "right[s] to file prison grievances," *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir.2003), and to "pursue civil rights litigation in the courts." *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir.1995). Purely retaliatory actions taken against a prisoner for having exercised those rights

---

[1] Defendants only offer of evidence that these actions are ***not*** retaliatory is to the Court *in camera*. Doc. 39, p.4, fn2. Defendants may present their evidence any time they wish. If it needs to be under a protective order, they may seek one. However, it is entirely improper to offer evidence to the Court ***only***, excluding Plaintiff. In the absence of this mysterious evidence, the Court may discount the extent of the *Turner* deference that is given.

necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield. See, e.g., *Pratt v. Rowland*, 65 F.3d 802, 806 & n. 4 (9th Cir.1995) ("[T]he prohibition against retaliatory punishment is `clearly established law' in the Ninth Circuit, for qualified immunity purposes. That retaliatory actions by prison officials are cognizable under § 1983 has also been widely accepted in other circuits.") (citing *Schroeder*, 55 F.3d at 461; *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir.1994); *Frazier v. Dubois*, 922 F.2d 560, 561-62 (10th Cir.1990); *Madewell v. Roberts*, 909 F.2d 1203 (8th Cir.1990); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir.1987); *Bridges v. Russell*, 757 F.2d 1155 (11th Cir.1985); *Buise v. Hudkins*, 584 F.2d 223 (7th Cir.1978)).

The best way to classify Defendant's behavior here is retaliation shrouded in bureaucracy. There is no investigation on going as to the "safety and security issues pertaining to Mr. Raniere", as Defendant's allege. (Doc. 39 at 4) The "investigation" is "for a violation of Bureau Regulations" (Doc 39-1 p. 15)  The only evidence Defendant's have provided is the "Administrative Detention Order" (*Id.*) which shows Mr. Raniere being placed in Ad Seg on 7/26/2022, Box (a) is checked indicating that the reason for the placement is investigation for a violation of Bureau regulations; presumably for fighting.

The conflicts in Defendants' own evidence goes to prove the retaliatory and *post hoc* nature of this entire episode.  On the Administrative Detention Order, Defendants show Mr. Raniere being placed in Ad Seg for "for a violation of Bureau Regulations"

8

(Doc 39-1 p. 15).  Subsequent documents (Ex. A, Att. 5 pp.1,3,5) <u>generated 3 days later</u>, which refer back to the original Administrative Detention Order,  now show the reason for the Ad Seg placement "Pending SIS Investigation" which is patently untrue.  The verifiable facts are:

- Mr. Raniere was assaulted 7/26/2022. (Doc 39-1 p.15)
- The reason for his initial placement in SHU was to investigate the "fight". (*Id.*)
- No other official report or document indicates that the cause of Mr. Raniere's SHU placement has changed.(see docket generally)
- The incident report was expunged on 8/15/2022 (Doc. 39-1 p.13)
- Mr. Raniere was notified of the expungement on 8/23/2022 (*Id.*)
- Mr. Raniere remains in SHU. Exhibit 1.

This shows at best, incompetence in keeping track of SHU prisoners, and at worst, a deliberate policy of dragging out Mr. Raniere's detention in order to interfere with his ability to challenge his conviction.

### F. THE PROPOSED SECOND AMENDED COMPLAINT

To the extent that the Court is inclined to deny any relief asked for in this request for injunction for the reason that it is not linked to claims in the First Amended Complaint, Plaintiff has filed a Motion for Leave to File a Second Amended Complaint. This proposed complaint includes many of the facts that Plaintiff relies on here.

### II. Law & Argument.

### A. LEGAL STANDARD FOR GRANTING A TEMPORARY RESTRAINING ORDER

Plaintiffs seeking a preliminary injunction generally must show that (1) their

claims are likely to succeed on the merits; (2) they will likely suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) the public interest favors an injunction. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *American Trucking Associations Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

The Ninth Circuit allows the above factors to be weighed using a sliding scale approach, whereby a strong showing in one factor may counterbalance a weaker showing in another. E.g. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2010); *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir. 1991) ("plaintiffs must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and balance of hardships tipping in their favor"). For example, "if a plaintiff can only show that there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two Winter factors are satisfied." *Tenorio-Serrano v. Driscoll*, 324 F. Supp. 3d 1053, 1058 (D. Ariz. 2018) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). In demonstrating that there are "serious questions", a plaintiff need not demonstrate a probability of success on the merits but only a "fair chance of success on the merits." *Cascadia Wildlands v. Scott Timber Co., 715 F. App'x 621, 624-25 (9th Cir. 2017) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)).

Plaintiff here has amply demonstrated a likelihood of success on the merits of his First and Sixth Amendment claims. He need only prove that his right to counsel and access to the courts have been "chilled", and he has done so.

> "*When the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel if it substantially prejudices the criminal defendant.*"

*Williams v. Woodford,* 384 F.3d 567, 584-85 (9th Cir.2004).

Here, the government has deliberately interfered with Mr. Raniere's right to communicate with his attorneys by retaliating against him. The result of it is that Mr. Raniere's rights have been chilled.  This is enough to implicate a 6th amendment violation and warrant granting Plaintiff relief.

Yet even if this Court were to find that Plaintiff has demonstrated a slightly less forceful showing on the merits, this Court may still grant preliminary injunctive relief with a concomitant finding that the balance of hardships tip sharply in Plaintiff's favor. Under either rubric, all four *Winter* factors weigh in favor of the requested temporary restraining order, and relief should be granted.

DATED this 27th day of October, 2022 by

/s/Stacy Scheff
STACY SCHEFF
Attorney for Plaintiff

Delivered via ECF
to all registered parties