EXHIBIT 1

Stacy Scheff
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611, Tucson, AZ 85717-0611
(520) 471-8333 • FAX (520) 300-8033
stacy.scheff@gmail.com
State Bar No. 028364
*Counsel for Plaintiff*

## DISTRICT COURT FOR THE UNITED STATES
## DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere, | Case No.: 4:21-cv-00179-RM |
| Plaintiff, | |
| v. | |
| Merrick Garland, US Attorney General; ~~Michael Carvajal~~ Colette Peters, Director Federal Bureau of Prisons; Unknown Current Warden USP Tucson,~~–~~ Anthony Gallion (all in their official capacities), | **PROPOSED ~~SECOND~~THIRD AMENDED COMPLAINT (Prospective relief only) (Hearing requested)** |
| Defendants | |

1. This is an action for narrow injunctive and declaratory relief for Plaintiff Keith Raniere, a prisoner in the U.S. Penitentiary in Tucson Arizona ("USP Tucson"). Plaintiff seeks an order enjoining prison officials from retaliating, and from actively frustrating and impeding his First and Sixth Amendment rights to access to the courts and counsel.

### JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction under the First and Sixth Amendments to the United States Constitution, and 28 U.S.C. § 1331 (federal question

1

jurisdiction), as Plaintiff seeks to enjoin practices and malpractices that amount to violations of the First and Sixth Amendments to the U.S. Constitution.

**3.** This Court has jurisdiction under 28 U.S.C. § 2201 to declare the rights of the respective parties.

**4.** This Court has jurisdiction under 5 U.S.C. §702, 28 U.S.C. § 2202, and Rule 65 of the Federal Rules of Civil Procedure to grant preliminary injunctive relief for the constitutional violations alleged herein.

**5.** Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action occurred in the District of Arizona.

**PARTIES**

**6.** The Plaintiff Keith Raniere is and was at all relevant times, a federal inmate at USP Tucson.

**7.** Defendant Merrick Garland is the Attorney General of the United States and the head of the United States Department of Justice. BOP is an agency of the United States Department of Justice. As such, Defendant Garland has ultimate authority over BOP decisions, including policy decisions regarding USP Tucson, and the promulgation of BOP regulations. See 18 U.S.C. § 4042. Garland has affirmatively maintained the policy of allowing Wardens to retaliate against individual prisoners based on personal animus and not supported by any legitimate penological purpose. Defendant Garland's place of work is located in Washington, DC. Defendant Garland is sued in his official capacity.

2

8. Defendant ~~Carvajal~~ Peters is ~~, and has been at all times relevant to this case,~~ Director of the BOP. Defendant ~~Carvajal~~ Peters exercises authority over all BOP determinations.  Defendant ~~Carvajal~~ Peters has affirmatively carried out the policy of allowing Wardens to retaliate against individual prisoners based on personal animus and not supported by any legitimate penological purpose.  See 18 U.S.C. §§ 4041, 4042. Defendant ~~Carvajal's~~ Peters' place of work is located in Washington, DC. Defendant ~~Carvajal~~ Peters is sued in ~~his~~ her official capacity.

9. Defendant ~~VonBlankensee~~Unknown Current Warden ("USP Tucson Warden") is the Warden of USP Tucson.  Defendant ~~VonBlankensee~~ USP Tucson Warden made the affirmative decision to interfere with Plaintiff's First and Sixth Amendment rights by endorsing the actions of previous wardens who ~~Plaintiff's power-of-attorney, and paralegal for Plaintiff's criminal defense attorney Joseph Tully, Suneel Chakravorty, from his approved list of people who he can call and receive as visitors in violation of theing an active attorney/client phone call with his criminal defense attorney, Joseph M. Tully to be terminated, and removingeaus~~ violated Plaintiff's First and Sixth Amendments to the U.S. Constitution. Defendant USP Tucson Warden also endorsed and/or caused a pattern of retaliating against Plaintiff for exercising his First and Sixth Amendment rights Defendant ~~VonBlankensee~~USP Tucson Warden is sued in ~~her~~their official capacity.

10. Defendant Anthony Gallion i was a Lieutenant at USP Tucson. Defendant Gallion made the affirmative decision to "scrub" Plaintiff's approved callers and visitors list, to include attorneys and their agents.

11. Plaintiff has exhausted or has been prevented by BOP staff from exhausting his administrative remedies related to the allegations of First Amendment retaliation and Sixth Amendment interference with counsel as pleaded below.

**FACTS**

12. Plaintiff is incarcerated at USP Tucson, serving a sentence of 120 years for, among other things, possession of child pornography and sexual exploitation of a child, and for purportedly taking twenty-two contraband photographs in 2005.  *U.S. v. Raniere*, US District Court, Eastern District of New York, 1:18-CRer-00204-NGG-VMS.

13. The criminal case has been the subject of significant main-stream and social media attention.

14. Among the "Special Conditions of Supervision" upon his supervised release, Mr. Raniere is prevented from associating "with any individual with an affiliation to Executive Success Programs, NXIVM, DOS, or any other NXIVM affiliated organizations…".

15. The Conditions of Supervision do not define who is or is not "affiliated" with these entities.

16.     NXIVM was a corporation founded by Plaintiff that offered personal development courses or "coaching" to nearly seventeen thousand people in the time it existed.

17. The level of involvement among these individuals varied from brief interactions all the way to being business and/or romantic partners with Plaintiff.

18. The Conditions of Supervision do not distinguish between these distinctly different levels of "affiliation" to NXIVM.

19. The Conditions of Supervision do not apply until Mr. Raniere is released on supervised release.

**Suneel Chakravorty**

20.     Mr. Chakravorty is Power of Attorney for Plaintiff Keith Raniere.

21.     Mr. Chakravorty first met Mr. Raniere in approximately June of 2017, when he enrolled in a coaching program to be coached by NXIVM teachers.

22. Mr. Chakravorty attended the entirety of Mr. Raniere's criminal trial in the Eastern District of New York.

23. Mr. Chakravorty is not a witness, co-conspirator, or co-defendant in the case.

24. Mr. Chakravorty got to know Mr. Raniere more personally after his criminal trial, which ended in June of 2019.

25. Prior to his sentencing in October 2020, Mr. Raniere asked Mr. Chakravorty if he would agree to be Power of Attorney for all public relations, legal, personal, and financial matters in the event that Mr. Raniere went to prison.

26. In January of 2021, Mr. Chakravorty signed a contract to act as Power of Attorney for Mr. Raniere.

27. As Power of Attorney, Mr. Chakravorty stands in Plaintiff's shoes in public relations, personal, financial, and legal matters, and can make decisions as though he were Mr. Raniere.

28. Mr. Chakravorty takes this responsibility very seriously, and always makes sure that the decisions he makes are the decisions that Mr. Raniere wants to be made.

29. It is impossible for Mr. Chakravorty to carry out his duties as Power of Attorney ethically without regularly communicating with Mr. Raniere.

30. In the Fall of 2019, after the trial, Mr. Raniere and Mr. Chakravorty shared his observations about Plaintiff's criminal case.

31.       Mr. Raniere was – and still is - adamant that he is innocent of the child pornography and related charges, and that these charges were based on falsified evidence.

32. Mr. Raniere and Mr. Chakravorty discussed potential theories regarding those convictions.

33. On Mr. Raniere's behalf, Mr. Chakravorty hired experts (first wave) to investigate digital evidence used to secure the Plaintiff's conviction.

34. The first-wave experts provided Mr. Chakravorty with information called "metadata" about the files in a spreadsheet format, such as the file names, dates, and times.

6

**35.** Using Mr. Chakravorty's background as a graduate from Harvard College trained in math and data analysis, he performed a preliminary analysis of the documents and data used to convict Plaintiff of possession of child pornography.

**36.** In Mr. Chakravorty's capacity as his Power of Attorney, Mr. Raniere and Mr. Chakravorty spoke about this information and analysis for months.

**37.** As Power of Attorney, Mr. Chakravorty found three additional qualified experts (second-wave), on Mr. Raniere's behalf, to analyze the information and to rigorously and skeptically examine the preliminary information and findings.

**38.** The second-wave experts concluded that the anomalies that had been uncovered could only be explained by deliberate manipulation and forgery.

**39.** The preliminary reports generated by the experts' conclusions during these processes were presented to Mr. Raniere's legal team, including attorney Joseph Tully.

**40.** The second-wave expert reports convinced attorney Tully to draft and file a Rule 33 motion to reopen his criminal case.

**41.** Mr. Chakravorty acts as a paralegal to attorney Tully for the purposes of the Rule 33 petition.

**42.** Mr. Chakravorty's role in orchestrating the analysis of this information has given him personal, intimate knowledge of the technical and esoteric facts vital to Mr. Raniere's criminal case.

**43.** Mr. Chakravorty's subject matter expertise of data analysis allowed him to translate between these two worlds: one is the highly technical world of forensic data analysts and the other is the world of Plaintiff's criminal defense team.

**44.** Mr. Chakravorty's personal knowledge of the facts of this case allows him to translate concepts and facilitate greatly streamlined communication between Mr. Raniere, the experts, and the legal team.

**45.** Since the advent of the expert opinions, Mr. Chakravorty's role has evolved into both paralegal for, and manager of the legal team, working to overturn the conviction of his criminal case, based on what Mr. Chakravorty, Mr. Raniere, members of his legal team, and renowned experts believe to have been extensive government corruption in his case.

**46.** As paralegal and legal manager, Mr. Chakravorty will be helping to prepare the attorneys and experts for a hearing on the Rule 33 petition as well as potential supplemental filings in the Second Circuit Court of Appeals.

**47.** Additionally, Mr. Chakravorty is involved in other matters pertaining to Plaintiff's financial and legal matters.  The estate of Mr. Raniere's deceased partner, Pamela Caftriz, is currently in probate.

**48.**    Mr. Chakravorty acts on Plaintiff's behalf, as Power of Attorney, to represent his interests in that matter.

8

49. Mr. Chakravorty also communicates with the mother of Mr. Raniere's son in matters regarding their son and Plaintiff's interest in Mexico.

50. Defendant USP Tucson Warden does not recognize Plaintiff's Mexican attorney Jorge de la Garza as an attorney for the purposes of legal calls and/or visits, therefore Mr. Chakravorty is currently the only person who can represent Plaintiff's interests in Mexico.

51. From September of 2019 until January of 2020, Mr. Chakravorty was approved, and visited Plaintiff when Plaintiff was housed at Metropolitan Detention Center ("MDC") in New York.

52. After visitation was suspended due to COVID-19, Mr. Chakravorty continued to be allowed to have phone calls with Plaintiff at MDC.

53. In July 2020, Plaintiff was blocked from calling Mr. Chakravorty.

54. In January 2021, Plaintiff was transferred to USP Tucson.

55. Plaintiff was allowed to call and visit with Mr. Chakravorty at USP Tucson.

56. On May 2, 2021, during visitation with Plaintiff, ~~Plaintiff's power-of-attorney Suneel~~ Mr. Chakravorty had his visit abruptly terminated and his visitation privileges permanently revoked by the Warden of USP Tucson.

57. Nicole Clyne was also present at the visit, but was not removed from the visit when Chakravorty was.

58. Officer Stengl explained to Chakravorty that the reason for the visitation privileges being revoked was the lack of an established relationship with Plaintiff.

9

**59.** Stengl accused Chakravorty of lying about the length of his relationship with Mr. Raniere on his application for visitation.

60. Chakravorty appealed this decision to the Warden.  Chakravorty explained that, in his application he stated that he had known Mr. Raniere for over three years.  In terminating the visitation, the unit manager referred to a blog post where Chakravorty stated that he met Mr. Raniere after the trial.  The unit manager assumed that Chakravorty was lying about the length of his relationship with Mr. Raniere.   Mr. Chakravorty explained that the misunderstanding was due to the different phases of the friendship between the two men, and the different meanings of the word "met":  Chakravorty had participated in coaching classes presented by NXIVM, where he met Plaintiff in Plaintiff's capacity as founder of NXIVM; Chakravorty then attended the trial; after the trial, they developed a closer relationship.

61. From September of 2019 to February 2020, Mr. Chakravorty visited Mr. Raniere every week that visitation was available at the Metropolitan Detention Center in Brooklyn NY.

**62.** An unidentified individual responded to Mr. Chakravorty's appeal:

> "According to records, an article you authored was published on December 28, 2020, titled "A Different View of USA v. Keith Raniere".  In this article you specifically state, "The first time I met Keith was after his trial, in his prison setting."  On your Visitor Information form under question 9, "Did you know the person prior to his current incarceration?", you checked "yes".  Additionally, under the question 10, "Indicate the length of time you have known this person and where the relationship developed", you wrote, "3 years, Albany and

10

Brooklyn, NY"  This information on your Visitation Form, dated February 15, 2021, contradicts the information you posted/published regarding your relationship with inmate Raniere.

According to Bureau of Prison Program Statement 5267.09, Visiting Regulations, dated September 8, 2020, "Visiting privileges shall be extended to friends and associates having an established relationship **prior to confinement**." Additionally, "Any violation of the institution's visiting procedures may result in termination of the visit and/or disciplinary action.  As soon as staff became aware of this information, your visiting privileges with inmate Raniere were terminated.

### Nicole Clyne, "Send Her My Love", & 97 Days in the SHU

**63.** In January of 2021, Mr. Raniere was transferred to USP Tucson.

**64.** Nicole Clyne has been a close personal friend and partner of Mr. Raniere's for over 15 years and was approved for visitation at both the Metropolitan Detention Center in New York and the USP in Tucson.

**65.** On information and belief, the USP Tucson Warden was aware of Ms. Clyne's widely-publicized prior involvement with NXIVM, and approved the visitation anyway.

**66.** In May of 2021, Nicole Clyne was visiting Mr. Raniere regularly.

**67.** In the summer of 2020 when prisons were on 24/7 lockdown due to COVID, Ms. Clyne started an outreach program for inmates and their families. Since then, she has spoken to many inmates at different facilities across the BOP to provide support and a connection to the outside.

**68.** For over two years, Ms. Clyne has spoken to several inmates across the BOP who lack support from family and friends.

**69.** On July 20, 2021, Mr. Raniere attended a restitution hearing where the bench and bar had a heated exchange that received publicity.[1]

**70.** On July 22, 2021, Mr. Raniere was given a disciplinary ticket for "199 – DISRUPTIVE CONDUCT – GREATEST) MOST LIKE, 196 – MAIL ABUSE, CRIMINAL 197 – PHONE ABUSE, CRIMINAL".

**71.** Mr. Raniere was placed in the Special Housing Unit ("SHU") during the investigation.

**72.** The SHU is extremely restrictive and unpleasant regardless of the reasons for SHU placement.

**73.** SHU inmates only receive one hour, at most, of recreation on weekdays, alone (or with 1-3 others) in a cage, instead of having access to a general population recreation yard.

**74.** SHU inmates eat their meals in their cells instead of in the dining hall.  Visits with friends, family, or attorneys are done in shackles and belly chains.

---

[1] https://www.nydailynews.com/new-york/ny-keith-raniere-lawyer-mark-fernich-threaten-arrest-nicholas-garaufis-20210720-vhfxgpo5arfyhb5abllrotzw5i-story.html;

 **https://abovethelaw.com/2021/07/give-him-this-to-go-cry-federal-judge-says-during-yelling-match-with-sex-cult-lawyer/;**-

https://nypost.com/2021/07/20/nxivm-leader-keith-raniere-ordered-to-pay-almost-3-5m-to-victims/

**75.** SHU inmates are shackled any time they leave their cell, with hands-on officer escorts.

**76.** The shackles are frequently painful and cut into the skin on the wrists and ankles.

**77.** SHU inmates are given one extra set of clothing, and must wash their own clothes in the cell sink or toilet, and hang it up to dry.

**78.** If SHU inmates are caught hanging clothes up to dry, they are given a disciplinary ticket and recreation time is cancelled for the day.

**79.** On July 24, 2021, Mr. Raniere was allowed a visit with Ms. Clyne.

**80.** Ms. Clyne had been helping inmate Tim Brooks with various issues for approximately two weeks before the communications were cut off.

**81.** After the visit on July 24, 2021, Ms. Clyne was banned from visiting or communicating with Mr. Raniere.

**82.** Ms. Clyne was never given an explanation for this.

**83.** Later, Mr. Raniere was told that the offending communication was asking Mr. Brooks to "send her my love" when speaking with Ms. Clyne.

**84.** On information and belief, this does not violate any policy.

**85.** The disciplinary hearing report states that Mr. Raniere was trying to communicate with "un-indicted co-conspirator" Clyne via Mr. Brooks.

**86.** Prior to the July 22, 2021 incident, however, Mr. Raniere was able to communicate directly with Ms. Clyne for months, and she was permitted to visit two days later, on July 24, 2021.  Therefore there would be no need to communicate through Mr. Brooks.

13

87. On information and belief, the USP Tucson Warden was aware that Mr. Raniere, Ms. Clyne, and Mr. Brooks were speaking to each other and had no objection to it until July 22, 2021.

88. Plaintiff was told by officers Rynart and Shirley that the suspension of Ms. Clyne and the subsequent disciplinary action were ordered by an individual "above the Warden".

89. The Incident Report was not written until September 16, 2021, 56 days later.

90. The disciplinary hearing was not held until October 26, 2021, 96 days since the alleged incident.

91. Mr. Raniere spent a total of 97 days in the SHU for saying "Send her my love".

92. Mr. Brooks – the main actor in the alleged misconduct – only spent 56 days in the SHU.

93. On information and belief, the USP Tucson Warden intentionally delayed the disciplinary process for the purpose of keeping Mr. Raniere in the SHU.

### Dr. Danielle Roberts

94. Danielle Roberts was licensed as a physician in New York.

95. Dr. Roberts knows Plaintiff from her involvement in NXIVM.

96. Dr. Roberts and Plaintiff have been friends and business partners for over a decade.

97. Dr. Roberts supervised the ceremony for women in DOS where they had their skin cauterized or branded with a symbol indicating their membership.

14

**98.** Dr. Roberts was never charged with any crime for this participation.

**99.** In February of 2021, Dr. Roberts spoke to the press and defended her actions as well as Plaintiff.[2]

**100.**      On September 29, 2021, New York State revoked Dr. Roberts' medical license citing her involvement with DOS.

**101.**      On November 8, 2021, Dr. Roberts publicly posted a response to the revocation of her license.

**102.**      Dr. Roberts visited Plaintiff regularly from approximately April of 2021 until January of 2022.

**103.**      On January 6, 2022, Dr. Roberts was informed by Defendant USP Tucson Warden that her visitation privileges were revoked.

**104.**      USP Tucson Warden cited the publicity surrounding the revocation of Dr. Roberts' license, and the Sentencing Memorandum that restricts Plaintiff's contact with members of NXIVM after his release from prison.

**105.**      On information and belief, the USP Tucson Warden was aware of Dr. Roberts' involvement with NXIVM, but did not take any action to stop her from visiting Plaintiff until after the publicity surrounding the license revocation and Dr. Roberts' defense of her actions.

**106.**      On information and belief, the USP Tucson Warden cancelled the visitation as retaliation against Plaintiff for the actions of Dr. Roberts, in violation of Plaintiff's First Amendment rights of Free Speech and Free Association.

[2] https://nypost.com/2021/02/24/nxivm-doctor-defends-branding-sex-cult-members/

15

### Rule 33

107.     Aided by the work of Mr. Chakravorty, Plaintiff's criminal defense attorneys hired several waves of experts, culminating in the expert report of Dr. J. Richard Kiper, former FBI Unit Chief and instructor at the FBI Academy, whose opinion was that evidence in Mr. Raniere's criminal case had been tampered with by the FBI, and the evidence planted in Plaintiff's belongings.

108.     The deadline for filing petitions based on newly-discovered evidence under Rule 33 was June 21, 2022.

109.     For about five months prior to April 28, 2022, Plaintiff's attorneys ~~have~~ had weekly calls with Plaintiff~~, with no interference~~.

110.     Some of these calls had connectivity issues, but most were completed successfully.

111.     On April 28, 2022, Plaintiff's criminal defense attorney Joseph M. Tully filed a motion to stay the appeal that was pending with the 2nd Circuit.  The motion, ~~on the basis that he~~  stated that Plaintiff intended to file for a new trial in the District court based on newly discovered evidence ~~in the form of three experts' reports concluding that the FBI had falsified and tampered with~~ of evidence tampering, ~~and that federal agents had committed~~ perjury ~~relevant to the conviction of possession of child pornography and sexual exploitation of a child~~.

112.     On the same day, ~~actress~~ Nic~~ki~~ole Clyne tweeted about the newly discovered evidence, and it has received approximately two million impressions.

16

**113.** On May 3, 2022, Plaintiff's criminal defense attorney Joseph M. Tully filed the motion pursuant to F.R.Crim.P. 33, requesting relief from the criminal conviction on the grounds of the newly discovered evidence. *U.S. v. Raniere*, Doc. 1169.

**114.** On May 4, 2022, Plaintiff was on a privileged legal call with attorney Tully, when the call was apparently terminated prematurely, and without warning.

**115.** ~~Mr. Tully anticipates that the Eastern District of New York will hold a hearing on the Rule 33 petition, and he needs to consult with Plaintiff in order to prepare for that hearing. Mr. Tully anticipates that Plaintiff -- who possesses first-hand knowledge of the criminal allegations against him -- is the individual best poised to assist Mr. Tully in the legal representation, namely, Mr. Tully's preparation for the upcoming Rule 33 hearing.~~

**116.** Shortly after the May 4 legal call was interrupted, Plaintiff's counsellor pulled Plaintiff out and instructed Plaintiff to go to an administ-or~~ive~~ 's office.

**117.** Within the federal prison system, a counsellor is the prison official who has routine, daily contact with federal prisoners. As such, a counsellor follows orders from supervisory and management personnel at the prison.

**118.** Plaintiff complied with the counsellor's instruction to visit the administrative office.

**119.** When he arrived at the administrative office, Defendant Anthony Gallion was present, and proceeded to ask Plaintiff about certain people on his list of

approved people that he could call and receive as visitors.  Many of them were attorneys or attorney's agents like Mr. Chakravorty.

120.    On information and belief, Gallion is with the Special Investigative ~~Services~~Agency ("SI~~AS~~") of the Federal Bureau of Prisons.

**121.**    Defendant Gallion then told Plaintiff that his list <u>of approved callers</u> was being "scrubbed", that Plaintiff would have to apply to the Unit Manager to have anyone re-approved, and that Mr. Chakravorty was not likely to be re-approved.

122.    ~~T~~At that point, t<u></u>he only way that Mr. Chakravorty ~~can~~could communicate with Plaintiff is if Mr. Chakravorty ~~is~~was on Plaintiff's approved list of callers. These calls are recorded and monitored by prison personnel, and are not treated as confidential even though Mr. Chakravorty is an agent of Plaintiff's criminal defense attorney Joseph Tully.

**123.**    Plaintiff asked Gallion why this was being done.

**124.**    Gallion refused to answer beyond an assertion that there was an investigation.

**125.**    On May 6, 2022, at 9AM, attorney Joseph Daugherty had a confidential legal call with Plaintiff. Upon information and belief, Defendants interfered and frustrated that legal call by, among other things, causing the phone call to be cut off before Plaintiff and Mr. D~~ao~~ugherty had concluded their conversation.

**126.**    On June 9, 2022, Defendants USP Tucson Warden, Carvajal, and Garland justified the restrictions on Mr. Chakravorty as being supported by Mr. Raniere's

18

conditions of supervised release, and took quotes from recorded conversations between Mr. Chakravorty and Mr. Raniere.  Doc. 14, p.2.

127.     The quotes from the recorded conversations were used out of context.  On information and belief, this was done intentionally in order to misrepresent the content of the conversations.

128.     Defendant USP Tucson Warden removed Mr. Chakravorty from Mr. Raniere's approved contacts under advice from the Counter Terrorism Unit.  Doc. 14, p.3.

129.     On June 17, 2022, Mr. Chakravorty requested to be recognized by the BOP as a paralegal to attorney Tully on an urgent basis.

130.     Attorney Clay Cook at USP Tucson denied Mr. Chakravorty's request for a legal visit, stating,

> 28 CFR 543.16(b)(3) and Program Statement 1315.07 at p. 19.  "The Warden may required each assistant to fill out and sign a personal history statement . . . ."  Also, "If necessary to maintain security or good order in the institution, the Warden may prohibit a legal assistant from visiting or corresponding with an inmate."   Given Mr. Chakravorty's history of being denied social visitation and social telephone privileges with Mr. Raniere at two separate BOP institutions, the NCIC form is also being required so that a formal background check can be completed.

131.     On June 17, 2022, the USP Tucson Warden reversed the decision of Attorney Cook and permitted a legal call but not a visit.

132.     On June 19, 2022, a second legal call was permitted between Mr. Chakravorty and Mr. Raniere.

19

**133.**      On June 23, 2022, Mr. Chakravorty requested a legal visit with Mr. Raniere.

**134.**      On June 24, 2022, the USP Tucson Warden denied the legal visit.  The Warden refused to give the reason for the re-reversal.

**135.**      Mr. Chakravorty continued to request calls or visits with Plaintiff.

**136.**      The USP Tucson Warden has denied each subsequent request for legal calls or visits made by Mr. Chakravorty.

**137.**      On information and belief, the USP Tucson Warden is acting arbitrarily and without penological justification.

**Mr. Raniere is Assaulted**

**138.**      On July 12, 2022, at the 69th Annual Attorney General's Awards, Defendant Garland honored the FBI agents that Plaintiff is accusing of falsifying and tampering with evidence in Plaintiff's criminal investigation for their actions in Plaintiff's case.

**139.**      On July 26, 2022, at approximately 6:50 A.M., Mr. Raniere was in the dining hall at USP Tucson, walking to a table with his breakfast tray when he was assaulted by Inmate Maurice Withers (BOP #10300-090) with a closed fist on Mr. Raniere's head and face.

**140.**      Mr. Raniere did not fight back.

**141.**      Mr. Raniere has limited knowledge of the assault.

**142.** On information and belief, the incident was captured on video and witnessed by several inmates and staff.

**143.** Plaintiff has not been permitted to view the video.

**144.** Mr. Raniere suffered a black eye, swelling, nausea, and dizziness for over a week.

**145.** Mr. Raniere asked for ice packs to help with the pain and swelling but the request was denied.

**146.** Mr. Raniere was given a disciplinary ticket for "201 – Fighting with another person."

**147.** On July 29, 2022, Mr. Raniere had a legal visit with undersigned counsel.

**148.** Mr. Raniere was told that he would have to use the non-contact attorney visit room and speak through a phone.

**149.** The phone in the non-contact attorney visit room did not function.

**150.** The staff were able to get clearance for Mr. Raniere to use the regular attorney visit room with handcuffs, a belly chain, and leg irons on during the visit.

**151.** On August 5, 2022, Mr. Raniere had another legal visit with undersigned counsel,

**152.** The visit was initially scheduled for 8:30 A.M., but was rescheduled at the last minute to 9:30 A.M.

**153.** When undersigned arrived, the staff insisted on using the non-contact room again.

**154.**     When the same problem occurred with the phone system, it took an hour for the staff to obtain approval.  As a result, the legal visit lasted only one hour instead of two.

**155.**     The justification given for the restrictions was the fact that Mr. Raniere was housed in the SHU pending investigation of his disciplinary ticket for fighting.

**156.**     On information and belief, the USP Tucson Warden is aware that Mr. Raniere was the victim of an assault and not a combatant.

**157.**     On information and belief, the USP Tucson Warden is following a pattern of retaliation for Plaintiff exercising his constitutional rights to challenge his criminal conviction and to speak to, and visit with, anyone not excluded by law or valid penological purpose.

**158.**     On August 23, 2022, the disciplinary ticket was dismissed.

**159.**     On September 5, 2022, Plaintiff had a legal visit with undersigned counsel. Plaintiff was still forced to wear painful handcuffs and belly chains for the visit.

**160.**     On October 13, 2022, a group of respected professionals including attorney Alan Dershowitz held a press conference in support of Mr. Raniere's Rule 33 petition.[3]

**161.**     On Monday, October 24, 2022, Plaintiff had a legal visit with undersigned and attorney Stoltz.

**162.**     Mr. Raniere was escorted to the visit by his counsellor.

---

[3] https://twitter.com/alandersh/status/1580670651039244288.  Accessed 11/3/2022.

22

163.     The counsellor told Mr. Raniere that the BOP was going to transfer him to another facility because he had too many legal calls and visits.

164.     On Tuesday, November 1, 2022, Plaintiff had a legal visit with undersigned.

165.     The counsellor escorting him to the visit again told Mr. Raniere that he would be transferred to another prison imminently.

166.     The counsellor said that Plaintiff would be transferred because he is getting too many legal calls and visits from attorneys.

167.     The counsellor said that USP Tucson did not have enough staff to accommodate Plaintiff's legal needs.

**168.**     If transferred, the BOP can keep Plaintiff in transit for weeks.

**169.**     Plaintiff will not be able to arrange communications with his attorneys while he is in transit.

**170.**     ~~On information and belief, Defendant VonBlankensee, or whoever the Warden was at the relevant time, was the main moving force behind the actions of Gallion both on May 4, 2022, May 6, 2022, and previously when Mr. Chakravortywas denied visitation with Plaintiff.~~

171.     On information and belief, Defendant ~~Carvajal~~ Peters, or whoever the Director of the BOP was at the relevant time, ~~was~~ is aware that federal prison wardens retaliate against individual prisoners based on personal animus and not supported by any legitimate penological purpose but fail~~ed~~s to take action to prevent it, and perpetuated the policy and practice.

23

## COUNT I

**Unlawful Frustration and Interference with First Amendment Access to the Courts**

**172.**      Plaintiff is neither a lawyer nor trained in the law. The First Amendment right of access to the courts includes with it a reasonable opportunity to communicate in a contemporaneous manner with his lawyers.

**173.**      As described above, on May 4, 2022, Defendants, in a non-frivolous manner, frustrated and interfered with Plaintiff's First Amendment right to communicate with his attorneys. By doing so, Defendants frustrated and interfered with Plaintiff's First Amendment right of access to the courts.

**174.**      Similarly, on May 4, 2022, Defendants threatened to continue to frustrate and interfere with Plaintiff's First Amendment right of access to the courts by effectively cutting off Plaintiff's ability to communicate by phone with his attorneys and their agents.

**175.**      Under this Count, Plaintiff seeks reasonable access to communicate with his attorneys and their agents, both in person and using contemporaneous telephonic methods, subject only to modest limitations that have a reasonable relationship to legitimate penological interests.

**176.**      Absent court action, Plaintiff will suffer irreparable harm.

**177.**      Granting Plaintiff's requested equitable relief will not impose an undue hardship on Defendants, who are required by the Constitution to grant reasonable access to the courts to all prisoners on a daily basis.

**178.**      The equities tip sharply in Plaintiff's favor.

**179.**      Under this Count, Plaintiff is entitled to both declaratory and injunctive

relief.

## COUNT II

### Retaliation Based on Rights Protected Under the First Amendment

**180.**      The First Amendment protects the right of all persons - including prisoners

- to have meaningful access to the Court. Nowhere is this right more critical than

when a prisoner seeks access to the courts for the express purpose of attacking his

underlying criminal conviction and sentence.

181.      The First Amendment protects the right of all persons to express themselves

and advocate for themselves without fear of retaliation.

182.      Prior to May 2, 2021, Plaintiff exercised his First Amendment rights by

communicating with Mr. Chakravorty in visits for the purpose of expressing his

wishes regarding his finances, legal affairs, and the conditions of confinement.

183.      On information and belief, Plaintiff's right to communicate with Mr.

Chakravorty was denied as retaliation for exercising his First Amendment rights.

184.      Prior to July 24, 2021, Plaintiff exercised his First Amendment rights by

communicating with Ms. Clyne in visits and over the phone for the purpose of

expressing his thoughts about his criminal case and conditions of confinement.

185.      On information and belief, Plaintiff's right to communicate with Ms. Clyne

was denied as retaliation for exercising his First Amendment rights.

**186.**      Prior to May 3, 2022, Plaintiff exercised this First Amendment right by

communicating with his criminal defense attorneys and their agents for the express

25

purposes of assisting them in preparing a timely Rule 33 petition in the federal court, asserting that newly discovered evidence justified the granting of a new trial in his underlying criminal prosecution.

**187.**     Less than 24 hours after Plaintiff's criminal defense attorney filed the Rule 33 petition, Defendants substantially, and in a non-frivolous manner, frustrated and impeded Plaintiff's ongoing ability to assist his criminal defense attorney by imminently threatening to cut off all telephonic and in-person communication with his attorneys.

**188.**     The short time between when Plaintiff exercised his First Amendment right to access the courts by filing an important petition in the federal courts on May 3, 2022 and the adverse action of Defendants in threatening him with this violative action raises a substantial likelihood that Defendants actions were retaliatory.

**189.**     Plaintiff is entitled to declaratory relief and injunctive relief under this Count. The injunctive relief that Plaintiff seeks is merely to maintain the status quo ante~~, pending administrative exhaustion~~. For the same reasons explained in Count I, above, Plaintiff is in imminent risk of suffering irreparable harm in the event that injunctive relief is not granted.

**COUNT III – SIXTH AMENDMENT INTERFERENCE WITH REPRESENTATION BY COUNSEL**

**190.**     Plaintiff is a criminal defendant.

**191.**     Defendants have deliberately interfered with the confidential relationship between Plaintiff and his criminal defense counsel.

26

192.     On information and belief, Defendants intend to transfer Mr. Raniere to another State in order to continue interfering with his attorney/client communications under the guise of an administrative transfer.

193.     The interference substantially prejudices the Plaintiff by denying Plaintiff the ability to timely communicate with his counsel during the time that his Rule 33 petition is pending. prepare his counsel for the upcoming Rule 33 hearing, and denying the ability of counsel to prepare and therefore to provide effective assistance of counsel for the hearing.

194.     Plaintiff's transfer from USP Tucson will cause irreparable harm  and directly impacts his constitutional right to assistance of counsel and to seek his legally available remedies to overturn his conviction.

195.     Any transfer of Plaintiff from USP Tucson will improperly frustrate his seeking redress for his grievance and will effectively moot this complaint without a decision on the merits.

196.     On information and belief, this interference was is not isolated, but rather part of a pattern and practice of interference intended to deprive Plaintiff of effective assistance of counsel.

### COUNT IV

**Interference with Sixth Amendment right to counsel and First Amendment retaliation by means of threatening a retaliatory transfer.**

27

197. Plaintiff is a criminal defendant with post-conviction motions currently pending before the United States District Court for the Eastern District of New York and a direct appeal pending before the Second Circuit Court of Appeals.

198. Plaintiff has been told recently on three separate occasions by USP Tucson staff that he is being transferred to another BOP facility because he receives "too many legal visits and calls."

199. Plaintiff has exercised his legal rights to counsel and seeks redress for violation of his First Amendment rights against retaliation by BOP staff.

200. Upon information and belief, BOP has approved Plaintiff's transfer and said transfer is imminent.

201. Plaintiff's transfer from USP Tucson will cause irreparable harm and directly impacts his constitutional right to assistance of counsel and to seek his legally available remedies to overturn his conviction.

202. Any transfer of Plaintiff from USP Tucson will improperly frustrate his seeking redress for his grievance and will effectively moot this complaint without a decision on the merits.


REQUEST FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court:

28

A. Issue a preliminary injunction to preserve the status quo pending administrative exhaustion, to include restraining Defendants, their employees, successors, and agents, from:

    1. Prohibiting, preventing, restricting, impeding, and/or obstructing Plaintiff from communicating with his attorneys using contemporaneous telephonic communications technologies, subject only to modest limitations that are reasonably related to legitimate penological interests of Defendants;

    2. Prohibiting, preventing, restricting, impeding, and/or obstructing Plaintiff from visiting in-person with his attorneys at the federal prison facility where he is currently housed, subject only to modest limitations that are reasonably related to legitimate penological interests of Defendants;

    3. Prohibiting, preventing, restricting, impeding, and/or obstructing Plaintiff from communicating with the employees and agents of his attorneys using contemporaneous telephonic communications technologies, subject only to modest limitations that are reasonably related to legitimate penological interests of Defendants;

    4. Engaging in other behavior that amounts to a non-frivolous frustration or interference with his First Amendment right to access the courts for the purpose of collaterally attacking his conviction and sentence;

B. Enter a judgment declaring that:

1. This court retains equitable powers to issue injunctions intended to maintain the status quo pending administrative exhaustion, regardless of the requirements imposed by 42 U.S.C. 1997e;

2. Defendants have violated Plaintiff's rights under the First Amendment;

3. Plaintiff is entitled under the First Amendment to communicate with his attorneys and his attorneys' employees, both in-person and using contemporaneous telephonic communications, for the purpose of discussing legal matters aimed at attacking his criminal sentence, and subject only to limited restrictions that are reasonably related to penological interests.

C. Attorneys' fees and costs accrued in bringing this action;

D. Such other relief as this court deems just and proper.

DATED this ~~ht6~~ 9th day of ~~May~~ September, 2022 by

/s/Stacy Scheff
STACY SCHEFF
Attorney for Plaintiff

30